# Exhibit B
# Redacted
# Complaint

# Exhibit A

Case 1:23-cv-04774-PAE    Document 1-2    Filed 06/06/23    Page 3 of 70

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| CARLYLE AVIATION MANAGEMENT LIMITED, ACCIPITER INVESTMENTS AIRCRAFT 4 LIMITED, VERMILLION AVIATION (TWO) LIMITED, ACCIPITER HOLDINGS DAC, MAVERICK AVIATION HOLDINGS LTD., MANCHESTER AVIATION FINANCE S.à r.l., WELLS FARGO TRUST COMPANY, N.A., not in its individual capacity but solely in its capacity as OWNER TRUSTEE, UMB BANK, N.A., not in its individual capacity but solely in its capacity as OWNER TRUSTEE, | Index No.: |
| Plaintiffs, | **COMPLAINT** |
|  | **JURY TRIAL DEMANDED** |
| v. | |
| FRONTIER AIRLINES, INC., | |
| Defendant. | |

Plaintiffs Carlyle Aviation Management Limited ("CAML"), Accipiter Investments Aircraft 4 Limited ("Accipiter"), Vermillion Aviation (Two) Limited ("Vermillion"), Accipiter Holdings DAC ("Accipiter Holdings"), Maverick Aviation Holdings Ltd. ("Maverick"), Manchester Aviation Finance S.à r.l. ("Manchester"), Wells Fargo Trust Company, N.A., not in its individual capacity but solely in its capacity as Owner Trustee ("Wells Fargo"), and UMB Bank, N.A., not in its individual capacity but solely in its capacity as Owner Trustee ("UMB"), bring this Complaint against Defendant Frontier Airlines, Inc. ("Defendant" or "Frontier") for Defendant's breaches of multiple contracts and tortious interference with one or more Plaintiffs' prospective business advantage, and hereby allege as follows:

Case 1:23-cv-04774-PAE    Document 1-2    Filed 06/06/23    Page 4 of 70

## PRELIMINARY STATEMENT

1.   Defendant is a commercial airline that leases 10 passenger aircraft, among others, that it uses in its business from certain of the Plaintiffs for which CAML acts as Servicer.  Plaintiffs are the beneficial owners and lessors of those aircraft, as well as certain of their affiliates.

2.   Plaintiffs and Defendant are parties to two litigations that are pending in the United States District Court for the Southern District of New York ("SDNY"), captioned *Frontier Airlines, Inc. v. AMCK Aviation Holdings*, No. 20-cv-09713-LLS, filed by Defendant on November 18, 2020 (the "2020 Litigation"), and *Frontier Airlines, Inc. v. AMCK Aviation Holdings*, No. 22-cv-02943-PAE, filed by Defendant on April 8, 2022 (the "2022 Litigation", and together with the 2020 Litigation, the "SDNY Litigations").

3.   Despite the litigation between the parties, they have an ongoing business relationship. Indeed, in recognition of the need to work together cooperatively even in the midst of pending litigation, in October 2022, Plaintiffs and Defendant, at Defendant's request, entered into a Non-Waiver and Preservation of Rights Agreement (the "Non-Waiver Agreement").  The Non-Waiver Agreement obligated the parties to "continue to cooperate in good faith regarding" a number of specified matters, which the agreement defines as "Lease Administration Activities."

4.   In addition, the aircraft Leases (defined below) each requires Defendant to cooperate with certain Plaintiffs on a range of different activities.

5.   Specifically, Section 20.2(a) of each of the Leases states that "[e]ach of Lessor [i.e., UMB or Wells Fargo] and Owner Participant [i.e., Accipiter or Vermillion] (and any subsequent permitted assignee or transferee) shall have the right at any time . . . to transfer ownership or beneficial ownership, as applicable, of the Aircraft," among other things.  And, to ensure that

Lessor and Owner Participant could accomplish their respective contractual obligations, they specifically bargained for an obligation for Frontier to cooperate with such transfer.

6.    Section 20.2(b) of the Leases states that "Lessee [i.e., Frontier] shall comply with all reasonable requests of Lessor or Owner Participant, and at the expense of Lessor, to cooperate in effecting" any "transfer, novation, assignment, mortgage, grant or other disposition referred to in paragraph (a) above and will execute any and all consents, agreements, amendments or other instruments . . . in form and substance reasonably satisfactory to Lessee . . . ."

7.    Sections 20.2(a) and 20.2(b) of the Leases do not create an exception for Frontier's obligations to further their positions in another litigation.

8.    Rather than comply with its obligations under the Non-Waiver Agreement and the Leases, Frontier has engaged in serial and ongoing breaches of their obligations, in an attempt to gain leverage over Plaintiffs and force a settlement of the SDNY Litigations.

9.    As detailed below, Plaintiffs have made repeated requests for Frontier to cooperate with certain Plaintiffs' attempts to sell certain aircraft and refinance others. All of Plaintiffs' contractual requests are industry standard, which any counterparty acting in good faith would comply with. But Frontier has unreasonably and unjustifiably withheld its consent.

10.   To take one example, Plaintiffs have requested that Frontier consent to a security assignment for each of the aircraft and a lease assignment for certain of the aircraft. These security assignments and lease assignments have no impact on Frontier's operations or interest in the aircraft. It would simply make it possible for certain Plaintiffs to sell or refinance the relevant aircraft. Such consents are granted as a matter of ordinary course in order to facilitate the widespread financing of the airline industry. But rather than grant the straightforward request, Frontier instead demanded that Plaintiffs include language in the security assignment

documentation ***subordinating the financier's security interests in the aircraft to Frontier's unsecured claims in the SDNY Litigations***, and subsequently demanded that Plaintiffs provide Frontier with either (i) a $60 million letter of credit for Frontier's benefit or (ii) a first lien mortgage against three of the aircraft selected by Frontier, to be perfected with filings on the International Registry and the Federal Aviation Administration's registry.  This request is not just totally off-market; it is nonsensical.  Virtually all of the monetary obligations under the Leases run ***from*** Frontier ***to*** Plaintiffs.  In other words, Frontier is, in effect, the "borrower" under the leases and Plaintiffs are the "lenders."  Frontier's request is akin to a homeowner demanding that his or her bank post a letter of credit to secure the bank's obligations under a mortgage.  This is just one unreasonable request among many, the effect of which has been to prevent Plaintiffs from selling or refinancing their aircraft and, as explained below, has damaged Plaintiffs by approximately $█

████.

  11. Accordingly, Plaintiffs have been forced to file this action for breach of contract and tortious inference of prospective business advantage.

### THE PARTIES

  12. Plaintiff Wells Fargo, not in its individual capacity but solely in its capacity as Owner Trustee under the Leases, is a national banking association with its designated main office in Ogden, Utah.

  13. Plaintiff UMB, not in its individual capacity but solely in its capacity as Owner Trustee under the Leases, is a national banking association headquartered in Kansas City, Missouri.

  14. Plaintiff Accipiter, Owner Participant for nine of the Leases and Guarantor for certain of those transactions, is a company incorporated under the laws of Ireland.

  15. Plaintiff Vermillion, Owner Participant for one of the Leases, is a company

incorporated under the laws of Ireland.

16. Plaintiff Accipiter Holdings, Guarantor for the other certain transactions involving Accipiter, is a company incorporated under the laws of Ireland.

17. Plaintiff Maverick is a company incorporated under the laws of the Cayman Islands. Maverick was established by non-party Maverick Aviation Partnership LP, which is incorporated under the laws of Canada. Maverick indirectly owns Accipiter and Vermillion.

18. Plaintiff Manchester is a company incorporated under the laws of Luxembourg. Manchester is wholly owned by Maverick.

19. Plaintiff CAML is a company organized and existing under the laws of Bermuda with its principal place of business in Dublin, Ireland.

20. Defendant is a corporation organized and existing under the laws of Colorado with its principal place of business in Denver, Colorado.

## JURISDICTION AND VENUE

21. The New York Civil Practice Law and Rules ("CPLR") Section 3033(1) permits jurisdiction over a non-domiciliary defendant pursuant to the parties' consent in a written, valid contract.

22. CPLR Section 501 permits contractual provisions fixing venue.

23. Pursuant to Section 20.15 of the Leases, Frontier has submitted to the jurisdiction of this Court for "any suit, action or proceedings relating to" that agreement "or any matter between the parties arising under or in connection with" that agreement. Frontier also waived any objection to venue in this Court.

**FACTUAL BACKGROUND**

### I.   THE LEASES

24.   Defendant is a party to individual lease agreements for ten Airbus A320 aircraft (the "Leases").[1]  One Aircraft Lease Agreement, between UMB and Frontier, executed on March 16, 2020, with the aircraft bearing manufacturer's serial number 10038, is attached hereto as Exhibit 1 and is an excerpted example of the Leases.  The ten Leases all contain substantially similar terms and the same format.

25.   The counterparty in each Lease is either UMB or Wells Fargo, acting not in each of their individual capacities but solely as the "Owner Trustees" under the terms of a related trust agreement.  Each Lease was signed by Frontier as the "Lessee" and either UMB or Wells Fargo as the "Lessor."

26.   Under each Lease, the Lessor acts for the beneficial owner of the aircraft, known as the "Owner Participant."

27.   Accipiter is the Owner Participant for nine of the Leases, and Vermillion is the Owner Participant for one Lease.

28.   At the time the Leases were entered, Accipiter and Vermillion were affiliates of AMCK Aviation Holdings Ireland Limited ("AMCK Holdings" or "AMCK").

29.   The Owner Trustee (UMB or Wells Fargo) legally owns the aircraft, whereas the Owner Participant (Accipiter or Vermillion) is the beneficial owner of the aircraft.  The Owner Trustee is also the Lessor, who leases the aircraft to Frontier to use as Lessee.  The Servicer (CAML) (described below) manages the sale, lease, and financing of the aircraft.

---

[1] Those Leases are for the aircraft bearing the following manufacturer's serial numbers: 8102, 8239, 8357, 8307, 8402, 8913, 8977, 9068, 9177, 10038.

30. The Lease has language that allows for the transfer of ownership of the aircraft pursuant to certain conditions. These provisions (cited below) govern transfers by the Lessors (UMB or Wells Fargo) or Owner Participants (Accipiter or Vermillion).

31. Section 20.2(a) of each of the Leases states that:

> Each of Lessor and Owner Participant (and any subsequent permitted assignee or transferee) shall have the right at any time, at its own expense and upon prior written notice to Lessee, to transfer ownership or beneficial ownership, as applicable, of the Aircraft, or to assign (including to assign as security), mortgage, novate, transfer, grant participations in, or otherwise dispose of its rights and obligations under this Agreement and the other Operative Documents, to any other person by outright transfer or assignment or collateral assignment or by operation of law and Lessee hereby consents to any such transfer or assignment; provided that . . . . (i) Lessee shall have no greater financial obligation or liability under this Agreement and the other Lessee Documents as a result of such transfer based on the facts and circumstances existing and applicable laws in effect at the time of such transfer, than it would have had if such transfer had not taken place . . . . (iii) in the case of a sale of the Aircraft by Lessor or transfer of the beneficial interest of Owner Participant in the Aircraft or a transfer (other than to an Affiliate of the Lessor Guarantor) of a controlling interest in the Owner Participant, any such assignee or transferee shall be a Permitted Transferee and shall unconditionally guaranty the obligations of Lessor under this Agreement pursuant to a Guarantee in form substantially similar to the Guarantee executed by Owner Participant in favor of Lessee unless the existing Lessor Guarantee will remain in full force and effect following such transfer. . . .

(Ex. 1 § 20.2(a).)

32. Section 20.2(b) of the Leases states that "Lessee [i.e., Frontier] shall comply with all reasonable requests of Lessor or Owner Participant, and at the expense of Lessor, to cooperate in effecting" any "transfer, novation, assignment, mortgage, grant or other disposition referred to in paragraph (a) above and will execute any and all consents, agreements, amendments or other instruments . . . in form and substance reasonably satisfactory to Lessee . . . ." (Ex. 1 § 20.2(b).)

33. Sections 20.2(a) and 20.2(b) of the Leases do not create an exception for Frontier's obligations to further their positions in another litigation. In other words, the Leases do not have any terms giving Frontier the right to perfect its interests in any litigation.

34. Four of the aircraft are subject to purchase agreements executed between certain Plaintiffs and third-party purchasers, pursuant to which a third-party purchaser has agreed to purchase the aircraft.

35. All of the aircraft are subject to financing agreements executed between certain Plaintiffs and third-party financiers, pursuant to which the financier has agreed to finance the aircraft pursuant to a temporary financing. In addition, six of the aircraft (including one of the aircraft subject to a purchase agreement) are subject to refinancing agreements executed between certain Plaintiffs and third-party financiers pursuant to a long-term financing.

## II.    THE 2020 LITIGATION

36. On November 18, 2020, Frontier filed the 2020 Litigation. The 2020 Litigation named AMCK Holdings and certain Plaintiffs in this action, Accipiter, Vermillion, Wells Fargo, UMB, as defendants.

37. Frontier asserted claims for breach of contract, breach of implied duty of good faith and fair dealing, breach of the covenant of quiet enjoyment, promissory estoppel, and fraud, in connection with a Framework Agreement, entered into on March 15, 2020, by and between Frontier and AMCK Holdings.[2]

38. Discovery has closed in the 2020 Litigation and the defendants' motions for summary judgment filed therein are currently pending before the court.

## III.    THE CARLYLE/CK TRANSACTION

39. In December 2021, CK Asset Holdings Limited ("CK"), the then-current ultimate corporate parent and majority shareholder of AMCK Holdings, Accipiter and Vermillion, announced an agreement to sell its aircraft leasing business to Maverick. AMCK Holdings

---

[2] AMCK Holdings is not a party to the proceedings here.

FILED: NEW YORK COUNTY CLERK 06/01/2023 04:26 PM
NYSCEF DOC. NO. 5
Case 1:23-cv-04774-PAE    Document 1-2    Filed 06/06/23    Page 11 of 70

INDEX NO. 652599/2023
RECEIVED NYSCEF: 06/01/2023

transferred its ownership in numerous corporate entities—including Vermillion—to Manchester, and then transferred its ownership interest in Manchester to Vermillion Aviation Holdings Limited ("Vermillion Holdings").

40. In April 2022, Vermillion Holdings transferred Manchester and another company that was the shareholder of Accipiter Holdings to Maverick (the "Carlyle/CK Transaction").

41. On April 12, 2022, the Carlyle/CK Transaction closed. As a result, the Owner Participants for the aircraft leased to Frontier were no longer indirectly owned by AMCK Holdings. Instead, they were indirectly owned by Maverick, and serviced by CAML.

