**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARLYLE AVIATION MANAGEMENT LIMITED, ACCIPITER INVESTMENTS AIRCRAFT 4 LIMITED, VERMILLION AVIATION (TWO) LIMITED, ACCIPITER HOLDINGS DAC, MAVERICK AVIATION HOLDINGS LTD., MANCHESTER AVIATION FINANCE S.a.r.l., WELLS FARGO TRUST COMPANY, N.A., not in its individual capacity but solely in its capacity as OWNER TRUSTEE, UMB BANK, N.A., not in its individual capacity but solely in its capacity as OWNER TRUSTEE,<br><br>        Plaintiffs,<br><br>   v.<br><br>FRONTIER AIRLINES, INC.<br><br>        Defendant. | Case No. 1:23-cv-04774 (PAE)<br><br>[Rel. 1:22-cv-02943 (PAE)] |

<u>**AMENDED ANSWER AND COUNTERCLAIM OF FRONTIER AIRLINES, INC.**</u>

Frontier Airlines, Inc. ("Frontier"), by its undersigned counsel, Binder & Schwartz LLP, hereby answers and responds as follows to the Complaint dated May 26, 2023 (the "Complaint"), filed by Carlyle Aviation Management Limited ("CAML"), Accipiter Investments Aircraft 4 Limited ("Accipiter"), Vermillion Aviation (Two) Limited ("Vermillion"), Accipiter Holdings DAC ("Accipiter Holdings"), Maverick Aviation Holdings Ltd. ("Maverick"), Manchester Aviation Finance S.a r.1. ("Manchester"), Wells Fargo Trust Company, N.A., not in its individual capacity but solely in its capacity as Owner Trustee ("Wells Fargo"), and UMB Bank, N.A., not in its individual capacity but solely in its capacity as Owner Trustee ("UMB") (collectively, "Plaintiffs"). Frontier denies each and every allegation in the Complaint except as expressly admitted below.

## ANSWER

1.      Frontier admits that it is a commercial airline that leases a total of fourteen passenger aircraft from certain of the Plaintiffs and/or their predecessors that it uses in its business.  Frontier denies the remaining allegations in Paragraph 1 of the Complaint and respectfully submits that issues concerning whether Plaintiffs are properly the beneficial owners and lessors of the aircraft are the subject of the 2022 Litigation (as defined in Paragraph 2 of the Complaint).

2.      Frontier admits the allegations in Paragraph 2 of the Complaint.

3.      Frontier denies the allegations in Paragraph 3, except admits that the parties entered into a Non-Waiver and Preservation of Rights Agreement, which allows Frontier to interface with Plaintiffs as though they are the proper counterparty under the Leases and other Operative Documents, which Frontier denies.  Frontier otherwise refers to the Non-Waiver and Preservation of Rights Agreement for its content.

4.      Paragraph 4 of the Complaint purports to describe the parties' Leases.  Frontier respectfully refers to the Leases for their contents, and otherwise denies the allegations in Paragraph 4.

5.      Paragraph 5 of the Complaint purports to contain quoted text from the Leases, and then characterizes the terms of the Leases.  Frontier respectfully refers to the Leases for their contents, and otherwise denies the allegations in Paragraph 5.

6.      Paragraph 6 of the Complaint purports to contain quoted text from the Leases. Frontier respectfully refers to the Leases for their contents and otherwise denies the allegations in Paragraph 6.

7.    Paragraph 7 of the Complaint is argumentative and purports to state legal conclusions as to which no response is required.  To the extent any response is required, Frontier denies the allegations in Paragraph 7.

8.    Paragraph 8 of the Complaint is argumentative and purports to state legal conclusions as to which no response is required.  To the extent any response is required, Frontier denies the allegations in Paragraph 8.

9.    Frontier denies the allegations in Paragraph 9 of the Complaint, except admits that Plaintiffs have asked Frontier to acknowledge their attempts to sell and/or refinance certain of the aircraft.

10.    Frontier denies the allegations in Paragraph 10 of the Complaint, except admits that Plaintiffs have requested in or around November 2022 that Frontier consent to a security assignment for each of the aircraft and a lease assignment for certain of the aircraft.

11.    Frontier denies the allegations in Paragraph 11 of the Complaint.

12.    Frontier admits the allegations in Paragraph 12 of the Complaint.

13.    Frontier admits the allegations in Paragraph 13 of the Complaint.

14.    Frontier admits that Accipiter is a company incorporated under the laws of Ireland and that it is the Owner Participant for thirteen Leases with Frontier and is Guarantor for certain of those Leases, and otherwise denies the allegations in Paragraph 14 of the Complaint.

15.    Frontier admits the allegations in Paragraph 15 of the Complaint.

16.    Frontier admits the allegations in Paragraph 16 of the Complaint.

17.    Frontier admits the allegations in the first sentence of Paragraph 17 of the Complaint.  Frontier denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second sentence in Paragraph 17 of the Complaint.  Frontier

denies the remaining allegations in Paragraph 17, except admits that pursuant to the transfer of

AMCK Aviation Holdings' assets to Carlyle Aviation Partners and its affiliates, Maverick owns

Accipiter and Vermillion.

18.     Frontier admits that Manchester is a company incorporated under the law of

Luxembourg and that pursuant to the transfer of AMCK Aviation Holdings' assets to Carlyle

Aviation Partners and its affiliates, Manchester is owned by Maverick, and otherwise denies the

allegations in Paragraph 18 of the Complaint.

19.     Frontier admits the allegations in Paragraph 19 of the Complaint.

20.     Frontier admits the allegations in Paragraph 20 of the Complaint.

21.     Paragraph 21 of the Complaint purports to state legal conclusions as to which no

response is required.

22.     Paragraph 22 of the Complaint purports to state legal conclusions as to which no

response is required.

23.     Paragraph 23 of the Complaint purports to describe Section 20.15 of the Leases.

Frontier respectfully refers to Section 20.15 of the Leases for its content.  The second sentence of

Paragraph 23 purports to state a legal conclusion as to which no response is required.  To the

extent a response is required, Frontier states that for purposes of this proceeding Frontier does

not object to venue in the United States District Court for the Southern District of New York, and

otherwise denies the allegation in Paragraph 23 of the Complaint.

24.     Frontier admits that it is party to lease agreements with Plaintiffs for thirteen

Airbus A320 aircraft, and otherwise denies the allegations in the first sentence of Paragraph 24

of the Complaint.  The second and third sentences of Paragraph 24 purport to describe the Leases

and Exhibit 1 to the Complaint.  Frontier respectfully refers to the Leases for their contents.

25.     Paragraph 25 of the Complaint purports to describe the Leases.  Frontier respectfully refers to the Leases for their contents.

26.     Paragraph 26 of the Complaint purports to describe the Leases.  Frontier respectfully refers to the Leases for their contents.