42. The Carlyle/CK Transaction did not result in a change in the owner of any of the aircraft, which in each case remained the Wells Fargo or UMB, as applicable, and it did not result in a change in the Owner Participant or Guarantor of any Aircraft, which remained Vermillion, Accipiter or Accipiter Holdings, as applicable, and the Carlyle/CK Transaction did not change nor transfer the rights or obligations of any Lessor, Owner Participant or Guarantor.

43. Following the closing, CAML took on the role of Servicer under the Leases. On or about April 13, 2022, CAML provided Frontier with notices regarding this change.

IV.     **THE 2022 LITIGATION**

44. Days before the Carlyle/CK Transaction closed, Frontier filed the 2022 Litigation. Complaint, *Frontier Airlines, Inc. v. AMCK Aviation Holdings*, No. 22-cv-02943-PAE (S.D.N.Y. Apr. 8, 2022), ECF No. 1. The 2022 Litigation named several Plaintiffs in this action as defendants, including Accipiter, Vermillion, Accipiter Holdings, Maverick, Manchester, Wells Fargo, and UMB. Frontier also named AMCK Holdings as a defendant.

45. On June 24, 2022, Frontier filed an amended complaint naming CAML as a defendant. Amended Complaint, *Frontier Airlines, Inc. v. AMCK Aviation Holdings*, No. 22-cv-02943-PAE

(S.D.N.Y. June 24, 2022), ECF No. 21.

46. On September 16, 2022, Frontier filed a second amended complaint, adding Vermillion Holdings as a defendant. The second amended complaint contains claims of breach of contract, declaratory relief, and voidable transfer. Second Amended Complaint, *Frontier Airlines, Inc. v. AMCK Aviation Holdings*, No. 22-cv-02943-PAE (S.D.N.Y. Sept. 16, 2022), ECF No. 35. No other operators transacting with the Plaintiffs have filed a lawsuit against Plaintiffs with similar claims.

47. On October 7, 2022, several defendants jointly moved to dismiss Frontier's second amended complaint. Defendants' Motion to Dismiss the Second Amended Complaint, *Frontier Airlines, Inc. v. AMCK Aviation Holdings*, No. 22-cv-02943-PAE (S.D.N.Y. Oct. 7, 2022), ECF No. 38. Defendant Vermillion Holdings filed a separate motion to dismiss on November 10, 2022, due to failure of service of process. Motion to Dismiss the Second Amended Complaint, *Frontier Airlines, Inc. v. AMCK Aviation Holdings*, No. 22-cv-02943-PAE (S.D.N.Y. Nov. 10, 2022), ECF No. 45. The defendants' motions to dismiss are currently pending before that court.

## V.    THE NON-WAIVER "COOPERATION" AGREEMENT

48. Despite the pendency of litigation between certain Plaintiffs and Frontier, they still had business to conduct. At Frontier's request, in mid-2022, CAML began engaging with Frontier to facilitate ordinary course activities relating to the aircraft, including the sale or refinancing of the aircraft, leased by Frontier.

49. Sales and financings of aircraft are typical and ordinary course transactions, which have nothing to do with the litigations pending between the parties. Indeed, to make that clear, and to make clear that Plaintiffs were not trying to seek any advantage in a litigation, Plaintiffs agreed, at Frontier's request, to enter into an agreement that allowed the parties to continue

working together on commercial and sale operations, among other ordinary course matters, without prejudicing their litigation positions.

50. On October 21, 2022, Plaintiffs and Frontier executed the Non-Waiver Agreement.

51. In relevant part, the Non-Waiver Agreement states the following:

Despite the existence of the [2022 Litigation] and the parties' respective claims and defenses asserted or potentially to be asserted therein, the Parties recognize the mutual operational benefits to the Parties from cooperating with each other in good faith regarding the day-to-day administration of the Lease Agreements and the Aircraft, including, without limitation, paying and accepting rent, processing and administering lease returns, Aircraft use reports, Aircraft registration renewals, Aircraft and record inspections, insurance certificates, consents, lease amendments, aircraft/lease financings, owner trustee and owner participant assignments and Aircraft sales (and related transfers, notices and acknowledgments, replacement of lessor guarantees, updated insurance certificates and matters ancillary thereto), warranty and insurance claims, notices, and the like in accordance with the terms of the Lease Agreements ("Lease Administration Activities"). ***Accordingly, the Parties hereby confirm that they will continue to cooperate in good faith regarding all Lease Administration Activities***.

(Non-Waiver Agreement, Paragraph 4, attached hereto as Exhibit 2 (emphasis added).)

52. As described below, however, Frontier has utterly failed to comply with its obligations under the Non-Waiver Agreement and the Leases. Instead, Frontier has consistently been uncooperative and acted unreasonably and in bad faith for almost eight months in contravention of the Non-Waiver Agreement and the Leases. Plaintiffs made repeated requests for Frontier to cooperate with Plaintiffs' attempts to sell certain aircraft and refinance others, which Frontier was already obliged to do pursuant to the Leases and Non-Waiver Agreement. Frontier continued to be uncooperative, so Plaintiffs then offered a new guaranty, with a new guarantor worth hundreds of millions of dollars. This offer was made as an accommodation by Plaintiffs and was not required under the Leases. Instead of accepting Plaintiffs' offer, Frontier requested terms that are not market and are by no means industry standard—either (i) a letter of credit from CAML for Frontier's benefit or (ii) a first lien mortgage against three of the aircraft selected by Frontier—

despite Frontier not being a financier of any of the aircraft.

## VI. FRONTIER'S BREACHES

53. From mid-2022 through April 2023, certain Plaintiffs have tried to engage with Frontier in good faith to negotiate various ordinary-course agreements in connection with refinancing or sales of the Aircraft, including security notices and acknowledgments, internal trust transfers, lease assignments, a guaranty, and a guaranty termination, in order to effectuate the sale and financing of the aircraft.

54. Plaintiffs have requested that Frontier consent to a security assignment and lease assignment for certain of the aircraft subject to the Leases in order for Plaintiffs to sell or refinance the aircraft. These security assignments and lease assignments have no impact on Frontier's operations or interest in the aircraft. Such consents are granted as a matter of ordinary course in the airline industry, including by major U.S. air carriers, and have been granted by Frontier. The Leases, as is standard for operating leases with commercial airlines, expressly contemplate that security assignments and lease assignments will occur and require Lessee's cooperation with documentation that may be required in connection with such security assignments and lease assignments.

55. In November and December 2022, Frontier and CAML sent multiple letters regarding CAML's executed letters of intent to sell four leased aircraft, which CAML gave notice to Frontier of on November 16, 2022.

     a. On November 23, 2022, Frontier indicated that the purported transfers could be void pending the 2022 Litigation and made several requests for information regarding the transfers.

     b. On November 29, 2022, CAML provided responses to Frontier's requests for

information, and CAML reminded Frontier that it agreed to cooperate in good faith

regarding the administration of the leases of the aircraft, including with sales and

financings, pursuant to the Non-Waiver Agreement.

c. On December 1, 2022, Frontier indicated that it was entitled to evaluate and assess

whether the transfers and security assignments will satisfy the transfer requirements

of the Lease Agreements.

56. From December 5 to December 9, 2022, CAML contacted Frontier several times for

updates on the draft security notices and the lease assignment document. CAML would email

Frontier eight more times for a copy of the draft lease assignment, which Frontier insisted on

drafting itself based on a form it had prepared, but never entered into, with AMCK. CAML did

not receive the draft lease assignment from Frontier until January 22, 2023.

57. Frontier has also insisted on including language related to the SDNY Litigations in the

security assignment notices and the lease assignment.

58. Frontier's proposed language in the security assignment notice is, in relevant part, as

follows:

> Each of the Lessor and the Security Trustee agrees, covenants, represents and
> warrants for the benefit of the Lessee that the security assignment transaction
> described hereunder (including any associated liens and encumbrances of Security
> Trustee) complies with the applicable terms and conditions of Clause 20.2 of the
> Lease and that pursuant to Clause 20.2(a)(ii) Lessee's rights, including but not
> limited to Lessee's rights as plaintiff and a judgment creditor (as applicable) arising
> from or in connection with the pending lawsuits filed in U.S. District Court for the
> Southern District of New York as case numbers 1:22-cv-02943 and 1:20-cv-09713,
> including, without limitation, Lessee's right to collect and recover damages, shall
> not be restricted or otherwise prejudiced as a result of such security assignment
> transaction. Any prejudice to or loss of priority of Lessee's rights and interests as
> a judgement creditor as a result of the security assignment described herein shall be
> deemed a restriction to the Lessee's rights under the Lease and other Lessee's
> Documents. If any such restriction occurs, the Lessor and the Security Trustee shall
> immediately upon the request of the Lessee subordinate any liens, security interests,
> encumbrances and collection rights of the Security Trustee against property or

assets, including, without limitation, against the Aircraft, the Lease Documents and monies held pursuant the Lease Documents, to the judgment creditor rights of the Lessee.

(Excerpt of Frontier's Security Assignment Redline received from Lane Powell via email on February 26, 2023, Paragraph 7, attached hereto as Exhibit 3.)

59.   Frontier's proposed language in the lease assignment to UMB as the New Lessor is, in

relevant part, as follows:

The purported transfer of the Aircraft and Lease (as such term is defined in Schedules 1 and 2 hereto) contemplated hereunder is subsequent to the purported sale of aircraft assets by CK Capital (Hong Kong) Limited and related entities to New Owner Participant Parent Assignor and related transactions (the "Specified Transaction"), which Specified Transaction was not consented to by Lessee and is being challenged by Lessee as novations conducted in violation of Clause 20.2 of the Lease and a fraudulent conveyance to prevent Lessee from collecting any potential judgement under the Actions (as defined below).  Prior to the Specified Transaction, Lessee filed actions against Assignors, Existing Owner Participant, and other affiliates to Existing Owner Participant for breach of contract, fraud and other claims arising from the parties' dealings in connection with contracts among the parties including the Lease and other "Operative Documents" (as such term is defined in the Lease).  As a result of these actions two cases are pending with the U.S. District Court for the Southern District of New York (the "Court") under case numbers 1:22-cv-02943 and 1:20-cv-09713 (collectively, the "Actions," each an "Action").

(A). In the Action bearing case number 1:22-cv-02943, Lessee has sought determinations that (1) Lessee was harmed by conduct by Assignor and other defendants and (2) that the Specified Transaction constitutes a lessor default under the Lease and other Operative Documents and with respect to the Specified Transaction, Lessee intends to seek an order declaring such novation as void and seek other available remedies. The named defendants in the Actions deny wrongdoing.  Lessee is entering into this Agreement as an accommodation to Existing Owner Participant to facilitate daily operations of Lessor, but such accommodations by Lessee are done without waiver of any rights, remedies or contentions relating to the Actions, including, without limitation, Lessee's challenge of the validity of the Specified Transaction, right to void the Specified Transaction and right to recover damages from the defendants in the Actions.

(Excerpt of Frontier's Lease Assignment Redline received from Lane Powell via email on February 26, 2023, Background Section A, attached hereto as Exhibit 4.)

60. Frontier's proposed language is unreasonable because, among other reasons, it (i) requires the Lessor to agree that the Leases provide Lessee certain rights or benefits that are not stated in the Leases, including that the Lessee has a right to a particular priority position as a creditor pursuant to the Lease and that the Leases provide that the Lessee's claims under the SDNY Litigation not be prejudiced, (ii) require the Lessor's financier's security interest in any of Lessor's assets to be subordinated to the Lessee's judgement creditor rights, and (iii) memorialize that Lessor defaulted under the Leases, which is inaccurate.

61. Although it was under no obligation to do so, to try to respond to Frontier's purported concerns, and in an effort to mitigate the parties' losses and to facilitate the closure of sales or financings, on March 24, 2023, CAML sent Frontier a guaranty proposal.

62. The Guarantor under each Lease is currently Accipiter Holdings, Accipiter, or Vermillion. As part of the guaranty proposal, CAML has offered additional security to Frontier pursuant to a new "Guaranty," by proposing that Maverick Aviation (Ireland) DAC, a subsidiary of Maverick Aviation Partnership LP, having a net worth of hundreds of millions of US dollars, provide a guaranty in favor of Frontier as to payment of amounts determined to be owed to Frontier in the SDNY Litigations by a defendant that is a direct or indirect subsidiary of Maverick Aviation Partnership LP, pursuant to a final, non-appealable judgment.

63. After certain Plaintiffs and Frontier exchanged several proposals for the Guaranty, Frontier most recently sent a counterproposal on May 5, 2023. In Frontier's response, as opposed to granting Plaintiffs' straightforward request for a consent to a security assignment and lease assignment for certain of the aircraft, Frontier instead demanded that Plaintiffs provide Frontier with either (i) a $60 million letter of credit for Frontier's benefit, or (ii) a first lien mortgage against

three of the aircraft selected by Frontier (which mortgages will be perfected with filings on the International Registry and the Federal Aviation Administration's registry).

64. All of the monetary obligations under the Leases run *from* Frontier *to* Plaintiffs. In other words, Frontier is, in effect, the "borrower" under the leases and Plaintiffs are the "lenders". Frontier's request is akin to a homeowner demanding that his or her bank post a letter of credit to secure the bank's obligations under a mortgage, which is unreasonable.

65. Frontier's constant stall tactics and unreasonable requests have caused Plaintiffs to suffer damages because certain Plaintiffs have been unable to move forward with the sale of the four aircraft for a combined total of approximately $█████████, from which Plaintiffs would make a profit of approximately $████████. Moreover, Plaintiffs have incurred millions of dollars in expenses that they would have avoided if they had been able to sell the aircraft months ago.

66. Frontier's tactics have also prevented certain Plaintiffs from closing on several refinancings of six aircraft from which Plaintiffs would have obtained equity proceeds of approximately $████████, and would have stopped incurring certain other expenses.

67. CAML, as Servicer, sent a letter, dated April 27, 2023, to Frontier detailing Frontier's multiple breaches of the Leases, and attaching notices previously sent to Frontier informing Frontier of the certain contemplated transactions regarding the aircraft (the "April 27 Letter").

68. On May 3, 2023, Frontier sent a letter to CAML responding to the April 27 letter. In that letter, Frontier not only continued to refuse Plaintiffs' reasonable requests, but also incorrectly asserted, among other things, that CAML refuses to provide a guarantee for the proposed transfer. As a result, on May 26, 2023, Plaintiffs issued notices of default to Frontier under the relevant Leases.