27.     Frontier denies the allegations in Paragraph 27 of the Complaint, except admits that Accipiter is the Owner Participant for thirteen Leases with Frontier and Vermillion is the Owner Participant for one Lease.

28.     Frontier admits the allegations in Paragraph 28 of the Complaint.

29.     The first and second sentences of Paragraph 29 of the Complaint purport to state legal conclusions as to which no response is required.  To the extent any response is required, Frontier denies the allegations in the first and second sentences of Paragraph 29 and respectfully refers to the Leases.  Frontier denies the allegations in the third sentence of Paragraph 29 and refers to the Leases for their content.

30.     Paragraph 30 of the Complaint purports to describe the Leases.  Frontier respectfully refers to the Leases for their contents.  Frontier otherwise denies the allegations in Paragraph 30.

31.     Paragraph 31 of the Complaint purports to contain quoted text from the Leases, as to which no response is required.  To the extent any response is required, Frontier respectfully refers to the Leases and otherwise denies the allegations in Paragraph 31 due to the incompleteness of the excerpt and lack of proper context.

32.     Paragraph 32 of the Complaint purports to contain quoted text from the Leases, as to which no response is required.  To the extent any response is required, Frontier respectfully

refers to the Leases and otherwise denies the allegations in Paragraph 32 due to the incompleteness of the excerpt and lack of proper context.

33.     Paragraph 33 of the Complaint is argumentative and purports to state legal conclusions as to which no response is required.  To the extent any response is required, Frontier respectfully refers to the Leases and otherwise denies the allegations in Paragraph 33 of the Complaint.

34.     Frontier denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 34 of the Complaint.

35.     Frontier denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 35 of the Complaint.

36.     Paragraph 36 refers to a publicly available document.  Frontier respectfully refers to that document for its content.

37.     Paragraph 37 refers to a publicly available document.  Frontier respectfully refers to that document for its content.

38.     Frontier admits that discovery has closed in the 2020 Litigation, and otherwise denies the allegations in Paragraph 38 of the Complaint.

39.     Frontier admits that a December 2021 press release from Carlyle Aviation Partners stated that AMCK reached an agreement to sell its entire aircraft portfolio to Carlyle Aviation Partners and certain other affiliated entities. Frontier denies knowledge or information sufficient to form a belief as to the truth or falsity of the announcement described in Paragraph 39 of the Complaint.  Frontier otherwise denies the allegations in Paragraph 39.

40.     Frontier admits that Vermillion Holdings transferred Manchester to Maverick, and otherwise denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 40 of the Complaint.

41.     Frontier admits the allegations in the first sentence of Paragraph 41 of the Complaint.  The second and third sentences of Paragraph 41 of the Complaint purport to state legal conclusions as to which no response is required.  To the extent any response is required, Frontier denies the allegations in the second and third sentences of Paragraph 41 of the Complaint and respectfully submits that these allegations are in dispute in the 2022 Litigation.

42.     Frontier denies the allegations in Paragraph 42 of the Complaint, and respectfully submits that these allegations are in dispute in the 2022 Litigation.

43.     Frontier admits that on or about April 13, 2022, CAML sent Frontier notices purporting to provide notice that CAML had replaced AMCK Aviation Holdings as Lease Manager under each of the Leases, and otherwise denies the allegations in Paragraph 43 of the Complaint.  These allegations are in dispute in the 2022 Litigation.

44.     Paragraph 44 refers to a publicly available document.  Frontier respectfully refers to that document for its content.

45.     Paragraph 45 refers to a publicly available document.  Frontier respectfully refers to that document for its content.

46.     The first and second sentences of Paragraph 46 refer to a publicly available document.  Frontier respectfully refers to that document for its content.  Frontier denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the third sentence of Paragraph 46 of the Complaint.

47.    The first and second sentences of Paragraph 47 refer to publicly available documents.  Frontier respectfully refers to those documents for their contents.  Frontier denies the allegations in the third sentence of Paragraph 47 of the Complaint.

48.    Frontier admits that after the filing of the lawsuit captioned *Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd.*, No 22-cv-02943-PAE (S.D.N.Y.), certain Plaintiffs made certain requests of Frontier to affirm and acknowledge the allegedly new owners and their alleged rights over the Leases and the Aircraft.  Frontier otherwise denies the allegations in Paragraph 48 of the Complaint.

49.    Frontier admits that the parties entered into a Non-Waiver and Preservation of Rights Agreement.  Frontier refers to the Non-Waiver Agreement for its content and otherwise denies the allegations in Paragraph 49 of the Complaint.

50.    Frontier admits the allegations in Paragraph 50 of the Complaint.

51.    Paragraph 51 of the Complaint purports to contain quoted text from the Non-Waiver Agreement, as to which no response is required.  To the extent any response is required, Frontier respectfully refers to the Non-Waiver Agreement for its content.

52.    Frontier denies the allegations in Paragraph 52 of the Complaint.

53.    Frontier denies the allegations in Paragraph 53 of the Complaint.

54.    Frontier admits that in late November 2022, certain Plaintiffs requested that Frontier review certain security assignment documents and lease amendments, and otherwise denies the allegations in Paragraph 54 of the Complaint.

55.    Frontier admits that in November and December 2022, Frontier and CAML exchanged multiple letters regarding CAML's intent to sell four of the Aircraft.  Frontier refers

to those communications for their contents, and otherwise denies the allegations in Paragraph 55 of the Complaint.

56.    Frontier denies the allegations in Paragraph 56 of the Complaint.

57.    Frontier admits that it proposed certain contract language necessary to protect Frontier's rights, including its rights in connection with the pending litigation in the 2022 Litigation, Frontier's ability to collect on its pending claim of contract breach in the framework agreement lawsuit, and Frontier's ability to use or operate the aircraft, but Plaintiffs refused to include this necessary language.  Frontier otherwise denies the allegations in Paragraph 57 of the Complaint.

58.    Paragraph 58 of the Complaint purports to contain quoted text from Frontier's revisions to CAML's draft Security Assignment, as to which no response is required.  To the extent any response is required, Frontier respectfully refers to the document for its content.

59.    Paragraph 59 of the Complaint purports to contain quoted text from a draft Lease Assignment, as to which no response is required.  To the extent any response is required, Frontier respectfully refers to the document.

60.    Frontier denies the allegations in Paragraph 60 of the Complaint.

61.    Frontier admits that on March 24, 2023, CAML sent Frontier a limited partial guaranty proposal, and otherwise denies the allegations in Paragraph 61 of the Complaint.

62.    Frontier admits the allegations in the first sentence of Paragraph 62 of the Complaint.  The remainder of Paragraph 62 of the Complaint purports to describe CAML's draft guaranty.  Frontier respectfully refers to the draft for its content and otherwise denies the allegations in Paragraph 62.