## FIRST CLAIM FOR RELIEF
### (BREACH OF CONTRACT OF THE LEASES)

69. Plaintiffs repeat and reallege each allegation in paragraphs 1 through 68 above as if fully set forth herein.

70. The Leases are binding agreements.

71. Plaintiffs have fulfilled their obligations under the Leases.

72. Pursuant to Section 20.2(b) of the Leases, Defendant must cooperate in effecting any transfers of ownership of the aircraft and in refinancing the aircraft.

73. Defendant has breached its obligations under the Leases by acting unreasonably and in bad faith in the negotiations of transactions with Plaintiffs.

74. Defendant has therefore breached the Leases.

75. Defendant's breaches, which have prevented Plaintiffs from selling or refinancing the aircraft have harmed Plaintiffs in the form of additional interest and other amounts Plaintiffs have had to pay, as well as the proceeds that would have been realized from the sale of the aircraft.

## SECOND CLAIM FOR RELIEF
### (BREACH OF CONTRACT OF THE NON-WAIVER AGREEMENT)

76. Plaintiffs repeat and reallege each allegation in paragraphs 1 through 75 above as if fully set forth herein.

77. The Non-Waiver Agreement, requested by Defendant, is a binding agreement.

78. Plaintiffs have fulfilled their obligations under the Non-Waiver Agreement.

79. Pursuant to Paragraph 4 of the Non-Waiver Agreement, Defendant is required to cooperate with Plaintiffs in good faith in administering the Leases.

80. Defendant has defaulted on its obligations under the Non-Waiver Agreement.

81. Defendant has at every opportunity wrongfully stalled negotiations or made

unreasonable requests with respect to the transactions and has thus failed to cooperate in good faith pursuant to the Non-Waiver Agreement.

82.  Defendant therefore has breached the Non-Waiver Agreement.

83.  Defendant's breaches, which have prevented Plaintiffs from selling or refinancing the aircraft have harmed Plaintiffs in the form of additional interest and other amounts Plaintiffs have had to pay, as well as the proceeds that would have been realized from the sale of the aircraft.

### THIRD CLAIM FOR RELIEF
### (TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)

84.  Plaintiffs repeat and reallege each allegation in paragraphs 1 through 83 above as if fully set forth herein.

85.  Certain Plaintiffs have signed sales contracts with third parties to sell certain aircraft. But to complete those sales, Defendant is required to provide certain consents, which are discussed above.

86.  Defendant has interfered with this transaction by wrongfully withholding consent so as to apply pressure on Plaintiffs in connection with the SDNY Litigation, and in an attempt to extract a favorable settlement from Plaintiffs and CK.

87.  Defendant's breaches, which have prevented certain Plaintiffs from selling or refinancing the aircraft, have harmed Plaintiffs in the form of additional interest and other amounts Plaintiffs have had to pay, as well as the proceeds that would have been realized from the sale of the aircraft.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs are entitled to judgment as against Defendant:

(i)    that Defendant breached the Leases and the Non-Waiver Agreement;

(ii)   that Defendant tortiously interfered with Plaintiffs' prospective economic

advantage;

(iii)    ordering Defendant to pay Plaintiffs damages for breaches of the Leases and the Non-Waiver Agreement in an amount to be determined at trial, but in an amount no less than $█████ with pre- and post-judgment interest thereon;

(iv)    entering an order enjoining Defendants from further breaches of the Leases and the Non-Waiver Agreement;

(v)    an award of punitive damages against Defendant;

(vi)    an award of Plaintiff's reasonable attorneys' fees, costs, and disbursements in this action; and

(vii)    awarding any other and further relief that the Court deems just and proper.

Dated:  May 26, 2023
         New York, New York

**MILBANK LLP**

Jed M. Schwartz
Emily Werkmann
55 Hudson Yards
New York, New York 10001
Tel: (212) 530-5000
JSchwartz@milbank.com
EWerkmann@milbank.com

*Attorneys for Plaintiffs*

# Exhibit 1

Case 1:23-cv-04774-PAE    Document 1-2    Filed 06/06/23    Page 23 of 70

EXECUTION VERSION

UMB BANK, N.A.,
NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS OWNER TRUSTEE,
AS LESSOR

AND

FRONTIER AIRLINES, INC.,
AS LESSEE

---

AIRCRAFT LEASE AGREEMENT

LEASE OF ONE AIRBUS MODEL A320-251N
AIRCRAFT, MANUFACTURER'S SERIAL NO:  10038
UNITED STATES REGISTRATION MARK:  N370FR
MAKE AND MODEL OF ENGINES: CFM
INTERNATIONAL, INC. MODEL LEAP-1A26
SERIAL NUMBERS OF ENGINES: 599709 AND 599720

---

COUNTERPART NO. ___ OF SIX (6) CONSECUTIVELY NUMBERED, MANUALLY EXECUTED COUNTERPARTS.  TO THE EXTENT THAT THIS AIRCRAFT LEASE AGREEMENT CONSTITUTES CHATTEL PAPER UNDER THE UNIFORM COMMERCIAL CODE IN THE UNITED STATES OF AMERICA OR ANY CORRESPONDING LAW IN ANY FOREIGN JURISDICTION, NO SECURITY INTEREST IN THIS AIRCRAFT LEASE AGREEMENT MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART HERETO OTHER THAN COUNTERPART NO. 1.

# CONTENTS

Clause                                                                              Page

1.   Definitions and Interpretation .................................................................................1
2.   Representations and Warranties .............................................................................18
3.   Conditions Precedent..............................................................................................22
4.   Commencement.......................................................................................................28
5.   Disclaimers .............................................................................................................30
6.   Rent and Other Payments .......................................................................................32
7.   Fees and Expenses ..................................................................................................37
8.   General Undertakings..............................................................................................37
9.   Operational Undertakings.......................................................................................39
10.  Maintenance and Repair .........................................................................................48
11.  Engines ...................................................................................................................56
12.  Title ........................................................................................................................60
13.  Manufacturer's Warranties .....................................................................................60
14.  Insurances ...............................................................................................................61
15.  Loss, Damage and Requisition ...............................................................................69
16.  Default ....................................................................................................................71
17.  Payments on Event of Default ................................................................................78
18.  Redelivery ..............................................................................................................81
19.  Indemnities .............................................................................................................85
20.  Further Provisions ..................................................................................................94

## SCHEDULES

Schedule 1 Aircraft Description.........................................................................Sch. 1-1
Schedule 2 Lease Agreement Supplement No. 1 ...............................................Sch. 2-1
Schedule 3 Officer's Certificate ........................................................................Sch. 3-1
Schedule 4 Redelivery Condition ......................................................................Sch. 4-1
Schedule 5 Maintenance Status Report..............................................................Sch. 5-1
Schedule 6 Basic Rent and Other Terms ...........................................................Sch. 6-1
Schedule 7 Form of Irrevocable Letter of Credit...............................................Sch. 7-1
Schedule 8 Maintenance Payments....................................................................Sch. 8-1
Schedule 9 Form of Quiet Enjoyment Letter.....................................................Sch. 9-1
Schedule 10 Form of Return Acceptance Certificate .........................................Sch. 10-1
Schedule 11 Form of Acceptance Certificate .....................................................Sch. 11-1

INDEX NO. 652599/2023
RECEIVED NYSCEF: 06/01/2023
Case 1:23-cv-04774-PAE    Document 1-2    Filed 06/06/23    Page 25 of 70

**THIS AIRCRAFT LEASE AGREEMENT** (this "**Agreement**") is made this $\underline{16}$ day of March, 2020.

**BETWEEN**:

(1)  **UMB BANK, N.A.,** a national banking association organized under the laws of the United States of America having its principal office at 6550 S. Millrock Drive, Suite 150, Salt Lake City, UT 84121, not in its individual capacity but solely as owner trustee under the Trust Agreement (the "**Lessor**"); and

(2)  **FRONTIER AIRLINES, INC.**, a corporation under the laws of the State of Colorado having its principal place of business at 4545 Airport Way, Denver, Colorado 80239, United States of America (the "**Lessee**").

**IT IS AGREED** as follows:

1.  **DEFINITIONS AND INTERPRETATION**

1.1  **Definitions**

In this Agreement the following words and expressions have, except where the context otherwise requires, the following meanings:

"**6Y Check**" means the structural inspection of the Aircraft as defined by the latest revisions of the Maintenance Program, and which shall include but will not be limited to (i) the 6-year or equivalent Zonal, Structural and Systems/Powerplant/APU Inspection Program tasks, (ii) the relevant C-Check and lower checks, (iii) any CPCP tasks falling due at that interval and (iv) all Supplementary Structural Inspection (SSI) items.

"**12Y Check**" means the structural inspection of the Aircraft as defined by the latest revisions of the Maintenance Program, and which shall include but will not be limited to (a) the 12-year or equivalent Zonal, Structural and Systems/Powerplant/APU Inspection Program tasks; (b) the relevant C-Check and lower checks; (c) any CPCP tasks falling due at that interval; and (d) all Supplementary Structural Inspection (SSI) items.

"**Acceptance Certificate**" means the acceptance certificate substantially in the form set out in Schedule 11.

"**Additional Insured**" has the meaning specified in Section 14.5(b)(i).

"**Affiliate**" means, in respect of any person, any person directly or indirectly controlling, controlled by, or under common control with such first person or within the same corporate group as such first person; and a person shall be deemed to control another person if such first person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other person, whether through the ownership of voting securities, contract or otherwise.

"**After-Tax Basis**" means, in respect of an amount (the "**base amount**") with respect to a person, the base amount supplemented by a future payment (the "**additional amount**"), if necessary, to such person such that, after the sum of the base amount and

the additional amount is reduced for all Taxes, if any, imposed on such person in respect of the sum of the base amount and the additional amount, the resulting amount shall be equal to the original base amount.

"**Agreed Value**" means the amount specified in Schedule 6.

"**Agreement**" means this Aircraft Lease Agreement and the Schedules hereto.

"**Aircraft**" means (a) the aircraft described in Part A of Schedule 1, including the Airframe, the Engines, the APU and all Parts installed in or on the Airframe at Delivery and all BFE; (b) all substituted and/or replacement Parts at any particular time installed in or on such aircraft; (c) any Parts installed in or on the Airframe following Delivery which have become the property of Lessor pursuant to this Agreement or a Lessee's Document; and (d) the Aircraft Documents; including, in the case of (a), (b) and (c), any Part which is for the time being detached from such aircraft but remains the property of Lessor pursuant to this Agreement.

"**Aircraft Documents**" means all of the documentation set forth or referred to in Part B of Schedule 1 and as may be supplemented from time to time, including on the Delivery Date (as set out in Annex 2 to Lease Supplement No. 1) and at redelivery of the Aircraft (as set out in Annex 2 to the Return Acceptance Certificate), and all technical data, manuals supplied by the Manufacturer or any other manufacturer or supplier (including, but not limited to, any updated or revised manuals), logs, records (including all historical records), computer data media and other materials and documents kept by Lessee or for the benefit of Lessee by any third party after Delivery or required to be kept with respect to the Aircraft or any part thereof whether in compliance with any applicable law or this Agreement or any requirement for the time being of the Aviation Authority or otherwise.

"**Aircraft 6Y Maintenance Payment Rate**" means the amount specified in Schedule 6.

"**Aircraft 12Y Maintenance Payment Rate**" means the amount specified in Schedule 6.

"**Airframe**" means the Aircraft, excluding the Engines, the APU and the Aircraft Documents.

"**Airframe Warranties Agreement**" means the Airframe Warranties Agreement, dated as of the Delivery Date, entered into by the Manufacturer, together with the initial notice thereunder specifying the Lessee as the "Initial Entitled Party" and specifying the Lessor as the "Initial Controlling Party", together with each and every further notice issued thereunder in accordance with the terms of such agreement, or such other agreement relating to the Manufacturer's airframe warranties in respect of the Aircraft entered into (or consented to, as the case may be) by the Lessor, the Lessee and the Manufacturer.

"**Airworthiness Directive**" means an airworthiness directive issued by the FAA.

"**Airworthiness Directive Threshold**" means the amount set forth in Schedule 6.

"**AMCK Aviation**" means AMCK Aviation Holdings Ireland Limited.

"**AMM**" means the latest revision of the Manufacturer's Aircraft Maintenance Manual.

"**Annual Adjustment Date**" means the first day of the calendar month in which the Delivery Date occurred.

"**Approved Maintenance Performer**" means any person qualifying as a FAR-145 Approved Maintenance Organization and, for the purposes of any Engine Performance Restoration or Fan and/or LPT Module Performance Restoration, a person approved by the Engine OEM.

"**APU**" means (a) the auxiliary power unit specified in Part A of Schedule 1 and (b) any replacement APU unit installed on the Aircraft in accordance with Clause 10.4(d), including any such auxiliary power unit which, having been removed from the Aircraft, remains the property of Lessor pursuant to this Agreement.

"**APU Cycle**" means each cycle or part thereof elapsing from the moment at which the APU commences operating until the APU is shut down, whether for aircraft operations or testing.

"**APU Hour**" means each hour or part thereof elapsing from the moment at which the APU commences operating until the time the APU is shut down, whether for aircraft operations or testing.

"**APU Maintenance Payment Rate**" means the amount specified in Schedule 6.

"**APU Overhaul**" means a complete power section disassembly, inspection and repair in accordance with the APU manufacturer's then current workscope planning guide entailing a complete disassembly of the power section at a minimum.

"**Assignment of Insurances**" means the Assignment of Insurances, dated as of the Delivery Date, between Lessor and Lessee together with the Notice and Acknowledgment relating thereto and entered into among each of the foregoing persons and acknowledged by Lessee's insurer or insurance broker, as the case may be.

"**Aviation Authority**" means the FAA and any successor thereto or other Government Entity which shall have control or supervision of civil aviation in the State of Registration or have jurisdiction over the registration, airworthiness or operation of, or other matters relating to, the Aircraft.

"**Back to Birth Traceability**" means original documentary evidence specifying the part number and the unique serial number, and providing a detailed full operational history record acceptable to an EASA or FAA regulatory standard but in any event having the following:  (a) the Original Delivery Document where Original Delivery Document means (i) for a part delivered new as a spare part, the manufacturer's airworthiness document (FAA Form 8130-3 or EASA Form 1) showing the part number and serial number; and (ii) for a part delivered new installed on an assembly, the manufacturer's assembly bill of material listing showing part number, serial number, assembly serial number and where relevant the as-delivered model and thrust rating; (b) a certified removal/installation ('on/off') transaction history detailing an unbroken record of the hours and cycles elapsed at each relevant thrust rating (for engine LLPs) from new up to current; and (c) a statement from the previous operator disclosing whether or not it

was involved in any major incident or accident, exposed to over-temperature extreme stress condition or immersed in salt water and whether or not it was obtained from any government or military source.