63.     Frontier admits that Frontier made several counterproposals including a counterproposal on May 5, 2023, refers to that proposal for its contents, and otherwise denies the allegations in Paragraph 63 of the Complaint.

64.     Frontier denies the allegations in Paragraph 64 of the Complaint.

65.     Frontier denies the allegations in Paragraph 65 of the Complaint.

66.     Frontier denies the allegations in Paragraph 66 of the Complaint.

67.     Frontier admits that CAML sent a letter to Frontier dated April 27, 2023.  Frontier respectfully refers to such letter for its contents and otherwise denies the allegations in Paragraph 67 of the Complaint.

68.     Frontier admits that Frontier sent a letter to CAML dated May 3, 2023, and that on May 26, 2023, CAML served Frontier with a notice of default on fourteen Leases.  Frontier respectfully refers to its May 3, 2023 letter and the May 26, 2023 notice of default for their contents and otherwise denies the allegations in Paragraph 68 of the Complaint.

## FIRST CLAIM FOR RELIEF
## (BREACH OF CONTRACT OF THE LEASES)

69.     Frontier repeats and realleges each of its responses to Paragraphs 1 through 68 of the Complaint.

70.     Paragraph 70 of the Complaint purports to state a legal conclusion as to which no response is required.

71.     Frontier denies the allegations in Paragraph 71 of the Complaint.

72.     Paragraph 72 of the Complaint purports to describe the contents of Section 20.2(b) of the Leases.  Frontier respectfully refers to Section 20.2(b) of the Leases for its content and otherwise denies the allegations in Paragraph 72.

73.     Frontier denies the allegations in Paragraph 73 of the Complaint.

74.    Frontier denies the allegations in Paragraph 74 of the Complaint.

75.    Frontier denies the allegations in Paragraph 75 of the Complaint.

## SECOND CLAIM FOR RELIEF
## (BREACH OF CONTRACT OF THE NON-WAIVER AGREEMENT)

76.    Frontier repeats and realleges each of its responses to Paragraphs 1 through 75 of the Complaint.

77.    Paragraph 77 of the Complaint purports to state a legal conclusion as to which no response is required.

78.    Frontier denies the allegations in Paragraph 78 of the Complaint.

79.    Paragraph 79 of the Complaint purports to describe the Non-Waiver Agreement. Frontier respectfully refers to the Non-Waiver Agreement for its content.

80.    Frontier denies the allegations in Paragraph 80 of the Complaint.

81.    Frontier denies the allegations in Paragraph 81 of the Complaint.

82.    Frontier denies the allegations in Paragraph 82 of the Complaint.

83.    Frontier denies the allegations in Paragraph 83 of the Complaint.

## THIRD CLAIM FOR RELIEF
## (TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)

84.    Frontier repeats and realleges each of its responses to Paragraphs 1 through 84 of the Complaint.

85.    Frontier denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 85 of the Complaint.

86.    Frontier denies the allegations in Paragraph 86 of the Complaint.

87.    Frontier denies the allegations in Paragraph 87 of the Complaint.

## DEFENSES

Frontier, without alleging or admitting that it bears the applicable burden of proof or persuasion concerning any of these matters, asserts the following defenses. Frontier reserves the right to assert such additional defenses and/or counterclaims as may become applicable during the course of this litigation.

## FIRST DEFENSE

1.     The Complaint fails to state a claim upon which relief may be granted. Among other things, the Complaint fails to adequately allege that Frontier breached the Leases, fails to adequately allege that Frontier breached the Non-Waiver Agreement, and fails to adequately allege that with respect to Plaintiffs' tortious interference with prospective business advantage Frontier acted solely out of malice or used dishonest, unfair, or improper means.

## SECOND DEFENSE

2.     Plaintiffs' claims are barred, in whole or in part, by their prior breaches of the Leases and failure to perform under those agreements, including but not limited to the following. Under Section 402 of Article 2A (Leases) of the Uniform Commercial Code, Plaintiffs' failure to comply with their obligations under a lease suspended any contractual obligation to perform on the part of Frontier. N.Y. U.C.C. § 2A-402. Each of the Leases provides for Frontier's consent to certain lease transfer transactions only in circumstances where certain preconditions have been satisfied, in order to ensure that Frontier's rights under the agreements will not be impaired, as set out in the Lease Agreements, Lessee's Documents (as defined in each of the Leases), and Participation Agreements. Plaintiffs breached the Leases, including the Lease Agreements, Guarantees, and Participation Agreements, by, among other things, failing to provide notice or inform Frontier of the transfer of interests in the Leases to CAML and its affiliates, failing to provide information in compliance with the Leases concerning the transfer to CAML and its

affiliates, and denying that the lease transfer and assignment provisions even applied to the CAML transaction. Plaintiffs further breached the Leases by failing to provide Frontier with assurances that its rights and interests under the Leases would not be diminished as a result of the proposed security assignments and transfers CAML seeks to complete, or to provide Frontier with sufficient information to properly assess the net impact of the transactions on Frontier's interests under the Leases. Additionally, Plaintiffs have not paid or agreed to pay "Lessee's reasonable and invoiced out-of-pocket costs and expenses incurred in connection with its cooperation with Lessor under . . . Clause 20.2(a) [of the Leases], including reasonable legal fees." Lease § 20(a)(v). Plaintiffs have also failed to facilitate negotiation of a new tripartite agreement including the alleged new owner(s) of the Aircraft, which is necessary to preserve Frontier's ability to operate the Aircraft using the presently installed engines, as contemplated by Sections 20.2(a)(i)-(iii) of the Leases. Without a new tripartite agreement, the proposed sales to the third parties could not close, yet Carlyle continued to pressure Frontier to finalize documents and insist Frontier was holding up the sale despite the fact that closing could not take place due to Plaintiffs' own failure to act. Carlyle was not entitled to hold Frontier's failure to consent against it until it removed these barriers to the proposed transfers.

## THIRD DEFENSE

3.      Plaintiffs' claims, in whole or in part, are barred due to lack of causation.

## FOURTH DEFENSE

4.      Plaintiffs' claims, in whole or in part, are barred by the doctrine of unclean hands. Among other things, Plaintiffs have acted in bad faith by intentionally failing to disclose the CAML transfer to Frontier, failing to provide sufficient details concerning the transfer of the Aircraft from AMCK to CAML and its affiliates, attempting to transfer interests in the Aircraft without proving assurances to Frontier that its rights and interests under the Leases would not be

diminished and while refusing to provide sufficient information to Frontier for it to evaluate the impact of such transactions on its interests in the Leases, issuing the notices of default on May 26, 2023, in which Plaintiffs threatened to ground, deregister, and impound the Aircraft unless Frontier ceded to Plaintiffs' demands, insisting on extra-contractual concessions as a condition of withdrawing the improper default notices, and filing this lawsuit on May 31, 2023, prior to the expiration of the notice and cure period provided for under the Leases and before any of the alleged defaults could possibly have matured to events of default.