"**Bankruptcy Code**" means Title 11 of the United States Code.

"**Basic Rent**" means all and any amounts payable under Clause 6.1(a).

"**Basic Rent Payment Date**" has the meaning specified in Schedule 6.

"**BFE**" means the buyer furnished equipment supplied or purchased by or on behalf of the Lessee in respect of the Aircraft for installation by the Manufacturer pursuant to the Purchase Agreement on or before the Delivery Date or by Lessee following the Delivery Date, in each case as agreed by Lessor and/or the Servicer on behalf of the Lessor on the one hand and Lessee on the other hand, it being agreed that such buyer furnished equipment will include the buyer furnished equipment specified in Schedule 1.

"**BFE Bill of Sale**" means the bill of sale relating to the BFE to be executed by Lessee in favor of Lessor on the Delivery Date.

"**Break Costs**" means any costs, expenses, losses, liabilities, premium or penalties which the Lessor or the Owner Participant or any Affiliate of the Owner Participant is required to pay in order to repay funds raised to finance or refinance the Lessor's acquisition or ownership of the Aircraft or secured directly or indirectly by the Aircraft, or in unwinding (or maintaining or continuing to make payments under) any swap, hedge, cap, forward interest agreement or other financial instrument entered into in whole or in part in connection with the leasing or financing or refinancing of the Aircraft or secured by the Aircraft.

"**Business Day**" means (a) with respect to any requirement under the Lessee's Documents for the Lessee to make payments in U.S. Dollars, a day other than Saturday or Sunday, on which banks are open in the State of Colorado and the State of New York, USA and (b) for all other matters, a day, other than a Saturday or Sunday, on which banks are open in Dublin, Ireland, and the State of Colorado and the State of New York, USA for the transaction of business of the nature required by this Agreement.

"**Cape Town Convention**" means, collectively, the official English language texts of the Convention on International Interests in Mobile Equipment (the "**Convention**"), the Protocol to the Convention on Matters Specific to Aircraft Equipment (the "**Protocol**") both signed in Cape Town, South Africa on 16 November 2001 and the regulations and procedures enacted by the Supervisory Authority of the International Registry thereunder.

"**C-Check**" means a maintenance check on the Airframe under the Maintenance Program consisting of full and complete zonal, systems and structural inspection checks, all in accordance with the Maintenance Program, or if the Maintenance Program permits such structural checks to be performed in phases, the performance of such phases shall constitute a constitute a complete zonal, systems and structural block "C" check, but in any event not including repairs arising as the result of operational or maintenance mishandling or accidental damage, which will be sufficient to clear the

Aircraft for the C-Check Interval, which on the date hereof is 7,500 Flight Hours, 4,250 Cycles and 24 months, as such figures may be increased in accordance with the Maintenance Program.

"**C-Check Interval**" means the then current inspection intervals (or its equivalent in the future) in the Maintenance Program without reference to the specific tasks associated with such "Inspection Interval".

"**Certificated Air Carrier**" means any person (except the United States government) that: (a) is a "citizen of the United States", as defined in Section 40102(a)(15)(c) of the Title 49 of the United States Code and (b) holds both (i) a Certificate of Public Convenience and Necessity issued under Section 41102 of Title 49 of the United States Code by the Department of Transportation or predecessor or successor agency thereto, or in the event such certificates are no longer issued, a person meeting the requirements set forth immediately above holding all necessary certificates, authorizations and licenses and legally engaged in the business of transporting passengers or cargo for hire by air predominantly to, from or between points within the United States of America, and (ii) an air carrier operating certificate issued pursuant to Chapter 447 of Title 49 of the United States Code for aircraft capable of carrying ten or more individual or 6,000 pounds or more of cargo thus entitling Lessor to the benefits of Section 1110.

"**CFM Tripartite Agreement**" means the CFM Rate Per Flight Hour Services Tripartite Agreement dated as of March 6, 2018 (as amended, supplemented and otherwise modified from time to time), among the Lessee, Accipiter Holdings DAC and the Engine Manufacturer relating to the CFM RPFH Agreement.

"**CFM RPFH Agreement**" means the CFM Rate Per Flight Hour Agreement #1-2494673211 dated October 17, 2011, as assumed and amended, between the Lessee and the Engine Manufacturer.

"**CFM Lessor Maintenance Agreement**" means the Lessor Maintenance Agreement dated as of March 6, 2018 (as amended, supplemented and otherwise modified from time to time), between Accipiter Holdings DAC and the Engine Manufacturer, together with the LSA Addendum thereto relating to the Engines between the Lessor and the Engine Manufacturer.

"**Change**" has the meaning specified in Clause 10.6(a).

"**Compliance Date**" shall have the meaning provided in Clause 19.1(b)(i).

"**Consolidated Text**" shall have the meaning provided in Clause 3.4.

"**Code**" means the Internal Revenue Code of 1986.

"**Core Module**" means the following major modules of the Engines:

(a)    high pressure compressor;

(b)    high pressure turbine;

(c)    combustion chamber; and

(d)      stage one low pressure turbine.

"**CPCP**" means the Manufacturer's Corrosion Prevention Control Program.

"**CRAF**" means the Civil Reserve Aircraft Fleet as more fully described in Clause 9.3(c).

"**CRAF Activation Period**" has the meaning specified in Clause 9.3(c).

"**Cycle**" means one (1) take-off and landing of the Aircraft or, in respect of any Engine or Part temporarily installed on another aircraft, of that other aircraft.

"**Damage Notification Threshold**" means the amount specified in Schedule 6.

"**Default Rate**" means a rate of interest per annum equal to (a) if there is a Lender, the interest rate specified as the default or overdue rate with respect to the indebtedness secured by the Security Documents or (b) otherwise, LIBOR for such period as Lessor shall specify plus three point five (3.5) percent.

"**Delivery**" means delivery of the Aircraft by Lessor to Lessee on the Delivery Date.

"**Delivery Date**" means the date on which Delivery occurs.

"**Delivery Location**" means the location specified in Schedule 6 or such other location as may be mutually agreed in writing between Lessor and Lessee.

"**Early Termination Date**" means the day numerically corresponding to the day before the Delivery Date in the 96th calendar month after the calendar month in which the Delivery Date occurs or, if the Delivery Date occurs on the first day of the month, the last day of the 95th calendar month after the calendar month in which the Delivery Date occurs.

"**Early Termination Fee**" means the amount as specified in Schedule 6.

"**Early Termination Notice**" has the meaning specified in Section 4.4(a)

"**Early Termination Option**" has the meaning specified in Section 4.4(a)

"**EASA**" means the European Aviation Safety Agency established by the European Parliament and the Council of the European Union under Regulation (EC) Number 1592/2002 and any successor that under the laws of the European Union shall have from time to time control or supervision of civil aviation in the European Union or have jurisdiction over the registration, airworthiness or operation of all other matters relating to the Aircraft.

"**Engine**" means (a) each of the engines of the manufacture and model and having the respective manufacturer's serial numbers specified in Schedule 1 and all Parts installed in or on such engines at Delivery; (b) any Replacement Engine acquired by Lessor and which becomes leased to Lessee hereunder pursuant to Clause 15.2 and all Parts installed in or on such engine at the time of such acquisition and lease; and (c) all substituted and replacement Parts at any particular time installed in or on any of the said engines in accordance with this Agreement; including, in the case of (a) and (b)

above, any such engine which, having been removed from the Aircraft, remains the property of Lessor pursuant to this Agreement and, in the case of (a), (b) and (c) above, any Parts which, having been removed from any such engine, remain the property of Lessor pursuant to this Agreement.

"**Engine Manufacturer**" means CFM International, Inc.

"**Engine Rate Adjustment Factor**" has the meaning set forth in Schedule 6.

"**Engine Performance Restoration**" means an Engine shop visit in which at a minimum any of the following modules are exposed, disassembled and subsequently refurbished in accordance with the then-current OEM LEAP-1A Maintenance Guide: (i) high-pressure compressor, (ii) high-pressure turbine or (iii) combustion chamber.

"**Engine Performance Restoration (Non-RPFH Covered)**" means an Engine shop visit in which at a minimum the following modules are exposed, disassembled and subsequently refurbished in accordance with the then current OEM LEAP-1A Maintenance Guide definition for a performance restoration; (i) high-pressure compressor, (ii) high-pressure turbine, (iii) combustion chamber and (iv) low-pressure compressor.

"**Engine Restoration Maintenance Payment Rate (Full Term)**" means the amount specified as such in, and determined in accordance with, Schedule 6.

"**Engine Restoration Maintenance Payment Rate (Early Termination)**" means the amount specified as such in, and determined in accordance with, Schedule 6.

"**Engine Shortfall**" means the amount as specified in Schedule 6.

"**Engine Thrust Rating**" means the "Maximum Engine Thrust" of the Engines specified in Schedule 1.

"**Engine Warranties Assignment**" means the Engine Warranties Assignment Agreement dated as of the Delivery Date, by the Engine Manufacturer, together with the initial notice thereunder specifying the Lessee as the "Initial Entitled Party" and specifying the Lessor as the "Initial Controlling Party", together with each and every further notice issued thereunder in accordance with the terms of such agreement, or such other agreement relating to the Engine Manufacturer's engine warranties in respect of the Aircraft entered into (or consented to, as the case may be) by the Lessor, the Lessee and the Engine Manufacturer.

"**Event of Default**" means any of the events referred to in Clause 16.1.

"**Excluded Tax**" has the meaning set forth in Clause 19.2.

"**Expiry Date**" means the day numerically corresponding to the day before the Delivery Date in the 144th calendar month after the calendar month in which the Delivery Date occurs or, if the Delivery Date occurs on the first day of the month, the last day of the 143rd calendar month after the calendar month in which the Delivery Date occurs; **provided that**, if the Lessee duly exercises the Early Termination Option in accordance with Clause 4.4, "Expiry Date" means the Early Termination Date.

"**FAA**" means the Federal Aviation Administration of the Department of Transportation of the United States of America and any successor that under the laws of the United States of America shall from time to time have control or supervision of civil aviation in the United States of America or have jurisdiction over the registration, airworthiness or operation of, or other matters relating to, the Aircraft.

"**FAA Bill of Sale**" has the meaning given to such term in Clause 2.1(f).

"**FAA Filed Documents**" has the meaning given to such term in Clause 2.1(f).

"**Fan Module**" means the (i) fan and booster; and (ii) low pressure compressor.

"**Fan and/or LPT Module Performance Restoration**" means a shop visit in which a Level 2 performance restoration is performed on the Fan Module and/or LPT Module, as applicable, in accordance with the then-current OEM LEAP-1A Maintenance Guide.

"**Fan and LPT Module Performance Restoration (Non-RPFH Covered)**" means a shop visit in which at a minimum the following modules are exposed, disassembled and subsequently refurbished in accordance with the then current OEM LEAP-1A Maintenance Guide definition for a performance restoration: (i) Fan Module and (ii) LPT Module.

"**FATCA**" means Section 1471 through 1474 of the Code (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1).

"**Federal Aviation Regulations**" or "**FAR**" means the regulations promulgated by the FAA pursuant to Title 49, Subtitle VII of the United States Code, including, for the avoidance of doubt, Part 25, Part 91 (as applicable), Part 121 and Part 129 (as applicable).

"**Financing Documents**" means all Loan Agreements and all Security Documents, swaps and forward interest rate agreements entered into in connection with any Loan Agreement and all other documents from time to time executed by Lessor, Owner Participant or any of its Affiliates or any third party by way of security for, or as a guarantee of the performance by, Lessor, Owner Participant or any of its Affiliates of its obligations under any Loan Agreement (whether or not such document secures any other obligations as well) and notified in writing to Lessee.

"**Flight Hour**" means each hour or part thereof elapsing from the moment at which the wheels of the Aircraft (or other aircraft in the case of Parts, the APU or Engines temporarily installed on such other aircraft) leave the ground on the take-off of the Aircraft (or such other aircraft) until the wheels of the Aircraft (or such other aircraft) touch the ground on the landing of the Aircraft (or such other aircraft) following such take-off.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Government Entity**" means (a) any national government, political subdivision thereof or local jurisdiction therein; (b) any instrumentality, board commission, court or agency of any of the foregoing, however constituted; and (c) any association,

organization or institution of which any of the foregoing is a member or to whose jurisdiction any thereof is subject or in whose activities any of the above is a participant.

"**Habitual Base**" means the jurisdiction set forth in Schedule 6.

"**Holdings**" means Frontier Airlines Holdings, Inc., a Delaware corporation.

"**I.A.T.A.**" means the International Air Transport Association.

"**ICAO**" means the International Civil Aviation Organization.

"**Incident and Accident Statement**" means a statement signed by Lessee's Quality Control Manager certifying that, other than as set out in detail in such certificate neither the Aircraft nor any Engine or Part thereon has ever been damaged in any 'accident' or 'incident' (as such terms are defined by the FAA) and has never been exposed to excessive heat, shock or salt water and that no Part has ever been procured form a military source.

"**Indemnitee**" means Lessor, Owner Participant, Servicer, Trust Company, each Lender and their respective successors, permitted assigns and their respective officers, directors, agents, shareholders, partners, members, managers, contractors, Affiliates and employees.

"**Inflight Equipment**" has the meaning specified in Clause 10.6(f).

"**International Registry**" shall mean the electronic registry maintained pursuant to the Cape Town Convention.

"**IRS**" means the Internal Revenue Service.

"**Landing Gear**" the complete strut assembly, consisting of the inner and outer cylinders of each main Landing Gear and nose Landing Gear and all associated parts that comprise each landing gear assembly (as listed in the Aircraft Documents) (including side struts, braces, and uplock and downlock mechanisms but excluding rotable parts such as wheels, tires, brakes, transducers and switch assemblies) as specified in Schedule 1 and any replacement landing gear installed on the Aircraft in accordance with the terms of this Agreement, title to which is vested in Lessor in accordance with this Agreement.

"**Landing Gear Maintenance Payment Rate**" means the amount specified in Schedule 6.

"**Landing Gear Overhaul**" means an overhaul of a Landing Gear assembly in accordance with the Manufacturer's repair manual that restores such Landing Gear to a "zero time since overhaul" condition in accordance with the Manufacturer's repair manual and is performed in accordance with the Manufacturer's overhaul specifications and operating criteria (excluding any rotable components such as wheels, tires, brakes and consumable items).