## FIFTH DEFENSE

5.      Plaintiffs' claims, in whole or in part, are barred because Plaintiffs have failed to specify or demonstrate actual harm or damages, including damages allegedly arising out of "additional interest" and "other payments" allegedly incurred, as well as "proceeds" from alleged potential sales of the Aircraft.

## SIXTH DEFENSE

6.      Plaintiffs have failed to mitigate damages.

## SEVENTH DEFENSE

7.      Plaintiffs' claims, in whole or in part, are barred by the doctrine of res judicata and/or estoppel.  The parties are actively involved in litigation before this Court in the action captioned *Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd.*, No. 22-cv-02943-PAE (S.D.N.Y.), in which Frontier brings claims against Plaintiffs for breaches of the Leases, Guarantees, and Participation Agreements arising from Plaintiffs' failure to comply with the same transfer and notice requirements that are at issue in this case.  Any ruling in that case substantiating Frontier's position with respect to these provisions should be binding upon the Plaintiffs in this action.

## EIGHTH DEFENSE

8.      Plaintiffs' claims, in whole or in part, should be dismissed pursuant to Fed. R.

Civ. P. 13(a) because they are compulsory counterclaims that must be brought, if at all, in

*Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd.*, No. 22-cv-02943-PAE

(S.D.N.Y.).

## COUNTERCLAIM

Defendant-Counterclaim Plaintiff Frontier Airlines, Inc. ("Frontier") hereby amends its

counterclaims against Plaintiffs-Counterclaim Defendants Carlyle Aviation Management

Limited (together with its affiliates, "Carlyle"), Accipiter Investments Aircraft 4 Limited

("Accipiter"), Vermillion Aviation (Two) Limited ("Vermillion"), Accipiter Holdings DAC

("Accipiter Holdings"), Maverick Aviation Holdings Ltd. ("Maverick"), Manchester Aviation

Finance S.a r.l. ("Manchester"), Wells Fargo Trust Company, N.A., not in its individual capacity

but solely in its capacity as Owner Trustee ("Wells Fargo"), and UMB Bank, N.A., not in its

individual capacity but solely in its capacity as Owner Trustee ("UMB") (collectively,

"Counterclaim-Defendants") as follows:

## JURISDICTION

1.      This Court has subject matter jurisdiction over Frontier's Counterclaim pursuant

to 28 U.S.C. § 1367(a) because the Counterclaim are so related to Plaintiffs' claims against

Frontier that they form part of the same case or controversy under Article III of the United States

Constitution.

2.      This Court also has subject matter jurisdiction over Frontier's Counterclaim

pursuant to 28 U.S.C. § 1332 because Counterclaim-Plaintiff and Counterclaim-Defendants are

citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest

and costs.  Counterclaim-Defendants' improper extra-contractual actions have required Frontier

to expend more than $130,000 in attorneys' fees (exclusive of fees and costs incurred in connection with the pending lawsuits) that Counterclaim-Defendants' have refused to reimburse, despite the fact that the Leases require such reimbursement.  In addition, Frontier has incurred more than $500,000 in litigation fees and costs arising from the parties' dispute.  Frontier has also suffered damages, in amounts to be determined at trial, due to operational limitations, increased costs, and reputational harm caused by Plaintiffs' misconduct and defaults.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) and because Counterclaim-Defendants are subject to the Court's personal jurisdiction by agreement of parties.

4.      Further, the parties submitted to the jurisdiction of this Court by agreement.  The Leases, Guarantees, and Participation Agreements each provide that the parties to each respective agreement irrevocably submit to the jurisdiction of this Court with respect to any suit, action, or proceeding relating to the respective agreement or any matter between the parties arising under or in connection with the agreement or any related Lease Document (as defined in each Lease).

**A.      The Leases**

5.      In this third installment of the overall dispute among the parties, Frontier brings its Counterclaim to address Counterclaim-Defendants' repeated and recent failures to abide by the leases (the "Leases") governing Frontier's leasing of fourteen aircraft (the "Aircraft").

6.      Thirteen of the fourteen Leases are subject to substantially similar form lease agreements referred to as an Aircraft Operating Lease Agreement ("Lease Form 1").  These leases each provide that the transfer of beneficial ownership, the grant of participations in the lease or other Operative Documents, or any other transfer or disposal of rights and obligations under the agreements are subject to certain preconditions.

7.      Section 20.2(a) of Lease Form 1 provides in relevant part:

Each of Lessor and Owner Participant (and any subsequent permitted assignee or transferee) shall have the right at any time, at its own expense and upon prior written notice to Lessee, to transfer ownership or beneficial ownership, as applicable, of the Aircraft, or to assign (including to assign as security), mortgage, novate, transfer, grant participations in, or otherwise dispose of its rights and obligations under this Agreement and the other Operative Documents, to any other person by outright transfer or assignment or collateral assignment or by operation of law and Lessee hereby consents to any such transfer or assignment; provided that:

(i) Lessee shall have no greater financial obligation or liability under this Agreement and the other Lessee Documents as a result of such transfer based on the facts and circumstances existing and applicable laws in effect at the time of such transfer, than it would have had if such transfer had not taken place . . .

(ii) such transfer shall not result in any restriction, based on the facts and circumstances existing and applicable laws in effect at the time of such transfer, on Lessee's rights under this Agreement or the other Lessee's Documents or on Lessee's use or operation of the Aircraft;

(iii) in the case of a sale of the Aircraft by Lessor or transfer of the beneficial interest of Owner Participant in the Aircraft or a transfer (other than to an Affiliate of the Lessor Guarantor) of a controlling interest in the Owner Participant, any such assignee or transferee shall be a Permitted Transferee and shall unconditionally guaranty the obligations of Lessor under this Agreement pursuant to a Guarantee in form substantially similar to the Guarantee executed by Owner Participant in favor of Lessee unless the existing Lessor Guarantee will remain in full force and effect following such transfer;

. . .

(v) Lessor shall have reimbursed to Lessee (or shall have agreed in writing to promptly reimburse to Lessee following such assignment, transfer or novation) Lessee's reasonable and invoiced out-of-pocket costs and expenses incurred in connection with its cooperation with Lessor under this Clause 20.2, including reasonable legal fees.