"**LEAP-1A Maintenance Guide**" means the Engine Manufacturer's workscope planning guide for the applicable engine type.

"**Lease Supplement No. 1**" means the lease supplement substantially in the form set out in Schedule 2.

"**Lender**" means one or more banks or financial institutions or other persons notified in writing to Lessee that may from time to time provide financing directly or indirectly to Lessor, Owner Participant or any of its Affiliates in relation to acquisition or continuing ownership of the Aircraft, or which is secured directly or indirectly by the Aircraft or the rights of the Lessor under this Agreement, and shall include any person acting as agent or security agent or trustee for one or more Lenders; **provided that**, any requirement in this Agreement to give notices to or receive consents from the Lender shall be disregarded until such time as the Lessor has identified one or more Lenders and has specified the Lender who is to be treated as the "Lender" for purposes of such requirements.

"**Lessee Caused Tax**" means any Tax imposed if and to the extent that such Tax results from (a) the negotiation, presence, execution, enforcement, registration, or delivery of any of the Operative Documents, (b) the presence, use, operation, maintenance, alteration, registration, repair, or replacement of the Aircraft or any part thereof, (c) the presence or organization of the Lessee, any sublessee or other person in possession of control of the Aircraft in, or payment of any amount under the Operative Document from such jurisdiction, (d) the gross negligence, recklessness or willful misconduct of the Lessee or other use of the Aircraft, or (e) the breach by Lessee of any of its representations or covenants under any Lessee's Document.

"**Lessee's Documents**" means (a) this Agreement, the Lease Supplement No. 1 and Acceptance Certificate, the CFM RPFH Agreement, the CFM Tripartite Agreement, the Warranty Bill of Sale, the BFE Bill of Sale, the Purchase Agreement Assignment, the Purchase Agreement insofar as it relates to the Aircraft, the Return Acceptance Certificate (when executed), the Assignment of Insurances, the Airframe Warranties Agreement, the Engine Warranties Assignment, any consent or confirmation of such assignment of warranties in respect of the Aircraft, or any Engines, any acknowledgment and agreement with respect to the Security Documents executed by Lessee and all notices, consents, certificates, confirmations and other documents from time to time issued or entered into by Lessee pursuant to or in connection with any of the foregoing; or (b) any other document or agreement with respect to the Aircraft which Lessee on the one hand and the Servicer or Lessor on the other hand agree in writing shall be a Lessee's Document.

"**Lessor Guarantee**" means a Guarantee from Lessor Guarantor in respect of Lessor's obligations under this Agreement.

"**Lessor Guarantor**" means Owner Participant.

"**Lessor's Lien**" means any Lien over the Aircraft arising as a result of (a) any act or omission of Lessor that constitutes a breach of any of the terms of this Agreement, (b) any indebtedness, liability or other obligation arising by, through or under Lessor that is unrelated to the Operative Documents or the transactions contemplated thereby or (c) the Financing Documents from time to time entered into by Lessor or (d) Taxes not indemnified by Lessee pursuant to the terms of Clause 19.2.

"**Letter of Credit**" has the meaning set forth in Clause 6.2(c) and forming a portion of the Security for the Aircraft.

"**LIBOR**" has the meaning set forth in Schedule 6.

"**Lien**" means any mortgage, charge, pledge, lien, right of detention, right of set-off, right of de-registration or export, any "international interest" or "national interest" as defined in the Cape Town Convention or any encumbrance or security interest whatsoever, howsoever created or arising.

"**LLP**" means any Part for which a mandatory or established replacement time limit or inspection interval is specified in the type design, instructions for continued airworthiness or, in some cases, the maintenance manual.

"**LLP Replacement Event**" means, in respect of an Engine, the performance of scheduled replacement of LLP(s) for an Engine in accordance with the Engine Manufacturer's time limits manual certified cyclic life limits.

"**Loan Agreement**" means any agreement from time to time entered into between Lessor, Owner Participant or any Affiliate of the Owner Participant and one or more Lenders providing financing to Lessor, Owner Participant or any Affiliate of the Owner Participant in relation to the acquisition or continuing ownership of the Aircraft or which is secured, directly or indirectly, by the Aircraft or the beneficial interests of the Owner Participant under the Trust Agreement or the rights of the Lessor under this Agreement.

"**LPT Module**" means the low pressure turbine module.

"**Maintenance Adjustment Payments**" means the amounts to be paid by Lessee pursuant to Clause 18.7.

"**Maintenance Planning Document**" means the latest revision of the Manufacturer's recommended maintenance program for the Aircraft.

"**Maintenance Program**" means at any time a continuous airworthiness maintenance and inspection program of Lessee that is authorized and approved by the Aviation Authority and based on the Manufacturer's Maintenance Planning Document and in compliance with FAA guidelines, encompassing scheduled maintenance (including block maintenance), condition monitored maintenance, and/or on condition maintenance of the Airframe and Engines.

"**Maintenance Requirements**" has the meaning provided in Clause 10.1.

"**Major Modification**" means any Change that requires an FAA supplemental type certificate.

"**Manufacturer**" means Airbus S.A.S., a *société par actions simplifiée* organized and existing under the law of France, or Airbus Americas, Inc., a corporation incorporated and existing under the law of Delaware, United States, as applicable.

"**Maximum Change Amount**" means the amount specified in Schedule 6.

"**Minimum Liability Coverage Amount**" means the amount specified in Schedule 6.

"**Module**" means any of the Core Module, the Fan Module or the LPT Module, as the context may require.

"**Module Apportionment Percentage**" has the meaning specified in Schedule 6.

"**MRO**" means a maintenance and repair organization that is certified pursuant to FAR Part 145.

"**OEM**" means an original equipment manufacturer.

"**OEM Parts**" means any part that has been produced, approved or licensed for production by or on behalf of an OEM and is included in the illustrated parts catalogue.

"**Operative Documents**" means Lessee's Documents and the Financing Documents and all notices, consents, certificates, confirmations and other documents from time to time issued or entered into pursuant to or in connection with any thereof.

"**Other Agreement**" means (a) any lease agreement relating to an Other Aircraft or (b) any other agreement that Lessee, on the one hand, and Lessor or the Servicer on behalf of the Lessor, on the other hand, agree is an "Other Agreement" for purposes of this Agreement.

"**Other Aircraft**" means any aircraft (other than the Aircraft) leased by Lessor or Owner Participant or an Affiliate of Owner Participant, on the one hand, to Lessee or Holdings or any of their respective subsidiaries, on the other hand.

"**Other Lessee's Documents**" has the meaning given to the term "Lessee's Documents" (or any functionally similar term) in any Other Agreement, and includes each Other Agreement.

"**Other Second Group Aircraft**" means any of the six (6) aircraft (other than the Aircraft) leased by Lessor or Owner Participant or an Affiliate of Owner Participant, on the one hand, to Lessee or Holdings or any of their respective subsidiaries, on the other hand, with scheduled delivery months, in the case of two aircraft April 2020, in the case of one aircraft May 2020, in case of one aircraft October 2020.

"**Owner Participant**" means Vermillion Aviation (Two) Limited.

"**Part**" means each part, component, appliance, accessory, instrument or other item of equipment (other than complete Engines or other engines) for the time being installed or incorporated in or attached to the Airframe or an Engine or which, having been removed therefrom, remains the property of Lessor pursuant to this Agreement, including, for the avoidance of doubt, all LLPs.

"**Permitted Lien**" means (a) any Lien in respect of Taxes which are either not yet assessed or, if assessed, not yet due and payable or if due and payable are being contested in good faith by appropriate proceedings (and for the payment of which adequate reserves are maintained by or an adequate bond has been provided by Lessee); (b) any Lien of an airport hangar-keeper, mechanic, material-man, carrier, employee or other similar Lien arising in the ordinary course of business by statute or by operation

of law, in respect of obligations that are not overdue or that are being contested in good faith by appropriate proceedings (and for the payment of which adequate reserves have been maintained by or an adequate bond has been provided by Lessee); (c) any Lien created by, or which is expressly permitted under, the terms of any of the Operative Documents; and (d) any Lessor's Liens; **provided that** (in relation to (a) and (b) above), any such proceedings, or the continued existence of such Lien, do not involve any likelihood of the sale, forfeiture or loss of the Aircraft or an Engine or any interest therein or the imposition of any criminal or unindemnified civil liability upon the Lessor or any Indemnitee.

"**Permitted Transferee**" has the meaning set forth in Schedule 6.

"**PMA Part**" means a Part manufactured in accordance with a parts manufacturer approval under FAR Part 21, but excludes Parts that are manufactured with the license or approval of the OEM and are included in the illustrated parts catalogue.

"**Purchase Agreement**" means the A320 Family Aircraft Purchase Agreement dated as of September 30, 2011 between the Lessee and the Manufacturer, together with its various exhibits and appendices, as assigned, amended and supplemented from time to time.

"**Purchase Agreement Assignment**" means the Purchase Agreement Assignment in respect of the Aircraft to be entered into and dated as of the Delivery Date between Lessor and Lessee, and the related consent thereto by Manufacturer.

"**Quotation Date**" means, in relation to any period for which an interest rate is to be determined hereunder, the day on which quotations would ordinarily be given by prime banks in the London Interbank Market for deposits in the currency in relation to which such rate is to be determined for delivery on the first day of that period (the time on such day on which such quotations are given being 11:00 a.m. London time); **provided that**, if, for any period, quotation would ordinarily be given on more than one date, the Quotation Date for that period shall be the last of those dates.

"**RDAS**" has the meaning specified in Section 10.3(e).

"**Redelivery**" means the redelivery of the Aircraft to Lessor in compliance with the terms of this Agreement.

"**Redelivery C-Check**" has the meaning specified in Schedule 4.

"**Redelivery Date**" means the date on which Lessor accepts the Aircraft for Redelivery.

"**Rent**" means Basic Rent and Supplemental Rent.

"**Removed Engine**" has the meaning set forth in Clause 11.1(a).

"**Replacement Engine**" has the meaning set forth in Clause 15.2(c).

"**Replacement Part**" has the meaning set forth in Clause 10.4(g).

"**Return Acceptance Certificate**" means the certificate substantially in the form set out in Schedule 10.

"**Return Location**" has the meaning provided in Clause 18.1.

"**Section 1110**" means Section 1110 of the Bankruptcy Code as in effect at any relevant time.

"**Security**" has the meaning provided in Clause 6.2.

"**Security Documents**" means any and all assignments by way of security, security agreements, mortgages or similar documents, instruments or agreements entered into by Lessor from time to time, and notified in writing to Lessee by Lessor, pursuant to which the Lessor grants a Lien in respect of any or all of Lessor's right, title and interest in and to the Aircraft, this Agreement and/or the other Lessee's Documents in favor of a Lender.

"**Servicer**" means AMCK Aviation or such other person that Lessor may notify Lessee in writing as being the servicer of this Agreement and the Aircraft from time to time.

"**Special FAA Counsel**" means Daugherty, Fowler, Peregrin, Haught and Jenson, or such other specialist FAA counsel as may be mutually agreed by Lessor and Lessee.

"**SRM**" means the latest revision of the Manufacturer's Structural Repair Manual.

"**State of Incorporation**" means the State of Colorado, U.S.A.

"**State of Registration**" means the either the United States of America or such other jurisdiction in which the Aircraft is then registered in accordance with the terms of this Agreement.

"**STC**" shall have the meaning as set forth in Clause 10.6(a).

"**Supplemental Rent**" means all amounts, liabilities and obligations (other than Basic Rent) which Lessee assumes or agrees to pay under this Agreement or any other Lessee's Document to Lessor or others, including Maintenance Adjustment Payments, and Security and Agreed Value payments.

"**Tax Indemnitee**" means each of Lessor, Owner Participant, Servicer, Trust Company, AMCK Aviation, each Lender and any Affiliate of any of the foregoing and if any such entity is treated as a partnership, a disregarded entity or other pass-through entity for tax purposes (each, a "**Pass-Through Entity**"), any person who owns, directly or indirectly through one or more Pass-Through Entities, an interest in the Pass-Through Entity and each of the respective successors and assigns of the foregoing.

"**Taxes**" means all present and future taxes, levies, imposts, duties, withholdings, fees or charges of any nature whatsoever, and wheresoever imposed, including value added tax, consumption tax or any other tax in respect of added value or any income (including gross income, minimum, alternative minimum, capital gains income, gross receipts and net receipts), franchise, transfer, sales, use, business, occupation, excise, personal property, real property, stamp, import, export or other tax imposed by a taxing authority of any country, or governmental subdivision thereof or therein or by any international authority, together with any penalties, additions to tax, fines or interest with respect to any of the foregoing; and "tax" and "taxation" shall be construed accordingly.

"**Term**" means the period commencing on the Delivery Date and ending on the Termination Date.

"**Termination Date**" means the Expiry Date, or, if earlier, (a) the date when Lessor terminates the leasing of the Aircraft to Lessee pursuant to the terms hereof, or (b) the date when Lessor receives the Agreed Value together with any other amounts then due and unpaid under Lessee's Documents, following a Total Loss of the Aircraft; **provided that**, if the Term is extended pursuant to Clause 18.4, the Termination Date shall be extended to the date when the Aircraft has been redelivered to Lessor in full compliance with this Agreement.

"**Total Loss**" means, in relation to the Aircraft, the Airframe, the APU or any Engine, any of the following:  (a) actual, constructive, compromised, arranged or agreed total loss (including any damage thereto or requisition for use or hire which results in an insurance settlement on the basis of a total loss); (b) destruction, damage beyond repair or being rendered permanently unfit for normal use for any reason whatsoever (which in the case of an Engine shall be determined jointly with the Engine Manufacturer); (c) requisition of title, confiscation, forfeiture, compulsory acquisition, sequestration, detention, seizure or other similar event; (d) its hijacking, theft or disappearance resulting in loss of possession by Lessee for a period of thirty (30) consecutive days or longer or on the last day of the Term; (e) any sale of the Aircraft in connection with a Lessee bankruptcy, whether by an administrator, trustee or court; or (f) any other occurrence not permitted under this Agreement which deprives Lessee, or any other person permitted to have possession or use of the Aircraft, of use or possession for a period of sixty (60) consecutive days or longer.

"**Transportation Code**" means subtitle VII of title 49, United States Code.