8.      The final lease utilizes a different basic form ("Lease Form 2").  Section 22.3 of

Lease Form 2 provides in relevant part:

Lessor may sell, assign, novate or otherwise transfer its right, title and interest in the Aircraft or this Lease without Lessee's consent (a "Transfer"), subject to the following conditions:

(i) the proposed purchaser, assignee or transferee (the "Transferee") shall enter into an agreement, reasonably satisfactory to Lessee, assuming all obligations of Lessor under this Lease and the other Operative Documents and of Beneficiary under the Participation Agreement and other Operative

Documents;

(ii) Lessor shall be responsible for Lessee's reasonable legal fees and other reasonable costs and expenses incurred in respect of such Transfer and shall pay such costs and expenses promptly upon demand therefor;

. . .

(v) any Transfer will not increase Lessee's obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, in each case under any Operative Document or in respect of the Aircraft (to be determined in each case as at the time of such Transfer by applying all applicable laws as are enacted and/or in effect on the effective date of such Transfer) . . . .

9.      The Owner Participant of the Lease governed by Lease Form 2 also entered into a Participation Agreement with Frontier.

10.     Pursuant to Section 3.1 of the Participation Agreement, the Owner Participant may sell or transfer its interest *only* if all of the following conditions are met:

(1) the proposed transferee confirms in writing, in a form reasonably satisfactory to Frontier, its undertaking to perform the obligations of Owner Participant in a form substantially similar to the Participation Agreement;

(2) the Owner Participant pays Frontier's reasonable legal fees and costs incurred in connection with the transfer;

(3) the transferee entity meets certain requirements, including that it is a citizen of the U.S.; not an airline or aircraft operator; and has, or through a guarantee acceptable to Frontier by a person having, a minimum net worth of a specified value in the tens of millions of dollars;

(4) the transfer does not increase Frontier's obligations or risks or diminish Frontier's rights and benefits under any of the lease documents; and

(5) the transfer does not affect the registration of the aircraft.

11.     Each of the Leases is guaranteed by the Owner Participant or a parent company.

12.     Among other requirements set forth in the Guarantees, each Guarantor agrees to be liable for the payment of all reasonable fees and expenses, including attorney's fees, incurred by Frontier in connection with the enforcement of the Guarantee.  Additionally, under the

18

Guarantees, Guarantors and beneficiaries each are responsible to perform and fulfill the lessor's. obligations under the leases when a lessor defaults.

13.    These provisions are each designed to protect Frontier in the event of any transfer (directly or indirectly) of an ownership interest with respect to the Leases or the Aircraft and to ensure that transfers, assignments, and novations—which are a regular occurrence in the airline finance industry—are conducted in a manner that do not increase lessee's risks or liabilities or otherwise diminish the lessee's rights in the Leases, Lessee's Documents, or Aircraft.

14.    Lessees in the aircraft leasing market are permitted and expected to investigate any proposed transaction, pursuant to which interests in the lease are to be transferred, to confirm that the transfer preconditions under the lease are satisfied, and to receive assurances from the existing lessor parties as well as documentary evidence that any fees incurred by lessee will be paid, the requirements under the Leases will be satisfied after the transfer, including that the transferee will meet the criteria of a permitted transferee; and the transaction will not prejudice lessee's rights under the Lease and each of the Lessee's Documents, including but not limited to any warranty documents.

15.    The Leases also protect Frontier from disturbances, interferences, and threats to its use and quiet enjoyment of the Aircraft.

16.    Section 4.3(a) of Lease Form 1 state provides:

(a) Quiet Enjoyment. Subject to the provisions of this Agreement, including the provisions for early termination, or unless compelled to do so by any applicable law, so long as no Event of Default has occurred and is continuing, Lessor will not disturb the continuous quiet use, possession and enjoyment of the Aircraft by Lessee during the Term.

17.    Similarly, Section 9.1 of the Lease Form 2 states that "provided no Event of Default has occurred and is continuing," Lessor shall not "interfere with the quiet use, possession and enjoyment of the Aircraft by Lessee . . . during the Lease Period . . . ."

18.     Section 2.1(b)(4) of the Participation Agreement further provides that the Owner Participant covenants to Frontier that Frontier will have quiet enjoyment of the Aircraft throughout the term of the Lease.

**B.     The Parties' Dispute**

19.     At the time the Leases were executed, the Aircraft were beneficially owned by AMCK Aviation Holdings Ireland Limited and its affiliates (collectively "AMCK")—through Wells Fargo and UMB as owner trustees.

20.     In March 2020, Frontier and AMCK entered into a Framework Agreement (the "Framework Agreement") for the lease of six additional aircraft.  Under the Framework Agreement, AMCK committed to purchasing six Airbus aircraft and then lease them to Frontier.

21.     Almost immediately, AMCK repudiated the Framework Agreement because of the adverse effect the COVID-19 pandemic had on aircraft financing markets.  On May 8, 2020, without warning, AMCK issued Frontier a Notice of Termination of the Framework Agreement, retracting its commitment to purchase five of the six aircraft as provided in the agreement.

22.     To avoid a default with Airbus, Frontier was forced to secure last-minute sources of financing on the verge of the aircraft deliveries, on terms that were substantially less favorable than those committed to by AMCK, causing more than $50 million in damages to Frontier.

23.     On November 18, 2020, Frontier filed suit ("Lawsuit 1") in this Court to recover the losses Frontier sustained because of AMCK's failure to uphold its end of its bargain with Frontier, alleging (among other things) that AMCK anticipatorily repudiated the Framework Agreement.  The action is pending before Judge Stanton.

24.     On May 5, 2021, AMCK's motion to dismiss the action was denied.

25.     On July 6, 2023, Judge Stanton denied AMCK's motion for summary judgment as to Frontier's core claim for breach of the Framework Agreement against AMCK.  Judge Stanton

held that there were "clear questions of fact whether the parties [agreed] to suspend payments" under the Leases due to the unforeseen circumstances of the COVID-19 pandemic and, if the parties had, then AMCK's subsequent non-performance was an unjustified breach of the Framework Agreement. The action remains pending and the parties are preparing for trial.

26.    During the pendency of Lawsuit 1, AMCK reached an agreement to sell its entire aircraft portfolio to Carlyle Aviation Partners and certain other affiliated entities, including Counterclaim-Defendants. A December 2021 press release from Carlyle Aviation Partners (the "Press Release") announced the sale.

27.    Despite its ongoing business relationship with AMCK and the active litigation between AMCK and Frontier, neither AMCK nor Carlyle informed Frontier of the sale. Rather, Frontier learned of the sale when it discovered the Press Release in January 2022.

28.    Upon review of publicly available financial statements and other corporate records of relevant entities, Frontier came to understand that AMCK conducted a series of internal transfers that effectively relinquished AMCK's ownership of valuable assets, including companies holding the AMCK subsidiaries that had leased the Aircraft to Frontier, for less than fair market value. Based on Frontier's review of financial statements, these transfers left AMCK Aviation Holdings with approximately 2% of its former assets.

29.    As a result of these improper transfers, Frontier determined that AMCK Aviation Holdings was unlikely to be solvent to pay any judgment obtained by Frontier in Lawsuit 1.