"**Trigger Event**" means, at Redelivery, that each of the following conditions is satisfied: (A) each of the CFM RPFH Agreement and the CFM Tripartite Agreement remains in full force and effect in respect of the Engines and (B) no event of default by Lessee has occurred and is continuing with respect to the Engines under the CFM RPFH Agreement or the CFM Tripartite Agreement (regardless of whether the same has been terminated).

"**Trust Agreement**" means the Trust Agreement (including each supplement thereto) relating to the Aircraft entered into on or prior to the Delivery Date between the Trust Company and the Owner Participant.

"**Trust Company**" means: (a) UMB Bank, N.A. a national banking association, in its individual capacity, or (b) if UMB Bank, N.A. is not then serving as Owner Trustee under the Trust Agreement, the entity serving as successor Owner Trustee, in its individual capacity.

"**UCC**" means the Uniform Commercial Code, as the same may be in effect in any applicable jurisdiction within the United States.

"**United States**" or "**U.S.**" means the United States of America; provided, that for geographic purposes, "United States" means, in aggregate, the 50 states and the District of Columbia of the United States of America.

"**US\$**," "**US Dollars**" or "**\$**" means the lawful currency of the United States of America.

"**Warranty Bill of Sale**" means the bill of sale in respect of the Aircraft, in form and substance satisfactory to the Lessor, executed and delivered by the Manufacturer in favor of Lessor.

## 1.2    Interpretation

(a)    References in this Agreement to:

  (i)    an Event of Default includes (except in relation to Clause 16.2) references to any event that, with the giving of notice and/or lapse of time and/or the making of a relevant decision contemplated by Clause 16.1 would constitute an Event of Default;

  (ii)    Clauses or Schedules are, unless otherwise specified, references to Clauses of, and Schedules to, this Agreement;

  (iii)    any statutory or other legislative provision shall be construed as including any statutory or legislative modification or re-enactment thereof, or any provision enacted in substitution therefor;

  (iv)    the Aircraft include any part of the Aircraft, and, where the context so admits, any of the Aircraft Documents, and references to any part of the Aircraft include any part of any Engine;

  (v)    the word "**person**" or "**persons**" or to words importing persons include individuals, partnerships, limited liability companies, corporations, Government Entities and other bodies, corporate or unincorporated, whether having distinct legal personality or not;

  (vi)    references to "**Lessor**", "**Lessee**", "**Owner Participant**", "**Trust Company**", "**Servicer**" or any "**Lender**" includes each of their respective successors, assigns and transferees, subject, in each case, to any provisions hereof (if any) relating to permissible successions, transfers and assignments;

  (vii)    any agreement shall include such agreement as it may from time to time be amended, restated, modified, supplemented, novated or substituted;

  (viii)    an "**agreement**" also includes a concession, contract, deed, instrument, franchise, license, treaty or undertaking (in each case, whether oral or written);

  (ix)    the "**assets**" of any person shall be construed as a reference to the whole or any part of its business, undertaking, property, assets and revenues (including any right to receive revenues);

  (x)    "**indebtedness**" with respect to any person includes any obligation of that person (whether present or future, actual or contingent, secured or unsecured, as principal or surety or otherwise) for the payment or repayment of money, including (A) under acceptances, bills, bonds,

debentures, notes or similar instruments; (B) under guarantees, indemnities or other assurances against financial loss; (C) under any finance or operating lease relating to any asset; or (D) in respect of any liability for the payment of any purchase price for any asset or services, payment of which is deferred for more than 180 days;

(xi)     "**law**" shall include common or customary law and any constitution, decree, judgment, legislation, order, ordinance, regulation, rule, statute, treaty, convention or other legislative measure in any jurisdiction or any present or future directive, regulation, procedure, request or requirement, or official or judicial interpretation of any of the foregoing, in each case having the force of law;

(xii)     "**month**" are references to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month (and references to "**months**" shall be construed accordingly) except that, where any such period would otherwise end on a non-Business Day, it shall end on the preceding Business Day; **provided that**, if there is no numerically corresponding day in the month in which that period ends, that period shall end on the last Business Day in such month;

(xiii)     a "**guarantee**" also includes any other obligation (whatever called) of any person to pay, purchase, provide funds (whether by way of the advance of money, the purchase of or subscription for shares or other securities, the purchase of assets or services, or otherwise) for the payment of, to indemnify against the consequences of default in the payment of, or otherwise to be responsible for, any indebtedness of any other person;

(xiv)     the words "**include**", "**includes**" and "**including**" shall be deemed to be followed by the phrase "without limitation";

(xv)     the word "**will**" shall be construed to have the same meaning and effect as the word "**shall**";

(xvi)     the words "**herein**", "**hereof**" and "**hereunder**", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof; and

(xvii)     "**gross negligence**" means, in relation to any person, intentional, conscious or voluntary acts or decisions of that person taken with wanton, reckless or flagrant disregard for the consequences of such act or decision; and

(xviii)     "**material**" means the subject matter of the statement or concealment related to a fact or circumstance which would be important to the decision to be made as distinguished from an insignificant, trivial or unimportant detail.

(b)     Headings are for ease of reference only.

(c)    Where the context so admits, words importing the singular number shall include the plural and *vice versa*, and words importing neuter gender shall include the masculine or feminine gender.

## 2.    REPRESENTATIONS AND WARRANTIES

### 2.1    Lessee's Representations and Warranties

Lessee acknowledges that Lessor and Owner Participant have entered into this Agreement and the other Operative Documents in full reliance on the representations and warranties by Lessee in Clauses 2.1 and 2.3; and Lessee now represents and warrants to Lessor and the Owner Participant that the following statements are on the date hereof, and on the Delivery Date will be, true and accurate:

(a)    Lessee is duly incorporated under the laws of the State of Incorporation and is validly existing and in good standing, and has full corporate power and authority to conduct its business as presently conducted, to own or hold under lease its assets, to enter into and perform its obligations under the Operative Documents to which it is a party, to satisfy the conditions precedent set forth in Clause 3.1 and to consummate the transactions contemplated by the Operative Documents to which it is a party;

(b)    Lessee's organizational documents incorporate provisions that permit, and all necessary authorizations, approvals, consents, licenses, permits and orders of and registrations with any Government Entity, including, but not limited to, those relating to foreign exchange controls, have been duly and unconditionally obtained and are now in full force and effect that are required to authorize, Lessee to sign and deliver, and perform its obligations under and the transactions contemplated by, the Operative Documents to which Lessee is a party and satisfy the conditions precedent set forth in Clause 3.1;

(c)    Lessee holds all licenses, certificates and permits from all relevant Government Entities for the conduct of its business (as presently conducted) as a Certificated Air Carrier and the performance of its obligations hereunder;

(d)    the Operative Documents to which Lessee is a party constitute, or when entered into will constitute, legal, valid and binding obligations of Lessee, enforceable in accordance with their respective terms, except to the extent that enforceability may be limited by any applicable bankruptcy or insolvency laws affecting creditors' rights generally and/or general principles of equity;

(e)    neither the execution and delivery of the Operative Documents to which Lessee is a party, the performance of any of the transactions contemplated herein and therein nor the satisfaction of the conditions precedent set forth in Clause 3.1 will: (i) contravene or constitute a violation or breach of or a default under any existing law or agreement by which Lessee or any of its assets is bound, any agreement to which it is a party or Lessee's organizational documents; (ii) cause any limitation on Lessee or its assets or the powers of its directors or officers, whether imposed by or contained in Lessee's organizational documents or any existing law, agreement or otherwise, to be exceeded; or (iii) result in the

19.12   **Forms**

(a)     Each Indemnitee agrees to furnish from time to time to Lessee or to such other person as Lessee may designate, at Lessee's request and expense, such duly executed and properly completed forms as such Indemnitee may be permitted and legally able to deliver and as may be necessary or appropriate in order to claim any reduction of, or exemption from any Tax which Lessee may be required to indemnify against hereunder, unless such Indemnitee determines that furnishing such forms may have an adverse effect on the business or operations of such Indemnitee.

(b)     Lessor will provide Lessee, upon Lessee's request not more frequently than once annually: (i) an IRS form W-8BEN-E or other appropriate tax form claiming a full exemption from U.S. withholding tax on the payments to be received from Lessee under this Agreement, duly completed (including a United States taxpayer identification number of Owner Participant) and executed by Owner Participant, (ii) an IRS form W-9 (or other appropriate tax form) duly completed by the Lessor evidencing that the Lessor/Trust Company is a U.S. Person as defined in Section 7701(a)(30) of the Code; and (iii) if and for so long as the Owner Participant is a person which is a resident of Ireland for tax purposes and it remains the practice of the Irish Revenue Commissioners to provide such certificates, a certificate of Irish tax residence evidencing that Owner Participant is a resident of Ireland; **provided, however, that** Lessor shall not be considered in breach of its obligation under this Clause 19.12(b) if the Owner Participant or the Lessor is unable to provide any such document or form as a result of a change in law after the date hereof.

19.13   **Survival**

The indemnities and other obligations of Lessee under this Clause 19 shall survive the expiration or other termination of this Agreement.

20.     **FURTHER PROVISIONS**

20.1    **Nature of Lessee's Obligations**

All obligations of Lessee under this Agreement shall constitute conditions, and the time for the performance of such conditions shall be of the essence.

20.2    **Benefit of Agreement**

(a)     *Lessor Transfer*.  Each of Lessor and Owner Participant (and any subsequent permitted assignee or transferee) shall have the right at any time, at its own expense and upon prior written notice to Lessee, to transfer ownership or beneficial ownership, as applicable, of the Aircraft, or to assign (including to assign as security), mortgage, novate, transfer, grant participations in, or otherwise dispose of its rights and obligations under this Agreement and the other Operative Documents, to any other person by outright transfer or assignment or collateral assignment or by operation of law and Lessee hereby consents to any such transfer or assignment; **provided that**:

Case 1:23-cv-04774-PAE    Document 1-2    Filed 06/06/23    Page 44 of 70

(i)    Lessee shall have no greater financial obligation or liability under this Agreement and the other Lessee Documents as a result of such transfer based on the facts and circumstances existing and applicable laws in effect at the time of such transfer, than it would have had if such transfer had not taken place and Lessee acknowledges that an increase in the number of or replacement of beneficiaries (including the number of beneficiaries under any applicable insurance or reinsurance), Indemnitees or Tax Indemnitees shall not, of itself, constitute an increase in Lessee's financial obligations hereunder;

(ii)   such transfer shall not result in any restriction, based on the facts and circumstances existing and applicable laws in effect at the time of such transfer, on Lessee's rights under this Agreement or the other Lessee's Documents or on Lessee's use or operation of the Aircraft;

(iii)  in the case of a sale of the Aircraft by Lessor or transfer of the beneficial interest of Owner Participant in the Aircraft or a transfer (other than to an Affiliate of the Lessor Guarantor) of a controlling interest in the Owner Participant, any such assignee or transferee shall be a Permitted Transferee and shall unconditionally guaranty the obligations of Lessor under this Agreement pursuant to a Guarantee in form substantially similar to the Guarantee executed by Owner Participant in favor of Lessee unless the existing Lessor Guarantee will remain in full force and effect following such transfer.

(iv)   in the case of an assignment as security by Lessor, any such assignee or transferee shall have delivered to Lessee an executed copy of a quiet enjoyment letter substantially in the form of Schedule 11, but in any event on terms not less favorable to Lessee;

(v)    Lessor shall have reimbursed to Lessee (or shall have agreed in writing to promptly reimburse to Lessee following such assignment, transfer or novation) Lessee's reasonable and invoiced out-of-pocket costs and expenses incurred in connection with its cooperation with Lessor under this Clause 20.2(a), including reasonable legal fees; and

(vi)   in the event of a transfer in accordance with this Clause 20.2, Lessor shall cause the new Lessor and/or new Owner Participant, as the case may be, to deliver to Lessee at the time of transfer a duly authorized and properly executed IRS Form W-8BEN-E, IRS Form W-8-IMY (with attachments), IRS Form W-8ECI (including a United States taxpayer identification number) or other applicable IRS form, claiming an exemption from, or reduced rate of, U.S. withholding taxes on payments to be received from Lessee under this Agreement, W-9 or appropriate successor or substitute form, as appropriate.

(b)    Lessee shall comply with all reasonable requests of Lessor or Owner Participant, and at the expense of Lessor, to cooperate in effecting any such transfer, novation, assignment, mortgage, grant or other disposition referred to in paragraph (a) above and will execute any and all consents, agreements, amendments or other instruments (including any supplement or amendment to

or novation of this Agreement and any confirmation of the Lessee's representations and warranties as of the date of such transfer, novation, assignment, mortgage, grant or other disposition) in form and substance reasonably satisfactory to Lessee and promptly provide an electronic consent to any registration or release of any Lien on the International Registry that may be required in order to give effect to or perfect any such transfer, novation, assignment, mortgage, grant or other disposition and promptly request the reissuance of any insurance and reinsurance certificates and broker's letters required in connection therewith with such changes as necessary to reflect such transfer, novation, assignment, mortgage, grant, or other disposition and if the transfer involves the assumption by the transferee of any of Lessor's or Owner Participant's obligations under Lessee's Documents, to release Lessor and Owner Participant from the obligations so assumed and will execute such certificates and cooperate in the provision of such legal opinions as shall be reasonably requested by Lessor in connection therewith. Without limiting the foregoing, in the event of any assignment to Lenders, Lessee undertakes to acknowledge the Security Documents by executing and delivering a consent to such documents in such form as Lessor shall reasonably require, to give the insurers notice of any assignment of insurance in such form as Lessor shall reasonably require and to procure that the insurers acknowledge the same and otherwise to provide all reasonable assistance and cooperation to Lessor, Owner Participant, each Lender and their respective representatives and advisers in connection with the perfection and maintenance of such security interests, including the effecting of all necessary filings and registrations of the Security Documents in the State of Registration and Habitual Base. Lessor shall provide Lessee with such financial and other information relating to a transferee as Lessee may reasonably request.

(c)    Subject to any subleases consented to by the Lessor under Clause 9.3 or any wet lease permitted under Clause 9.3, no assignment, transfer or charge may be made by Lessee of all or any of its rights in respect of the Aircraft or this Agreement, and any such purported assignment, transfer or charge shall be void *ab initio*.