30.    On January 4, 2022, Frontier made a written demand on AMCK for documents and information relevant to the transfer of ownership interests to Carlyle and its affiliates.

31.    Despite its obligations under the Leases, AMCK denied that the sale was a "transfer" under the leases and provided no information.

32.     On or about April 13, 2022, Carlyle notified Frontier that its transaction with AMCK had closed and stated that Carlyle had taken over as the new Servicer with respect to the aircraft leased to Frontier.

33.     Frontier objected to the transactions and to Carlyle's purported designation as Servicer.  Carlyle did not respond to Frontier's objections.

34.     In June 2022, Carlyle notified Frontier that it had assigned as security all of its rights under certain Leases to a third-party lender and demanded that Frontier add the new parties as additional insured under its insurance.  Just as in the transfer from AMCK to Carlyle, Carlyle provided Frontier neither notice nor opportunity to comment prior to executing that assignment, in violation of the Leases.  Frontier responded to those notices by providing comments and markups, and Carlyle ignored Frontier's correspondence.

35.     In light of Counterclaim-Defendants' conduct in connection with the sale to Carlyle and the subsequent security assignment, on June 22, 2022, Frontier filed an action captioned *Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd.*, et al., No. 22-cv-02943-PAE (S.D.N.Y.) ("Lawsuit 2").  The Counterclaim-Defendants are each a defendant in Lawsuit 2, which remains pending before this Court.

36.     In Lawsuit 2, Frontier brought claims for breach of the Leases arising from the AMCK/Carlyle transaction, as well as the June 2022 security assignments.  Frontier also brought claims against Carlyle for actual and constructive fraudulent transfer arising out of Carlyle's raiding of AMCK's assets, which rendered AMCK judgment proof and frustrated Frontier's ability to collect on a judgment in Lawsuit 1.

37.     On June 7, 2023, the Court denied defendants' motion to dismiss Frontier's contract claims, but dismissed Frontier's claims for declaratory relief and fraudulent transfer.

38.    While that action was pending, in November 2022, Carlyle informed Frontier that it wanted to sell four of its aircraft to two separate third parties.

39.    On November 23, 2022, Frontier sent Carlyle a letter asking for additional details about the transfers and expressing its concern that the proposed transactions might negatively affect Frontier's interests in the pending litigation concerning the Leases.

40.    Hours later, on the same day, Carlyle sent Frontier proposed security assignments for all of the Aircraft without responding to—or even acknowledging—Frontier's letter.

41.    Carlyle did not address Frontier's concerns about the impact of the proposed transactions on Frontier's right to recovery in the two litigations, nor did it clearly explain how these security assignments related to the other contemplated transactions.  Nonetheless, Carlyle demanded that Frontier participate in the contemplated transactions in ways that would impair Frontier's recovery rights in Lawsuits 1 and 2.

42.    The transaction documents proposed by Carlyle would have the effect of diminishing many of Frontier's contract rights by undermining Frontier's claims in Lawsuits 1 and 2, including its claims that AMCK had wrongfully transferred the Aircraft to Carlyle in the first instance and that Carlyle had improperly engaged in the June 2022 security assignments.  In addition, Counterclaim-Defendants' refusal to provide the additional information and assurances requested by Carlyle made it impossible to determine if other contract rights of Frontier would be eliminated or impaired if Frontier were to agree to the transactions proposed by Carlyle.

43.    Frontier's concerns were reasonable and valid, particularly given Carlyle's pattern of prior bad conduct in connection with the Leases.  As set out above, Carlyle and AMCK intentionally raided AMCK of its valuable assets—selling 98% of AMCK's assets to Carlyle, but none of its litigation liabilities—while failing to even inform Frontier of the existence of the

parties' sale agreement. And less than three months after its acquisition closed, Carlyle continued its mischief, purporting to enter into security assignments without any notice to Frontier. Frontier had every reason to be concerned that Carlyle would continue to disregard Frontier's rights and interests.

44.     Nonetheless, Frontier engaged with Carlyle to negotiate an appropriate commercial solution that addressed Frontier's reasonable concerns while still allowing the transactions to go ahead.

45.     Frontier and Carlyle held a counsel call on December 5, 2022 to discuss these communications.  On that call, Carlyle committed to provide a detailed chart setting out the proposed structure and timing of the transactions, including information about the identity and corporate relationship of each party to the transactions.

46.     However, the chart that Carlyle provided to Frontier after the call did not explain the corporate relationship between the parties, contained only vague assertions about transaction timing, and did not contain relevant information about the transaction parties and the specific timing for each of the proposed transactions.

47.     Frontier also understood—and expressed to Carlyle on the December 5, 2022 counsel call—that certain of Carlyle's proposed assignments could not move forward even with Frontier's consent, because a condition of such transfer would be the execution of a new tripartite agreement between CFM, who manufactures the engines used in the Aircraft, Frontier, and the proposed transferees.  Carlyle acknowledged that no new tripartite agreement was in place as of that time, nor did it have a definitive timeline for the negotiation of a new agreement.

48.     In subsequent communications between December 2022 and mid-January 2023, Carlyle continued to provide incomplete information about the identities of key parties to the

transactions and their parents and controlling entities.  Withholding this information prevented Frontier from being able to accurately assess the net effect of the transactions on Frontier's rights under the Leases and in connection with its pending lawsuits.

49.     Carlyle also continued to deny that Frontier had any basis to protect its rights in connection with the proposed transfers based on the claim that the pending litigation was meritless.

50.     Despite Carlyle's refusal to provide information required by the Leases and industry practice, Frontier expressed willingness to cooperate with the proposed transactions but proposed modifications to the transaction documents necessary to acknowledge Frontier's right to recover in the pending litigations and protect Frontier's right to execute against the Aircraft should the defendants be otherwise unable to satisfy a judgment against them.

51.     On February 9, 2023, Carlyle rejected Frontier's proposed protective language. All Carlyle would agree to was the addition of a conclusory statement that the assignments would not be "a waiver of any contractual or extra contractual right or as a waiver of any claim, right or defense by any person, trust or other entity in connection with" the pending litigations. Carlyle would not agree to any terms in the proposed contracts to affirmatively protect Frontier's rights.

52.     After Carlyle refused to consider Frontier's protective language in the contracts, Frontier offered to consider multiple alternative methods to provide security for payment of a judgment in Lawsuit 1, including a bond, a letter of credit, or an acceptable guarantee. Carlyle initially rejected all of these, and continued to deny that Frontier had any contractual or other rights to protect its ability to obtain a recovery in the pending lawsuits.