(d)    Subject to the provisions of Clause 9.3, no assignment or transfer may be made by Lessee of all or any of its rights or obligations in respect of this Agreement or any other Lessee's Document. Notwithstanding the foregoing and for so long as no Event of Default shall have occurred and be continuing, without the prior consent of Lessor, Lessee may consolidate (on a solvent basis) with or merge into or with any other corporation or other person, or convey, transfer, lease or otherwise disposes of all or substantially all of its property and other assets, whether by one or a series of transactions, to, or merge or consolidates (on a solvent basis) with another corporation or person, **provided that**:

(i)    the person formed by or surviving or receiving such acquisition, consolidation or merger, as applicable (the "**Successor Entity**"): (A) is a U.S. Person, (B) immediately after giving effect to such transaction, has a tangible net worth of not less than Lessee's tangible net worth (determined in each case in accordance with GAAP) immediately prior to such transaction; and (C) if and to the extend required under Section

Case 1:23-cv-04774-PAE    Document 1-2    Filed 06/06/23    Page 46 of 70

20.11 **Entire Agreement**

(a)    Lessee's Documents constitute the entire agreement between the parties hereto in relation to the leasing of the Aircraft by Lessor to Lessee, and supersede all previous proposals, agreements and other written and oral communications in relation thereto.

(b)    The parties intend and agree that this Agreement:

(i)    constitutes a "true lease" and not a "security interest" as defined in Section 1-201(37) of the UCC; and

(ii)    confers only a leasehold interest on Lessee in and to the Aircraft on and subject to the terms of this Agreement, and no ownership or other interest with respect to the Aircraft is provided to Lessee under this Agreement.

Lessee shall not file any tax return that is inconsistent with the provisions of this Clause 20.11(b).

20.12 **Section 1110**

Lessee acknowledges that Lessor would not have entered into this Agreement unless it had available to it the benefits of a lessor under Section 1110. Lessee covenants and agrees with Lessor that to better ensure the availability of such benefits, Lessee shall support any motion, petition or application filed by Lessor with any bankruptcy court having jurisdiction over Lessee, whereby Lessor seeks recovery of possession of the Aircraft under Section 1110 and shall not in any way oppose such action by Lessor unless Lessee shall have complied with the requirements of Section 1110 to be fulfilled in order to entitle Lessee to continue use and possession of the Aircraft under this Agreement.  In the event Section 1110 is amended, or it is repealed and another statute is enacted in place thereof, Lessor and Lessee agree to amend this Agreement and take such other action (to the extent not inconsistent with this Agreement) as Lessor reasonably deems necessary so as to afford to Lessor the rights and benefits as such amended or substituted statute confers upon owners and Lessors of aircraft similarly situated to Lessor.

20.13 **Third Party Beneficiary**

The Owner Participant shall be an express third party beneficiary with respect to each provision herein that expressly grants the Owner Participant rights and is entitled to enforce directly and in its own name such rights.

20.14 **Governing Law**

This Agreement shall be construed in accordance with, and this Agreement and all matters arising out of or relating in any way whatsoever to this Agreement (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York. This Agreement has been delivered in the State of New York.

### 20.15   Submission to Jurisdiction

(a)   With respect to any suit, action or proceedings relating to this Agreement or any other Lessee's Document or any matter between the parties arising under or in connection with this Agreement or any other Lessee's Document ("**Proceedings**"), each party irrevocably:  (i) submits to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in the Borough of Manhattan and the United States District Court for the Southern District of New York, and any appellate court from any thereof; and (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. Each party hereby agrees that, subject to any rights of appeal, a final judgment in any such Proceedings shall be conclusive and may be enforced in other jurisdictions otherwise having jurisdiction over such party by suit on such final judgment or in any other manner provided by law.  Nothing in this Agreement precludes any party from bringing Proceedings in any other jurisdiction, nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(b)   Lessee shall designate, appoint and empower Corporation Service Company (CSC) of 80 State Street, Albany, NY 12207, as its authorised agent solely to receive and acknowledge, for and on its behalf, service of any writ, summons, order, judgment or other notice of legal process in any Proceedings.  As long as this Agreement remains in force, Lessee shall maintain a duly appointed and authorised agent to receive and acknowledge, for and on its behalf, service of any writ, summons, order, judgment or other notice of legal process in any Proceedings.  Lessee shall keep Lessor advised of the identity and location of such agent.  Lessee irrevocably undertakes not to revoke the authority of such agent and, in the event of the termination of such appointment, or if for any reason Lessee's process agent is unable to act as such, Lessee will appoint a substitute process agent acceptable to Lessor.

(c)   Lessee further agrees that service of process in any Proceedings also may be effected by mailing a copy thereof by registered or certified mail or by overnight courier service, postage prepaid, to it at its address specified in Clause 20.8. Notwithstanding anything herein to the contrary, Lessee hereby waives, to the fullest extent permitted by applicable law, the right to object to the service of process by Lessor, with respect to any Proceedings.  Nothing in this Agreement will affect the right of Lessor to serve process in any other manner permitted by applicable law or to bring any legal action or proceeding or to obtain execution of judgment in any jurisdiction.

(d)   Lessee irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, with respect to itself and its property (irrespective of its use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might

otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

### 20.16  Waiver of Jury Trial

**EACH OF LESSOR AND LESSEE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDINGS.** Each of the parties hereby (a) certifies that no representative, agent or attorney of any other parties has represented, expressly or otherwise, that such other parties would not, in the event of a Proceeding, seek to enforce the foregoing waiver and (b) acknowledges that it has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this paragraph.

### 20.17  Confidentiality

Each of Lessor and Lessee shall keep confidential the provisions of this Agreement that were redacted for filing with the FAA and any confidential information furnished or made available to them hereunder by the other party hereto, except:

(a) each of Lessor and Lessee may make disclosure to the extent necessary to comply with the law, the valid order of a court of competent jurisdiction or the request of a regulatory authority;

(b) each of Lessor and Lessee may make disclosure as part of its normal reporting or review procedure to its parent companies (and, in the case of Lessor, to the Owner Participant and its Affiliates), its auditors, its attorneys, its regulators and its advisors; **provided that**, such parent companies, the Owner Participant, Owner Participant's Affiliates, auditors, attorneys and advisors will be bound by the provisions of this Clause;

(c) each of Lessor and Lessee may make disclosure to the extent necessary to enforce its rights and remedies under this Agreement;

(d) Lessor may make disclosures to any Lender or any potential Lender and to potential assignees and transferees and their respective auditors, attorneys and advisers, so long as Lessor obtains an undertaking of confidentiality from such persons on the terms substantially no less strict *mutatis mutandis* than this Clause; or

(e) each of Lessor and Lessee may disclose such information as is in the public domain.

Notwithstanding the foregoing provisions of this Clause 20.17, each of Lessor and Lessee (and any employee, representative, or agent of Lessor or Lessee) is expressly authorized to disclose to any and all persons, without limitation of any kind, the U.S. federal and state tax treatment and U.S. federal and state tax structure of the transactions contemplated by this Agreement and the other Operative Documents, and all materials of any kind (including opinions or other tax analyses, if any) that are provided to it related to such tax treatment and tax structure.

FILED: NEW YORK COUNTY CLERK 06/01/2023 04:26 PM
NYSCEF DOC. NO. 5
Case 1:23-cv-04774-PAE Document 1-2 Filed 06/06/23
INDEX NO. 652599/2023
Page 49 of 70
RECEIVED NYSCEF: 06/01/2023

**IN WITNESS WHEREOF**, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement to be executed as of the date first above written.

UMB BANK, N.A.,
not in its individual capacity, but solely as owner trustee

By:................................................................
Name: Scott Rosevear
Title: Senior Vice President

*[Signature Page – Aircraft Lease Agreement (MSN 10038)]*

FRONTIER AIRLINES, INC.

By: .........................................................

Name:

Title:

**James G. Dempsey**
**Chief Financial Officer**

*[Signature Page – Aircraft Lease Agreement (MSN 10038)]*

# Exhibit 2

## Non-Waiver & Preservation of Rights Agreement

1. This Non-Waiver and Preservation of Rights Agreement (this "Agreement") is entered into by FRONTIER AIRLINES, INC. ("Frontier") and ACCIPITER INVESTMENT 4 LIMITED, VERMILLION AVIATION (TWO) LIMITED, ACCIPITER HOLDINGS DAC, CARLYLE AVIATION MANAGEMENT LIMITED, MAVERICK AVIATION HOLDINGS LTD., MANCHESTER AVIATION FINANCE S.a.r.l., WELLS FARGO TRUST COMPANY, N.A., solely in its capacity as OWNER TRUSTEE, and UMB BANK, N.A., solely in its capacity as OWNER TRUSTEE, individually or collectively as the context may require, "Carlyle"), and are referred to herein, individually as the "Party" and collectively as the "Parties".

2. This Agreement applies to Lease Agreements (the "Lease Agreements") for fourteen aircraft currently leased to Frontier for use in its operations and one Airbus model A320-214 aircraft bearing U.S. registration number N227FR which was redelivered to its lessor on July 21, 2022 (collectively, the "Aircraft"), the related Operative Documents (as defined in the Lease Agreements), and the other related documents and agreements that affect the Lease Agreements and the parties' respective rights and responsibilities with respect to such leased Aircraft, and to certain transactions defined in the Lawsuit as "the December 2021 Transaction" and the "Carlyle Transaction."

3. Frontier contends that Carlyle failed to comply with certain terms in the Lease Agreements regarding the transfer of interests to Carlyle. Frontier has filed a lawsuit captioned *Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Limited, et. al.*, USDC SDNY Case No. 1:22-cv-02943 (PAE) ("the Lawsuit"). Frontier's Amended Complaint in the Lawsuit seeks, among other things, a declaration that Frontier is not deemed to have consented to certain transactions involving Carlyle and Carlyle-related entities, and an order directing that Frontier is relieved of certain obligations under the Lease Agreements until the December 2021 Transaction or the Carlyle Transaction is unwound, plus reasonable attorneys' fees and costs. Carlyle denies any breach of the Leases and all other wrongful conduct, and opposes the relief requested by Frontier.

4. Despite the existence of the Lawsuit and the parties' respective claims and defenses asserted or potentially to be asserted therein, the Parties recognize the mutual operational benefits to the Parties from cooperating with each other in good faith regarding the day-to-day administration of the Lease Agreements and the Aircraft, including, without limitation, paying and accepting rent, processing and administering lease returns, Aircraft use reports, Aircraft registration renewals, Aircraft and record inspections, insurance certificates, consents, lease amendments, aircraft/lease financings, owner trustee and owner participant assignments and Aircraft sales (and related transfers, notices and acknowledgments, replacement of lessor guarantees, updated insurance certificates and matters ancillary thereto), warranty and insurance claims, notices, and the like in accordance with the terms of the Lease Agreements ("Lease Administration Activities"). Accordingly, the Parties hereby confirm that they will continue to cooperate in good faith regarding all Lease Administration Activities.

5. The Parties also wish to ensure that any rights and defenses in connection with the claims asserted in the Lawsuit that may have arisen for either Party will not be waived or adversely affected by participating and cooperating in Lease

Case 1:23-cv-04774-PAE    Document 1-2    Filed 06/06/23    Page 53 of 70

Administration Activities. Accordingly, unless otherwise agreed to in a writing executed by the relevant Parties, no Party shall be treated as having waived any contractual or extra contractual rights by engaging or participating in any Lease Administration Activity during the term of this Agreement.

6. The term of this Agreement shall begin April 13, 2022, and shall expire on the earlier of July 1, 2024 or 30 days after either Party gives written notice of termination.

7. This Agreement is subject to New York law without application of conflict of law principles.

8. This Agreement may be signed in counterparts.

FILED: NEW YORK COUNTY CLERK 06/01/2023 04:26 PM
NYSCEF DOC. NO. 3

_____
October 21, 2022
Date

_____
FRONTIER AIRLINES, INC.

_____
Date

_____
ACCIPITER INVESTMENT 4 LIMITED

_____
VERMILLION AVIATION (TWO) LIMITED

_____
ACCIPITER HOLDINGS DAC

_____
CARLYLE AVIATION MANAGEMENT
LIMITED

_____
MAVERICK AVIATION HOLDINGS LTD.

_____
MANCHESTER AVIATION FINANCE
S.a.r.l.,

_____
WELLS FARGO TRUST COMPANY, N.A.,
solely in its capacity as OWNER TRUSTEE

_____
UMB BANK, N.A., solely in its capacity as
OWNER TRUSTEE

October 21, 2022
_____
Date

_____
Date

_____
FRONTIER AIRLINES, INC.

_____
ACCIPITER INVESTMENT 4 LIMITED

_____
VERMILLION AVIATION (TWO) LIMITED

_____
ACCIPITER HOLDINGS DAC

_____
CARLYLE AVIATION MANAGEMENT
LIMITED

_____
MAVERICK AVIATION HOLDINGS LTD.

_____
MANCHESTER AVIATION FINANCE
S.a.r.l.,

_____
WELLS FARGO TRUST COMPANY, N.A.,
solely in its capacity as OWNER TRUSTEE

_____
UMB BANK, N.A., solely in its capacity as
OWNER TRUSTEE

October 21, 2022
_____
Date

FRONTIER AIRLINES, INC.

_____
Date

ACCIPITER INVESTMENT 4 LIMITED

_____

VERMILLION AVIATION (TWO) LIMITED

_____

ACCIPITER HOLDINGS DAC

_____

CARLYLE AVIATION MANAGEMENT
LIMITED

_____

MAVERICK AVIATION HOLDINGS LTD.

_____

MANCHESTER AVIATION FINANCE
S.a.r.l.,

_____

WELLS FARGO TRUST COMPANY, N.A.,
solely in its capacity as OWNER TRUSTEE

_____

UMB BANK, N.A., solely in its capacity as
OWNER TRUSTEE

October 21, 2022
_____
Date

FRONTIER AIRLINES, INC.
_____

_____
Date

ACCIPITER INVESTMENT 4 LIMITED
_____

VERMILLION AVIATION (TWO) LIMITED
_____

ACCIPITER HOLDINGS DAC
_____

CARLYLE AVIATION MANAGEMENT
LIMITED
_____

MAVERICK AVIATION HOLDINGS LTD.
_____

MANCHESTER AVIATION FINANCE
S.a.r.l,
_____

WELLS FARGO TRUST COMPANY, N.A.,
solely in its capacity as OWNER TRUSTEE
Corey J. Dahlstrand - Assistant Vice President
_____

UMB BANK, N.A., solely in its capacity as
OWNER TRUSTEE
_____

October 21, 2022
_____
Date

_____
Date

_____
FRONTIER AIRLINES, INC.

_____
ACCIPITER INVESTMENT 4 LIMITED

_____
VERMILLION AVIATION (TWO) LIMITED

_____
ACCIPITER HOLDINGS DAC

_____
CARLYLE AVIATION MANAGEMENT
LIMITED

_____
MAVERICK AVIATION HOLDINGS LTD.

_____
MANCHESTER AVIATION FINANCE
S.a.r.l.,

_____
WELLS FARGO TRUST COMPANY, N.A.,
solely in its capacity as OWNER TRUSTEE
Marilee Sobieski
Vice President

_____
UMB BANK, N.A., solely in its capacity as
OWNER TRUSTEE

# Exhibit 3

**NOTICE OF SECURITY ASSIGNMENT**

From: UMB BANK, NATIONAL ASSOCIATION, not in its individual capacity, but solely as owner trustee (the "**Lessor**")"), and

UMB BANK, NATIONAL ASSOCIATION, not in its individual capacity, but solely as security trustee (the "**Security Trustee**")

To:    FRONTIER AIRLINES, INC. (the "**Lessee**")").