53.     On March 24, 2023, Carlyle changed its position and proposed a limited unsecured guarantee from a Carlyle single-purpose entity.  The guarantee expressly excluded liabilities of AMCK and proposed to cover only the liability that a Carlyle-owned entity would have to Frontier in the lawsuit for as long as they were owned by Carlyle while imposing additional obligations on Frontier to complete the proposed transfers for Carlyle.

54.     The proposed guarantee was insufficient and, for many reasons, Frontier rejected the proposal, including because (i) the proposed guarantee did not guarantee payment of a judgment against AMCK, the owner trustees, or any liability against any entity not owned by Carlyle, (ii) the guarantee was to be executed by another entity controlled by Carlyle that could easily be stripped of all assets and rendered unable to honor it, and (iii) the proposed guarantee would necessitate that Frontier file another lawsuit to enforce it.

55.     On April 7, 2023, Frontier proposed a revised guarantee that addressed its concerns.

56.     On April 24, 2023, Carlyle rejected Frontier's April 7, 2023 proposal, and did not materially change its initial guarantee proposal.

57.     In the middle of the parties' ongoing negotiations, Carlyle abruptly sent Frontier a letter on April 27, 2023, asserting that Frontier had breached the Leases and the parties' Non-Waiver and Preservation of Rights Agreement entered into after the filing of Lawsuit 2.

58.     On May 3, 2023, Frontier sent a letter in response to Carlyle's letter to correct Carlyle's factual inaccuracies and dispute Carlyle's allegations.  Nonetheless, Frontier expressed its continued desire and willingness to negotiate toward mutually agreeable terms and sent revised proposal on May 5, 2023, to which Carlyle did not respond.

59.     Frontier did not hear further from Carlyle on these issues for nearly a month.

60.    Then, on May 26, 2023, the Friday before Memorial Day weekend, Carlyle, on behalf of the owner trustees, served on Frontier fourteen notices of default.

61.    The notices alleged that Frontier was in default as a result of its failure to execute transfer documents in the form presented by Carlyle, and invoked Section 20.2(b) of Lease Form 1.

62.    The notices threatened, among other things, to ground, impound, or deregister the Aircraft upon expiration of the 15-day cure period, should Frontier fail to cure the alleged default.

63.    The notices falsely allege that Frontier has defaulted under the Leases, which it has not.

64.    Carlyle served the notices of default despite knowing that Frontier remained committed to working toward a resolution of the issues between the parties—and despite the fact that executing the transaction documents requested by Carlyle would diminish and restrict Frontier's rights and interests in the Aircraft and disturb Frontier's use and enjoyment of its leased property.

65.    Along with the default notices, Counterclaim-Defendants filed this action in New York Supreme Court on or about May 31, 2023.  Counterclaim-Defendants served a copy of the filing on Frontier via Frontier's agent for service of process, which Frontier received on June 5, 2023.

66.    The default notices served on May 26, 2023 led Frontier to seek emergency relief in Lawsuit 2 to prevent Carlyle from improperly exercising the extreme remedies of grounding, impounding, and deregistering the Aircraft, as Frontier was faced with consenting to transfers

27

and assignments that violated its contractual rights and interests or having key and necessary portions of its fleet grounded, which would cause Frontier irreparable harm.

67.    The Court entered a temporary restraining order on June 8, 2023, prohibiting Counterclaim-Defendants Wells Fargo and UMB from exercising their threat.

68.    On July 3, 2023, while Frontier's application to convert the temporary restraining order into a preliminary injunction was pending, Carlyle made a non-binding proposal containing a revised guarantee.  The proposed revised contained improved terms compared to the original guarantee but was still substantially deficient.

69.    The proposal contained improved terms but also imposed extra-contractual requirements on Frontier, including a requirement that Frontier move aircraft to any state that the Counterclaim-Defendants dictate and a new unspecified "cap" on Frontier's contractually guaranteed legal fees incurred in connection with reviewing proposed transaction terms and documentation between old and new lessors.  Both of these terms run afoul of well-established industry standards and violate the Leases and impact Frontier's rights under the agreements.

70.    On July 18, 2023, the Court granted Frontier's application for a preliminary injunction and enjoined the owner trustees from grounding, impounding or deregistering the Aircraft.  The Court stated that "a durable ironclad guarantee [of the obligation to pay any judgment entered in the case before Judge Stanton] that, once committed to, is outside of [Carlyle's] control and assures a recovery" would obviate the need for the preliminary relief, as well as Lawsuit 2 and this action pending before the Court.  The Court scheduled a follow-up conference for August 10, 2023, to address the continuing need for the preliminary injunction and whether, in the ensuing weeks, Counterclaim-Defendants proposed a financial guarantee sufficient to safeguard the interests of Frontier.

71.    On August 15, 2023, after exchanging additional proposals and consistent with the direction by the Court at the August 10, 2023 conference, the parties agreed on a form guarantee and submitted the proposal, along with dueling proposed orders addressing the necessary steps preliminary injunction.  The Court entered an order on August 17, 2023 directing Counterclaim-Defendants to provide the executed guarantee on or before August 21, 2023, and ordering Frontier to execute on or before August 31, 2023, those certain assignment documents previously provided by Carlyle, as reasonably revised by the parties.

72.    Frontier provided signed transaction documents in the forms acceptable to Carlyle on or before August 30, and received the executed guarantee on August 21, 2023.[1]

73.    On August 30 and 31, 2023, Frontier provided executed copies of the transaction documents provided to it on July 18 and August 14, 2023, thereby complying with its obligations under the Court's August 17 order.

74.    The Leases require Carlyle to pay Frontier's legal fees incurred in connection with any security assignment or transfer proposed by Carlyle.  Paragraph 20.2(a)(v) of Lease Form 1 requires that "Lessor shall have reimbursed to Lessee (or shall have agreed in writing to promptly reimburse to Lessee following such assignment, transfer or novation) Lessee's reasonable and invoiced out-of-pocket costs and expenses incurred in connection with its cooperation with Lessor under this Clause 20.2(a), including reasonable legal fees."  Paragraphs 22.2(2) and 22.3(ii) of Lease Form 2 similarly require that for security assignments, "Lessor shall pay all reasonable and documented out-of-pocket costs and expenses, including reasonable fees and disbursements of counsel, incurred by Lessee in connection with any such Security

---

[1] Frontier's claim for constructive trust, asserted in its initial Answer & Counterclaim, was mooted by the executed guarantee, and Frontier reserves all rights with respect to this claim, including the right to reassert the constructive trust claim in the event that the guarantee is not honored.

Interest or assignment," and for transfers, "Lessor shall be responsible for Lessee's reasonable legal fees and other reasonable costs and expenses incurred in respect of such Transfer and shall pay such costs and expenses promptly upon demand therefor . . . ."

75.     Frontier repeatedly requested that Carlyle fulfill the contractual obligations identified above.  Carlyle acknowledged its obligation to pay fees, but claimed that it was only obligation to pay "nonlitigation" fees despite the lack of any such limitation in the parties' contracts.