[_____], 2023

Dear Sirs

We refer to the Aircraft Lease Agreement, dated as of September 30, 2019, between the Lessor and the Lessee (as assigned, supplemented and amended from time to time, the "**Lease**") relating to one Airbus A320-251N aircraft with manufacturer's serial number 9177[_____] and United States registration mark N359FR together with the two (2) CFM International Inc. model LEAP-1A26 engines described therein (the bearing manufacturer serial numbers [_____] and [_____] (collectively, the "**Aircraft**").  All terms defined in the Lease shall, unless the context otherwise requires, have the same meaning herein.

Reference is also made to a Facility Agreement, dated as of April 11, 2022 (the "**Facility Agreement**"), between Maverick Aviation Holdings Ltd., as borrower (the "**Borrower**"), Carlyle Aviation Management Limited, as the servicer (the "**Servicer**"), UMB Bank, National Association, as the Security Trustee and the administrative agent (the "**Administrative Agent**"), and the lenders party thereto from time to time.

We hereby notify you that:

(1)    By a Security Agreement, dated as of April 11, 2022 (the "**Security Agreement**"), among, the Lessor, the Borrower, the Security Trustee, the Servicer and the other parties named therein as grantors, the Lessor shall assign to the Security Trustee, as security, all of its rights, title and interest in, to and under the Lease and each of the other Operative Documents as defined in the Lease (the "**Lease Documents**"), effective as of the Effective Date, including certain insurance proceeds.

The Lessor hereby notifies you in writing that the security assignment described in the foregoing sentence is effective as of the date hereof (the "**Effective Date**").

We attach a form of letter of quiet enjoyment from the Security Trustee as Appendix A and agree that we shall cause the Security Trustee to execute and deliver to you a letter of quiet enjoyment substantially in the form of Appendix A concurrently with delivery to you of this Notice.

(2)    From and after the Effective Date, all monies that may be payable by you or on your behalf under the Lease Documents shall continue to be paid to the same account to which

---

**Commented [A1]:** This document needs to be attached to the chattel mortgage if it is to be filed with the FAA against the aircraft and/or Lease or if no chattel mortgage is filed against the aircraft at the FAA (e.g. where the OPs interest in the trust is being encumbered, the ownership of the OP is being encumbered or another higher ownership interest is being encumbered without an FAA filing) then it needs additional re-formatting to be a free standing document that can and will be filed with the FAA at the effective time the Lessee's acknowledgment of Lessor's compliance with the CPs of the security assignment is met.

**Commented [A2]:** Please list out the other current grantor parties by name.

**Field Code Changed**

under any applicable insurance or reinsurance), Indemnitees or Tax Indemnitees shall not, of itself, constitute an increase in Lessee's financial obligations and (ii) such security assignment will not result in any restriction, based on applicable laws in effect at the time of the security assignment on your rights under the Lease or the other Lessee's Documents or on your use or operation of the Aircraft.

(6)      Lessor shall promptly pay or cause the Owner Participant to pay Lessee's reasonable and invoiced out-of-pocket costs and expenses incurred in connection with Lessee's cooperation with Lessor in execution and delivery of this Notice and the related documentation, including reasonable legal fees.  Lessee's non-FAA counsel legal fees shall be paid directly by Lessor (or Owner Participant) to Lessee's designated legal counsel.

Formatted: Indent: Hanging: 0.01"

(7)      Each of the Lessor and the Security Trustee agrees, covenants, represents and warrants for the benefit of the Lessee that the security assignment transaction described hereunder (including any associated liens and encumbrances of Security Trustee) complies with the applicable terms and conditions of Clause 20.2(a) of the Lease and that such security assignment transaction shall not result in any restriction, based on the facts and circumstances existing and applicable laws in effect at the date hereof, on pursuant to Clause 20.2(a)(ii) Lessee's rights under the Lease or the other Lessee's Documents or on Lessee's use or operation of the Aircraft, including (to the extent, if any, constituting Lessee's rights under the Lease or the other Lessee's Documents or Lessee's use or operation of the Aircraft)but not limited to Lessee's rights as plaintiff and a judgment creditor (as applicable) arising from or in connection with the pending lawsuits filed in U.S. District Court for the Southern District of New York as case numbers 1:22-cv-02943 and 1:20-cv-09713 (the "**Actions**"), including, without limitation, Lessee's right to collect and recover damages; provided that nothing herein shall constitute or be treated as a waiver of any contractual or extra contractual right or as a waiver of any right or defense by any person, trust or other entity in connection with either Action, including, without limitation, Lessee's right to collect and recover damages, shall not be restricted or otherwise prejudiced as a result of such security assignment transaction.  Any prejudice to or loss of priority of Lessee's rights and interests as a judgement creditor as a result of the security assignment described herein shall be deemed a restriction to the Lessee's rights under the Lease and other Lessee's Documents.  If any such restriction occurs, the Lessor and the Security Trustee shall immediately upon the request of the Lessee subordinate any liens, security interests, encumbrances and collection rights of the Security Trustee against property or assets, including, without limitation, against the Aircraft, the Lease Documents and monies held pursuant the Lease Documents, to the judgment creditor rights of the Lessee.

Formatted: Indent: Hanging: 0.01", Right: 0", Space After: 11.45 pt

(8)      Each of the Lessor and the Security Trustee acknowledge and confirm that the Notice of Security Assignment dated June 1, 2022 is hereby expressly revoked and shall have no further effect.

Formatted: Indent: Hanging: 0.01"

Upon issuance, this Notice and the instructions herein contained shall become irrevocable until you receive notice in writing to the contrary from the Security Trustee.  Please acknowledge receipt of this Notice on the Lessee Acknowledgment provide to you by us, it being provided

Field Code Changed

hereby that your signature on the Lessee Acknowledgment shall confirm your acknowledgment of, and agreement for the benefit of the Security Trustee that the Security Trustee shall not be bound by, nor have any liability for the performance of, any of our obligations under the Lease Documents unless expressly provided herein or expressly agreed to in writing by the Security Trustee.  This Notice shall be governed by, and construed in accordance with, the laws of the State of New York.

[*signature ~~page follows~~pages follow*]

3

**Field Code Changed**

Yours faithfully,

For and on behalf of:
UMB BANK, NATIONAL ASSOCIATION, not in
its individual capacity but solely as Owner Trustee

By: _____
    Name:
    Title:

UMB BANK, NATIONAL ASSOCIATION, not in
its individual capacity but solely as Security Trustee

By: _____
    Name:
    Title:

#4888-6484-9951v8

RECEIVED AND ACKNOWLEDGED:


Frontier Airlines, Inc.


By: _____
    Name:
    Title:

**Commented [A3]:** There is a separate acknowledgement document. It may be helpful to combine that document with this Notice to have one single document set.

#4888-6484-9951v8

# Exhibit 4

WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION (F/K/A WELLS FARGO BANK
NORTHWEST, NATIONAL ASSOCIATION)
not in its individual capacity, but solely as Owner Trustee
as Assignor and Existing Lessor,

AND

FRONTIER AIRLINES, INC.
as Lessee,

AND

UMB BANK, NA
not in its individual capacity, but solely as Owner Trustee
as Assignee and New Lessor,

AND

ACCIPITER INVESTMENTS AIRCRAFT 4 LIMITED
as Existing Owner Participant,

~~ACCIPITER HOLDINGS DAC~~
AND

~~as Existing Guarantor,~~

MAVERICK AVIATION TL (D) LIMITED
as New Owner Participant,

AND

MAVERICK AVIATION HOLDINGS LTD.
as New Owner Participant Parent Assignor

AND

MAVERICK AVIATION BORROWER 1 LTD.
as New Parent Guarantor

AND

ACCIPITER HOLDINGS, DAC
as Existing Guarantor

DATED AS OF _____, 2023

MASTER ASSIGNMENT, ASSUMPTION, AMENDMENT,
ACKNOWLEDGEMENT AND CONSENT AGREEMENT

Master Assignment__.docx

*[Margin annotations: Formatted: Space After: 0 pt; Commented [A1]: This Agreement will need to be filed with the FAA, so it will need to be in the proper form for filing. It is subject to any comments by FAA counsel.]*

Relating to One (1) Airbus A320-251N Aircraft
Manufacturer's Serial Number  [_____]
U.S. Registration Number N[____]FR

Master Assignment__.docx

**TABLE OF CONTENTS**

Page

Section 1.    Definitions and Interpretation ................................................... 31

Section 2.    Assignment and Lease Amendments ........................................ 32

Section 3.    Conditions Precedent .............................................................. 63

Section 4.    Insurance .................................................................................. 64

Section 5.    Rent .......................................................................................... 74

Section 6.    Representations and Warranties ............................................... 75

Section 7.    Effective Time ........................................................................... 86

Section 8.    Miscellaneous ........................................................................... 86

Schedule 1        Lease Amendments Description of Aircraft

Schedule 2        Description of Lease

Schedule 3        Conditions Precedent

Schedule 3    4    Effective Time Certificate

Schedule 4    New 5    Amended and Restated Guarantee

Schedule 5        6    Instrument of Resignation and Succession of Owner Trustee and Amendment to Trust Agreement

Schedule 6    7    Termination of Guarantee

Schedule 7        Certain Provisions [to be redacted for FAA filing]

Exhibit A        Aircraft Description

Exhibit B        Lease Description

Carlyle Frontier - Form Lease Assignment_02252023_LP Redline against MB draft.docx        Lease Assignment - exe.docx

i

THIS MASTER ASSIGNMENT, ASSUMPTION, AMENDMENT, ~~ACKNOWLEGEMENT~~ACKNOWLEDGEMENT **AND CONSENT AGREEMENT** (this "**Agreement**") is dated as of _____, 2023 and made by and among WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION (f/k/a Wells Fargo Bank Northwest, National Association), a national banking association organized and existing under the laws of the United States, with its address at ~~299 South Main Street, 5th Floor, MAC: U1228-051, Salt Lake City, Utah 84111~~9062 Old Annapolis Road, Columbia, MD 21045, not in its individual capacity, but solely as Owner Trustee ("**Assignor**" or "**Existing Lessor**"); and UMB BANK, N.A., a national banking association organized under the laws of the United States of America with its address at 6550 S. Millrock Drive, Suite 150, Salt Lake City, UT 84121, not in its individual capacity, but solely as Owner Trustee ("**Assignee**" or "**New Lessor**"); and FRONTIER AIRLINES, INC., a Colorado corporation with its address at 4545 Airport Way, Denver, Colorado 80239 ("**Lessee**"~~")~~"); and ACCIPITER INVESTMENTS AIRCRAFT 4 LIMITED~~, an Irish,~~ a [Ireland limited company] with its address at ~~Connaught House 1 Burlington Road, Dublin 4, Ireland [·]~~ ("**Existing Owner Participant**"~~), ACCIPITER HOLDINGS DAC~~"); and MAVERICK AVIATION TL (D) LIMITED, an ~~Irish~~[Ireland limited company] with its address at ~~Connaught House 1 Burlington Road, Dublin 4, Ireland ("Existing Guarantor"); MAVERICK AVIATION TL (D) LIMITED, an Irish limited company with its address at Connaught House 1 Burlington Road, Dublin 4, Ireland~~[_____] ("**New Owner Participant**"~~")~~"); and MAVERICK AVIATION BORROWER 1 LTD., a [Cayman Islands limited company] with its address at ~~Connaught House 1 Burlington Road, Dublin 4, Ireland~~[_____] ("**New Parent Guarantor**"~~")~~"); and MAVERICK AVIATION HOLDINGS LTD., a [Cayman Islands limited company] ("**New Owner Participant Parent Assignor**"); and ACCIPITER HOLDINGS DAC, an Irish limited company ("**Existing Guarantor**") with respect to the New Owner Participant Ownership Transfer.

**BACKGROUND:**

The purported transfer of the Aircraft and Lease (as such term is defined in Schedules 1 and 2 hereto) contemplated hereunder is subsequent to the purported sale of aircraft assets by CK Capital (Hong Kong) Limited and related entities to New Owner Participant Parent Assignor and related transactions (the "**Specified Transaction**"), which Specified Transaction was not consented to by Lessee and is being challenged by Lessee as novations conducted in violation of Clause 20.2 of the Lease and a fraudulent conveyance to prevent Lessee from collecting any potential judgement under the Actions (as defined below). Prior to the Specified Transaction, Lessee filed actions against Assignors, Existing Owner Participant, and other affiliates to Existing Owner Participant for breach of contract, fraud and other claims arising from the parties' dealings in connection with contracts among the parties including the Lease and other "Operative Documents" (as such term is defined in the Lease). As a result of these actions two cases are pending with the U.S. District Court for the Southern District of New York (the "**Court**") under case numbers 1:22-cv-02943 and 1:20-cv-09713 (collectively, the "**Actions,**" each an "**Action**").

(A).    [2]In the Action bearing case number 1:22-cv-02943, Lessee has sought determinations that (1) Lessee was harmed by conduct by Assignor and other defendants and (2) that the Specified Transaction constitutes a lessor default under the Lease and other Operative Documents and with respect to the Specified Transaction, Lessee intends to seek an order declaring such novation as void and seek other available remedies. The named defendants in the Actions deny wrongdoing. Lessee is entering into this Agreement as an accommodation to Existing Owner Participant to facilitate daily operations of Lessor, but such accommodations by Lessee are done without waiver of any rights, remedies or contentions relating to the Actions, including, without limitation, Lessee's challenge of the validity of the **Specified Transaction,** right to void the Specified Transaction and right to recover damages from the defendants in the Actions.

---

[1] ~~Note to LP: As discussed, we propose to have current guarantor confirm the current guarantee continues, which is in Section 2.4(a).~~

[2] ~~Note to LP: As discussed, we have moved more express references to the litigation to Schedule 7.~~

**Formatted:** Font: Bold