76.     In an effort to obtain at least a portion of the fees it was entitled to, Frontier sent Carlyle a March 9, 2023 fee invoice for $204,353 in "nonlitigation" fees incurred to date, reserving the right to collect "litigation" fees at a later time.

77.     Carlyle did not object to this invoice for more than five months but simply failed to pay it.

78.     At Carlyle's request, on August 27, 2023, Frontier provided to Carlyle an updated redacted detailed invoice of its non-litigation legal fees and costs incurred relating to the transaction that totaled $290,632.30.  On approximately August 31, 2023, Carlyle paid $160,472.60 of the amount owed, leaving approximately $130,000 of the invoice unpaid.

79.     In addition, to date Frontier has incurred an additional $500,000 in litigation fees and costs as a result of Counterclaim-Defendants' conduct that they are required under the Leases to reimburse.

## FIRST CLAIM FOR RELIEF
## (BREACH OF CONTRACT)

80.     Frontier repeats and realleges each allegation in Paragraphs 1 through 79 of the Counterclaim.

81.    Frontier and Counterclaim-Defendants are party to the Leases, the Guarantees, and the Participation Agreement.

82.    Frontier has performed its obligations under each Lease, Guarantee, and Participation Agreement, and is current on all rent payments under the Leases.

83.    Under Section 20.2(a) of Lease Form 1, Frontier is required to consent to an assignment or transfer only to the extent certain conditions are met.

84.    Section 20.2(a)(ii) of Lease Form 1 further allows Frontier to withhold consent to a transaction if that transaction would "result in any restriction, based on the facts and circumstances existing . . . , on Lessee's rights under this Agreement or the other Lessee's Documents . . . ."

85.    Section 4.3(a) of Lease Form 1 further states that "so long as no Event of Default has occurred and is continuing, Lessor will not disturb the continuous quiet use, possession and enjoyment of the Aircraft by Lessee during the Term."

86.    Section 22.3(v) of Lease Form 2 provides that any Transfer "will not increase Lessee's obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, in each case under any Operative Document or in respect of the Aircraft (to be determined in each case as at the time of such Transfer by applying all applicable laws as are enacted and/or in effect on the effective date of such Transfer) . . . . "

87.    Additionally, Section 9.1 of the Lease Form 2 states that "provided no Event of Default has occurred and is continuing," Lessor shall not "interfere with the quiet use, possession and enjoyment of the Aircraft by Lessee . . . during the Lease Period . . . ."

88.    Section 2.1(b)(3) of the Participation Agreement requires the Owner Participant to cause the Lessor to perform all of its obligations under the Leases.

89.    Further, in Section 2.1(b)(4) of the Participation Agreement, the Owner Participant covenants to Frontier that Frontier will have quiet enjoyment of the Aircraft throughout the term of the Lease.

90.    The Guarantees require the Guarantors to fulfill the obligations of the Lessors under the Leases, including all payment obligations, upon failure of the Lessor to perform or comply with the obligations.

91.    Additionally, as lessee, Frontier is entitled to a common-law right to quiet enjoyment of its leased property.

92.    Counterclaim-Defendants breached the Leases, the Participation Agreement, and the Guarantees by failing to provide Frontier, in accordance with Section 20.2(a)(ii) of Lease Form 1, Section 22.3 of Lease Form 2, and Section 2.1(b)(3) of the Participation Agreement with reasonable and required assurances in connection with their demand that Frontier execute certain assignments and sale transaction documents commencing in November 2022 that such transactions would not restrict or otherwise diminish Frontier's rights and interests under the Leases and its use the Aircraft, or harm Frontier's ability to recover on a judgment in Lawsuit 1. Counterclaim-Defendants refused for months to provide Frontier with those assurances.

93.    Counterclaim-Defendants further breached the lease by failing to reimburse Frontier for the full amount of its legal costs associated with the transactions, as contractually required.

94.    Finally, Counterclaim-Defendants breached Section 4.3 of Lease Form 1, Section 9.1 of Lease Form 2, Section 2.1(b)(3)-(4) of the Participation Agreement, the Guarantees, and Frontier's common-law right to quiet enjoyment by issuing notices of default to Frontier that falsely claimed Frontier has failed "to execute a consent in a form Lessor reasonably require[s],"

and threatening to ground, impound, and/or deregister the Aircraft.  Prior to seeking a temporary injunction in Lawsuit 2, Frontier sought Lessors' temporary agreement to not impound, ground or deregister the Aircraft, which Lessors expressly rejected.

95.    Counterclaim-Defendants' breaches have damaged Frontier, including by causing Frontier to incur more than $130,000 in unreimbursed attorneys' fees, as well as causing actual and potential disruption to Frontier's operations, requiring substantial amounts of time by Frontier managers and employees to deal with the fallout of Carlyle's improper default notices, and harming Frontier's reputation, goodwill and standing in the industry, all in amounts to be determined at trial.  Frontier has further incurred over $500,000 in legal fees and costs arising from the Counterclaim-Defendants' conduct.

**WHEREFORE**, Frontier denies that Plaintiffs are entitled to any relief and respectfully requests that the Court grant Frontier the following relief:

(i)    Dismissal of Plaintiff's claims pursuant to Fed. R. Civ. P. 13(a) on the ground that they are compulsory counterclaims in Lawsuit 2;

(ii)    A judgment denying all relief requested by Plaintiffs;

(iii)    A judgment dismissing all of Plaintiffs' claims with prejudice;

(iv)    A judgment against Plaintiffs and in favor of Frontier in all respects;

(v)    An award to Frontier for reasonable attorneys' fees, costs, and expenses as required by the Leases;

On the Counterclaim:

(vi)    A judgment granting all relief requested by Frontier;

(vii)    An award of damages for Counterclaim-Defendants' breaches of the Leases in an amount to be determined at trial, plus interest and attorneys' fees;

(viii)    An award of attorneys' fees, costs, and expenses incurred in prosecuting the

Counterclaim; *and*

(ix)    Such other relief to Frontier as the Court may deem just and proper.

Dated:    New York, New York
          September 6, 2023

Respectfully Submitted,

**BINDER & SCHWARTZ LLP**

/s/ Eric B. Fisher
Eric B. Fisher
Tessa B. Harvey
675 Third Avenue, 26th Floor
New York, New York 10017
Tel: (212) 510-7008
Email: efisher@binderschwartz.com
Email: tharvey@binderschwartz.com

David Schoeggl (*pro hac vice* forthcoming)
**LANE POWELL PC**
601 S.W. Second Avenue
Suite 2100
Portland, Oregon 97204
Telephone: (503) 778-2100
Email: schoeggld@lanepowell.com

*Attorneys for Frontier Airlines, Inc.*