UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CARLYLE AVIATION MANAGEMENT LIMITED, *et al.*,

Plaintiffs,

-v-

FRONTIER AIRLINES, INC.,

Defendant.

23 Civ. 4774 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

In this action, plaintiffs (together, "the Lessors") allege that the lessee of 14 aircraft, defendant Frontier Airlines, Inc. ("Frontier"), has violated the terms of the airplanes' leases. Frontier denies the Lessors' allegations. It brings a counterclaim alleging that the Lessors breached the terms of the leases.

Pending now are two motions. The Lessors have moved to dismiss Frontier's counterclaim. Frontier has cross-moved to consolidate this action with *Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd. et al.*, No. 22 Civ. 2943 (PAE) (S.D.N.Y.). For the reasons that follow, the Court, although significantly narrowing Frontier's counterclaim, denies both motions.

I.      **Background**

A.      **Factual Background**[1]

The Court here provides only the limited background necessary to resolve the pending motions.

---

[1] The facts which form the basis of this decision are taken from the parties' pleadings and the contracts and agreements that are incorporated by reference into or integral to Frontier's amended counterclaim. In particular, the Court draws on the complaint, Dkt. 1, Ex. 2

1.      **The Lease Agreements**

Like many other airlines, Frontier does not own most of its airplanes; instead, it relies on

"sale and leaseback" agreements to operate its fleet.  *See* Compl. ¶¶ 34–35; Counterclaim ¶¶ 12–

14.  A sale and leaseback agreement (or, more simply, a "leaseback") is a financial transaction in

which a company sells an asset (such as property, equipment, or, as here, an aircraft) to a buyer

---

("Compl."); Frontier's amended answer, Dkt. 30 at 1–15 ("Answer"); Frontier's amended
counterclaim, Dkt. 30 at 15–34 ("Counterclaim"); the Lessors' brief in support of their motion to
dismiss Frontier's amended counterclaim, Dkt. 32 ("Pl. Br."), and Jed M. Schwartz's declaration
in support, and attached exhibits, Dkt. 33 ("Schwartz Decl."); Frontier's brief in opposition to the
Lessors' motion and in support of its motion to consolidate, Dkt. 39 ("Def. Br."); and the
Lessors' reply brief in support of their motion and in opposition to Frontier's motion to
consolidate, Dkt. 41 ("Pl. Reply Br."), and Schwartz's declaration in support, and attached
exhibits, Dkt. 42 ("Schwartz Reply Decl.").   In resolving the motion to dismiss Frontier's
counterclaim, the Court considers all well-pleaded facts found in the counterclaim to be true and
draws all reasonable inferences in Frontier's favor.  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699
F.3d 141, 145 (2d Cir. 2012).  For exhibits and briefs with both internal and Bates-stamped
numbering, the Court cites the Bates-stamped page numbers.

"[D]istrict courts may 'permissibly consider documents other than the complaint' for the truth of
their contents if they 'are attached to the complaint or incorporated in it by reference.'"  *Ark.
Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 n.3 (2d Cir. 2022) (quoting
*Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).  The Lessors did not attach the Lease
Agreements, the Participation Agreement, or the Framework Agreement, each of which is
discussed in the amended counterclaim at some length.  *See* Counterclaim ¶¶ 6–17 (Lease
Agreements), ¶¶ 18, 89, 92 (Participation Agreement), ¶¶ 20–24 (Framework Agreement).  Such
"clear, definite and substantial reference[s] to the documents" incorporate each by reference.
*Thomas v. Westchester County Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002).
In any case, given that the contracts are "legal document[s] containing obligations upon which
the [counterclaim] stands or falls," they are "integral" to Frontier's counterclaim and thus
properly before the Court.  *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150,
157 (2d Cir. 2006).  The Lease Agreements are attached in the supporting papers of Frontier's
motion to dismiss, *see* Schwartz Decl., Ex. 1 ("Lease Form 2"), Ex. 3 ("Lease Form 3"), as is the
Participation Agreement, *see id.*, Ex. 2 ("Participation Agreement").  The Framework Agreement
is attached in a filing in the related litigation referred to herein as Litigation 2.  *See* Dkt. 72, Ex. 3
("Framework Agreement"), *Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd., et
al.*, No. 22 Civ. 2943 (PAE) (S.D.N.Y.).

and simultaneously leases it back from the purchaser.  This allows the company to free up capital tied to the ownership of the asset while retaining its operational use.[2]

At issue in this case are 14 such leases (together, the "Lease Agreements"), each for an Airbus A320 aircraft (together, the "Aircraft").  Compl. ¶¶ 24–35; *see* Dkt. 26, Exs. 1, 3 (full text of the Lease Agreements).  Frontier is party to each agreement as the "Lessee."  Compl. ¶¶ 24–25; Counterclaim ¶¶ 5–18.

Due to federal regulations that impede the domestic leasing of foreign aircraft, the Aircraft are legally owned by U.S.-domiciled trusts.[3]  The trustees—either UMB Bank, N.A. ("UMB Bank") or Wells Fargo Trust Company, N.A. ("Wells Fargo")—serve as Frontier's counterparties in the Lease Agreements.  Compl. ¶ 25; Counterclaim ¶ 19.  UMB and Wells Fargo are, accordingly, the "Lessors," and also referred to as the "Owner Trustees."  Compl. ¶ 25; Counterclaim ¶ 19.  At the time the leases were concluded, the real parties-in-interest—that is, the beneficial owners of the Aircraft (known as the "Owner Participants")—were two subsidiaries of AMCK Aviation Holdings Ireland Limited ("AMCK"): Accipiter Investment 4 Limited ("Accipiter") and Vermillion Aviation (Two) Limited ("Vermillion").  Compl. ¶¶ 27–29; Counterclaim ¶ 19.  At that point, AMCK—organized under the laws of Ireland—was an aircraft leasing company controlling more than 100 aircraft, including those in the Lease Agreements.

---

[2] *See generally* ROB MURPHY, AIRCRAFT FINANCING 49–53, 185–96 (5th ed. 2022).  By one 2019 estimate, more than half of all commercial aircraft operate under leaseback arrangements.  *See id.* at 185.

[3] *See* Notice of Policy Clarification for the Registration of Aircraft to U.S. Citizen Trustees in Situations Involving Non U.S. Citizen Trustors and Beneficiaries, 78 Fed. Reg. 36412, 36413–14 (June 18, 2013) (discussing use of "non-citizen trusts" as "owners of aircraft on the U.S. registry"); *see also* MURPHY, *supra*, at 69–70.

2.      **The Pending Litigation**

These leases—and other agreements between the parties—are at issue in three cases

pending in this District.  This case, as the third in the line, will be referred to as "Litigation 3."  A

brief description of the two prior cases ("Litigation 1" and "Litigation 2") is necessary, however,

to understand Litigation 3.

a.      *Litigation 1*

The first litigation ("Litigation 1") centers around a March 2020 contract between

Frontier and AMCK known as the "Framework Agreement."  Compl. ¶ 37; Counterclaim ¶ 20.

At the time the Framework Agreement was reached, AMCK had already delivered 13 of the

Aircraft at issue in this case (that is, Litigation 3) under preexisting leaseback agreements.

Counterclaim ¶¶ 6, 19–20.  Under the Framework Agreement, AMCK was to purchase six new

Airbus airplanes and then lease them back to Frontier at a predetermined rate.  Framework

Agreement ¶¶ 1.1, 2.1.

After just one leaseback transaction had been concluded under the Framework

Agreement (the final leased aircraft at issue in this case), AMCK terminated the Framework

Agreement.  Counterclaim ¶¶ 21–23.  The termination led to Litigation 1, pending before Judge

Stanton, in which Frontier sues AMCK, Accipiter, Vermillion, UMB Bank (as trustee), and

Wells Fargo (as trustee) for breach of contract, seeking damages in excess of $50 million—the

alleged cost of finding replacement financing arrangements with other leasing companies.  *See*

*Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd., et al.*, No. 20 Civ. 9713 (LLS)

(S.D.N.Y.).  The case turns on whether AMCK's termination was wrongful.  Counterclaim ¶ 25;

*see also Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd.*, No. 20 Civ. 9713

(LLS), 2023 WL 4364450, at *8–10 (S.D.N.Y. July 6, 2023) (granting in part and denying in

part defendants' motion for summary judgment).  As of today, that action is ongoing, with a bench trial scheduled for March 2024.

### b.     Litigation 2

The second litigation ("Litigation 2") arises out of transactions after the initiation of Litigation 1.  In December 2021, AMCK sold its airline leasing business to entities affiliated with Carlyle Aviation Management Limited ("Carlyle")—that is, Carlyle took a controlling share in AMCK's then-subsidiaries (Accipiter and Vermillion).  Compl. ¶¶ 24–35; Counterclaim ¶¶ 26–27.  That leasing business included the one commercial aircraft leased under the Framework Agreement as well as the 13 other aircraft leased to Frontier under prior contracts.  Compl. ¶¶ 53–68; Counterclaim ¶¶ 28, 38.

In Litigation 2, pending in this Court, Frontier sues the defendants in Litigation 1— AMCK, Accipiter, Vermillion, UMB Bank (as trustee), and Wells Fargo (as trustee)—as well as Carlyle and entities affiliated with Carlyle: Maverick Aviation Holdings Limited ("Maverick"), Manchester Aviation Finance s.a.r.l. ("Manchester"), Accipiter Holdings DAC ("Accipiter Holdings"), and Vermillion Aviation Holdings Limited ("Vermillion Holdings").  *See Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd., et al.*, No. 22 Civ. 2943 (PAE) (S.D.N.Y.).  That case also entails a breach of contract claim.  Frontier claims it was entitled to notice before the sale of AMCK's airline leasing business.  Compl. ¶¶ 44–47; Counterclaim ¶¶ 35–36.  After motions practice, Litigation 2 centers on whether such notice was required.  Compl. ¶ 47; Counterclaim ¶¶ 36–37; *see also Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd.*, No. 22 Civ. 2943 (PAE), 2023 WL 3868585, at *7–12 (S.D.N.Y. June 7, 2023) (granting in part and denying in part motion to dismiss).  Fact discovery in Litigation 2 is due to conclude in March 2024.

### c.   Litigation 3

This litigation ("Litigation 3") arises out of more recent transactions. Under the Lease Agreements, Frontier is obliged "to cooperate in effecting any . . . transfer, novation, assignment, mortgage, grant or other disposition" of the Aircraft that meet specified conditions. Lease Form 1 § 20.2(b); *see also* Lease Form 2 § 22.2. In October 2022, Carlyle and Frontier agreed to "continue to cooperate in good faith" during Litigation 2 "regarding all Lease Administration Activities," including such transfers. Compl. ¶¶ 50–51; *see also id.*, Ex. 2 ("Non-Waiver Agreement") ¶ 4.

As detailed below, in November 2022, Carlyle sought to sell four of the aircraft to new purchasers and to refinance the other 10 aircraft. Compl. ¶¶ 48–54; Counterclaim ¶¶ 38–79. Carlyle alleges that Frontier improperly refused to cooperate and thus scuttled the transactions. Compl. ¶¶ 65–66. In this litigation, Carlyle, Accipiter, Accipiter Holdings, Vermillion, Maverick, Manchester, Wells Fargo (as trustee), and UMB Bank (as trustee) sue Frontier for breach of contract. *See Carlyle Aviation Mgmt. Ltd., et al. v. Frontier Airlines, Inc.*, No. 23 Civ. 4774 (PAE) (S.D.N.Y.). They contend that Frontier's refusal to administer the proposed transactions breached the Lease Agreements and the Non-Waiver Agreement. Compl. ¶¶ 55–83. Litigation 3 centers on whether Frontier was obliged to cooperate.

### 3.   Frontier's Counterclaim

Frontier's counterclaim, the focus of this opinion, arises out of the proposed November 2022 transactions. Frontier alleges that, in November 2022, Carlyle informed Frontier that it planned to sell four of the aircraft to two third parties and refinance the remaining 10 aircraft. Counterclaim ¶ 38. Carlyle sought Frontier's cooperation to affect the transfers. *Id.* ¶ 47. On November 23, 2022, Frontier sent Carlyle a letter seeking additional details about the transfers,

based on its stated concern that the security assignments would hinder its ability to recover in Litigations 1 and 2. *Id.* ¶ 39. Carlyle refused to grant the assurances sought by Frontier—specifically, protective language or a security guarantee. *See id.* ¶¶ 45–52.

As the parties' negotiations continued, on April 27, 2023, Carlyle sent Frontier a letter asserting it had breached the Lease Agreements and the Non-Waiver Agreement. *Id.* ¶ 57. A month later, on May 26, 2023, Carlyle served on Frontier 14 default notices, alleging that Frontier was in default due to its failure to execute the transfer documents prepared by Carlyle. *Id.* ¶¶ 60–61. In the notices, Carlyle threatened to ground, impound, or deregister the Aircraft within 15 days unless Frontier consented to the transfers forthwith. *Id.* ¶ 62. A few days later, on May 31, 2023, the Lessors filed this action in New York State Supreme Court in Manhattan, *id.* ¶ 65, which Frontier timely removed to this Court on June 6, 2023.

On June 8, 2023, as part of Litigation 2, the Court granted emergency relief to Frontier, enjoining the Owner Trustees from grounding, impounding, or deregistering the Aircraft. *Id.* ¶¶ 66–70. Two months later, on August 15, 2023, the parties agreed on a revised guarantee. *Id.* ¶ 71. The Court in turn directed Carlyle to execute the guarantee and Frontier to execute the assignment documents—which the parties did by August 31, 2023. *Id.* ¶¶ 71–73. At that time, Carlyle withdrew the default notices. *See id.* ¶ 73.

### 4. The Provisions at Issue

The parties' dispute—and Frontier's counterclaim—turn on provisions in several contracts. Because the applicable contracts differ among aircraft, it is useful to review which contract applies to which aircraft. As discussed above, 13 of the 14 Aircraft were leased before AMCK and Frontier executed the Framework Agreement; the Court refers to these as the "Pre–Framework Agreement Airplanes." One Aircraft was leased pursuant to the Framework

Agreement before its termination; the Court refers to this airplane as the "Framework Agreement Airplane." The Framework Agreement Airplane, and 12 of the 13 Pre–Framework Agreement Airplanes, use a standardized lease, "Lease Form 1." The one remaining airplane, one of the Pre–Framework Agreement Airplanes, was leased pursuant to a different standardized lease, "Lease Form 2," and a separate contract, the "Participation Agreement."

For simplicity, the applicable agreements can be summarized as follows:

| | |
|---|---|
| Lease Form 1 applies to: | 12 Pre–Framework Agreement Airplanes |
| | The Framework Agreement Airplane |
| Lease Form 2 and the Participation Agreement apply to: | 1 Pre–Framework Agreement Airplane |

       *a.*    *Provisions relevant to Frontier's claims that Carlyle unreasonably demanded that it sign transfer documents*

**Lease Form 1**: As to Frontier's claim that Carlyle unreasonably demanded that it sign transfer documents, Section 20.2 of Lease Form 1 contains the following relevant provisions:

(a)     *Lessor Transfer.* Each of Lessor[4] and Owner Participant[5] (and any subsequent permitted assignee or transferee) shall have the right at any time, at its own expense and upon prior written notice to Lessee,[6] to transfer ownership or beneficial ownership, as applicable, of the Aircraft, or to assign (including to assign as security), mortgage, novate, transfer, grant participations in, or otherwise dispose of its rights and obligations under this Agreement and the other Operative Documents, to any other person by outright transfer or assignment or collateral assignment or by operation of law and Lessee hereby consents to any such transfer or assignment; provided that:

---

[4] The contract defines this party as either UMB Bank (as trustee) or Wells Fargo (as trustee), depending on the particular Lease Agreement.

[5] The contract defines this party as either Accipiter or Vermillion, depending on the particular Lease Agreement.

[6] The contract defines this party as Frontier.

(i)      Lessee shall have no greater financial obligation or liability under this Agreement and the other Lessee Documents as a result of such transfer based on the facts and circumstances existing and applicable laws in effect at the time of such transfer, than it would have had if such transfer had not taken place . . . ;

(ii)     such transfer shall not result in any restriction, based on the facts and circumstances existing and applicable laws in effect at the time of such transfer, on Lessee's rights under this Agreement or the other Lessee's Documents or on Lessee's use or operation of the Aircraft;

(iii)    in the case of a sale of the Aircraft by Lessor or transfer of the beneficial interest of Owner Participant in the Aircraft or a transfer (other than to an Affiliate of the Lessor Guarantor) of a controlling interest in the Owner Participant, any such assignee or transferee shall be a Permitted Transferee and shall unconditionally guaranty the obligations of Lessor under this Agreement pursuant to a Guarantee in form substantially similar to the Guarantee executed by Owner Participant in favor of Lessee unless the existing Lessor Guarantee will remain in full force and effect following such transfer[;]

(iv)    in the case of an assignment as security by Lessor, any such assignee or transferee shall have delivered to Lessee an executed copy of a quiet enjoyment letter substantially in the form of Schedule 11, but in any event on terms not less favorable to Lessee;

(v)     Lessor shall have reimbursed to Lessee (or shall have agreed in writing to promptly reimburse to Lessee following such assignment, transfer or novation) Lessee's reasonable and invoiced out-of-pocket costs and expenses incurred in connection with its cooperation;

. . .

(b)     Lessee shall comply with all reasonable requests of Lessor or Owner Participant, and at the expense of Lessor, to cooperate in effecting any such transfer, novation, assignment, mortgage, grant or other disposition referred to in paragraph (a) above and will execute any and all consents, agreements, amendments or other instruments . . . in form and substance reasonably satisfactory to Lessee . . . .  Lessor shall provide Lessee with such financial and other information relating to a transferee as Lessee may reasonably request.

Lease Form 1 § 20.2.  Section 4.3(a) of Lease Form 1 further provides that "so long as no Event of Default has occurred and continuing, Lessor will not disturb the continuous quiet use, possession and enjoyment of the Aircraft by Lessee during the Term."  *Id.* § 4.3(a).

*Lease Form 2*:  As to Frontier's claim that Carlyle unreasonably demanded it sign transfer documents, this form contains similar provisions.  Section 22.3 of Lease Form 2 provides:

> Lessor may sell, assign, novate or otherwise transfer its right, title and interest in the Aircraft or this Lease without Lessee's consent (a "Transfer"), subject to the following conditions:
>
> (i)    the proposed purchaser, assignee or transferee (the "Transferee") shall enter into an agreement, reasonably satisfactory to Lessee, assuming all obligations of Lessor under this Lease and the other Operative Documents and of Beneficiary under the Participation Agreement and other Operative Documents;
>
> . . .
>
> (v)    any Transfer will not increase Lessee's obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, in each case under any Operative Document or in respect of the Aircraft (to be determined in each case as at the time of such Transfer by applying all applicable laws as are enacted and/or in effect on the effective date of such Transfer) . . . .
>
> . . .
>
> Upon compliance by Lessor, Beneficiary and Transferee with the foregoing terms and conditions, and at Lessor's cost and expense (as provided herein), Lessee shall execute and deliver in connection with such Transfer such documents and assurances (including a consent to the Transfer) and take such further action as Lessor or Beneficiary may reasonably request to establish or protect the rights and remedies created or intended to be created in favor of the Transferee in connection with such Transfer.

Lease Form 2 § 22.3.  In addition, Section 9.1 provides that the Lessor shall not "interfere with the quiet use, possession and enjoyment of the Aircraft by Lessee . . . during the Lease Period."  *Id.* § 9.1.

***The Participation Agreement***:  This separate agreement, which also governs the sole aircraft covered by Lease Form 2, provides in Section 3.1(a) that the Owner Participant may transfer "all or any of its rights" given that:

(1)     the proposed purchaser, assignee or transferee shall confirm in writing, in a form reasonably satisfactory to Lessee, its undertaking to perform the obligations of Owner Participant in a form substantially similar to this Agreement;

(2)     Owner Participant shall be responsible for Lessee's reasonable legal fees and other reasonable costs and expenses incurred in respect of such [Owner Participant] Transfer and shall pay such costs and expenses promptly upon demand therefor;

(3)     the [Owner Participant] Transferee shall (i) not be an airline, aircraft operator, freight forwarder, or an Affiliate thereof and (ii) have (or be guaranteed, through a guarantee agreement reasonably acceptable to Lessee, by a person having) a minimum tangible net worth [in the tens of millions of dollars] as determined by [International Financial Reporting Standards] as of the time of and immediately after giving effect to such [Owner Participant] Transfer;

(4)     the [Owner Participant] Transferee must be a "citizen of the United States" under Section 40102(a)(15) of Title 49 of the U.S.C. or must otherwise permit Lessor to qualify for the continued United States registration of the Aircraft without restriction as to use;

(5)     the [Owner Participant] Transfer will not increase Lessee's obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, in each case under any Operative Document or in respect of the Aircraft (to be determined in each case as at the time of such [Owner Participant] Transfer by applying all applicable laws as are enacted and/or in effect on the effective date of such [Owner Participant] Transfer), it being acknowledged by Lessee that the inclusion of the OP Transferee as an Indemnitee and as an Additional Insured will not constitute an increase in Lessee's obligations, liabilities or risks; and

(6)     the [Owner Participant] Transfer shall not affect the U.S. registration of the Aircraft (assuming the Aircraft is registered in the U.S. at the time of the transfer) or the registration of the Aircraft in any other country where the Aircraft may be registered at the time of such OP Transfer.

Participation Agreement § 3.1(a).  Section 3.1(c) adds: "Upon compliance by Owner Participant and an [Owner Participant] Transferee with the terms and conditions of Section 3.1(a), Lessee shall, at Owner Participant's cost and expense, execute and deliver in connection with such [Owner Participant] Transfer such documents and assurances" to affect the transfer.  *Id.* § 3.1(c).

<em>b.  Provisions relevant to Frontier's claim that Carlyle has refused to reimburse its legal expenses</em>

***Lease Form 1***:  As to Frontier's claim that Carlyle has refused to reimburse its legal expenses, Section 20.2(a)(v) of Lease Form 1 provides:

> Lessor shall have reimbursed to Lessee (or shall have agreed in writing to promptly reimburse to Lessee following such assignment, transfer or novation) Lessee's reasonable and invoiced out-of-pocket costs and expenses incurred in connection with its cooperation with Lessor under this Clause 20.2, including reasonable legal fees.

Lease Form 1 § 20.2(a)(v).

***Lease Form 2***:  Similarly, Section 22.3(ii) of Lease Form 2 provides:

> Lessor shall be responsible for Lessee's reasonable legal fees and other reasonable costs and expenses incurred in respect of such Transfer and shall pay such costs and expenses promptly upon demand therefor.

Lease Form 2 § 22.3(ii).

***The Participation Agreement***:  Section 3.1(2) of the Participation Agreement likewise obliges "the Owner Participant [to] pay[] Frontier's reasonable legal fees and costs incurred in connection with the transfer."  Participation Agreement § 3.1(2).

**B.    Procedural Background**

On July 26, 2023, after the Lessors filed this action and Frontier removed it to this Court, Frontier answered the Lessors' complaint and filed several counterclaims.  Dkt. 18.  On August 16, 2023, the Lessors moved to dismiss the counterclaims.  Dkt. 24.  On August 17, 2023, the Court ordered Frontier either to oppose the Lessors' motion or amend its counterclaims and set a

12

briefing schedule to apply in either case.  Dkt. 27.  On September 6, 2023, Frontier amended its

answer, asserting a single counterclaim for breach of contract.  Dkt. 30.  On September 27, 2023,

the Lessors moved to dismiss the amended counterclaim, Dkt. 31, and filed a memorandum of

law in support, Dkt. 32 ("Pl. Br.").  On October 23, 2023, Frontier opposed the Lessors' motion,

Dkt. 39 ("Def. Br."), and cross-moved to consolidate this action with Litigation 2, Dkt. 38.  On

November 3, 2023, the Lessors filed a reply brief in support of their motion to dismiss and in

opposition to Frontier's motion to consolidate.  Dkt. 41 ("Pl. Reply Br.").

## II.     Discussion

### A.     Carlyle's Motion to Dismiss Frontier's Counterclaim

#### 1.     Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where

"the allegations in a complaint, however true, could not raise a claim of entitlement to relief."

*Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the Court must assume all well-

pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v.

Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  That tenet, however, does not apply to

legal conclusions.  *See Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions"

or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at

555.

### 2.      Discussion

To state a claim for breach of contract under New York law,[7] Frontier must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). To survive a motion to dismiss, Frontier must identify "the specific provisions of the contract upon which liability is predicated." *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 33 (S.D.N.Y. 2017).

As pled, Frontier's counterclaim pursues three distinct theories of breach. First, that the Lessors failed to provide Frontier "reasonable and required assurances" that the proposed transfers would not diminish its "ability to recover on a judgment" in Litigation 1. Counterclaim ¶ 92. Second, that the Lessors have failed to reimburse Frontier for its legal expenses in connection with the proposed transfers. *Id.* ¶ 93. And third, that the Lessors' default notices interfered with its right to quiet enjoyment of the Aircraft. *Id.* ¶ 94. The Court considers each theory in turn.

#### a.      *Frontier's cooperation with the proposed transfers*

Frontier first alleges that the Lessors' refusal to assure Frontier that the transfers would not violate its "rights and interests" violated the Lease Agreements. *Id.* ¶ 92. It alleges that these agreements protect its "ability to recover on a judgment" in Litigation 1. *Id.* The "unreasonable"

---

[7] The parties have exclusively discussed the claim for breach of contract under New York law, consistent with the Lease Agreements' selection of New York law to govern any disputes. *See* Lease Form 1 § 20.14; Lease Form 2 § 25.1; Participation Agreement § 4.1. Where "[t]he parties' briefs assume that New York substantive law governs the issues . . . presented here, . . . such implied consent is, of course, sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001)). The Court "follow[s] their lead" and applies New York law here. *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997).

transfer documents presented by Carlyle, it contends, would have "waived" those rights, and left it in an untenable position.  Def. Br. at 12.  In support, it points to Section 20.2(a) of Lease Form 1, which bars the Lessors from transferring their interest in the Aircraft if the transfer would force Frontier to bear a "greater financial obligation or liability under [the Leases] and the other Lessee Documents."  Lease Form 1 § 20.2(a).  And it notes, Lease Form 2 and the Participation Agreement bar the Lessors from transfers that would "increase [Frontier's] obligations, liabilities (financial or otherwise), or risks or diminish [its] rights and benefits."  Participation Agreement § 3.1.  Frontier argues that the Court's prior opinions in Litigation 2 have effectively resolved these questions in its favor.  Def. Br. at 13.

The Lessors counter that Frontier confuses the issues.  Litigation 2, they note, addressed a different transaction (the sale of AMCK's airplane leasing business to Carlyle) and presented a different legal question (whether the upstream sale of an asset constitutes a "transfer" under the Lease Agreements).  Pl. Reply Br. at 6.  Frontier's counterclaim, in contrast, presents the question whether the Lease Agreements protect Frontier's ability to secure a judgment in an unrelated litigation—Litigation 1, before Judge Stanton.  *Id.*  They argue that the Lease Agreements do not give Frontier any such right.  *Id.*  And even if these agreements did so, they argue, Frontier's counterclaim does not allege facts sufficient to make out such a breach—that is, that *Carlyle*'s proposed transaction would have damaged its ability to recover in Litigation 1.  *Id.* at 7.

For multiple reasons, the Lessors have the better of this argument.

First, at the threshold, the Lease Agreements—save for the one aircraft leased pursuant to the Framework Agreement—do not protect Frontier's "rights with regard to a potential judgment" in Litigation 1, as an analysis of the two pertinent lease agreements shows.

Start with Lease Form 1.  This lease form applies to 13 of the 14 Aircraft: 12 of the 13 Pre–Framework Agreement Airplanes and the one Framework Agreement Airplane.  Lease Form 1 bars transfers that impose a "greater financial obligation or liability *under this Agreement and the other Lessee Documents*."  Lease Form 1 § 20.2(a) (emphasis added).  It defines "Lessee's Documents" as follows:

> "Lessee's Documents" means (a) this Agreement, the Lease Supplement No. 1 and Acceptance Certificate, the CFM RPFH Agreement, the CFM Tripartite Agreement, the Warranty Bill of Sale, the BFE Bill of Sale, the Purchase Agreement Assignment, the Purchase Agreement insofar as it relates to the Aircraft, the Return Acceptance Certificate (when executed), the Assignment of Insurances, the Airframe Warranties Agreement, the Engine Warranties Assignment, any consent or confirmation of any such assignment of warranties in respect of the Aircraft, or any Engines, any acknowledgment and agreement with respect to the Security Documents executed by Lessee and all notices, consents, certificates, confirmations and other documents from time to time issued or entered into by Lessee pursuant to or in connection with any of the foregoing; or (b) any other document or agreement with respect to the Aircraft which Lessee on the one hand and the Servicer or Lessor on the other hand agree in writing shall be a Lessee's Document.

*Id.* § 1.1.  The Framework Agreement is not listed as a "Lessee's Document" in subsection (a). To be a "Lessee's Document," it thus must fall within subsection (b)—that is, it must be an agreement in which the parties have "agree[d] in writing [it] shall be a Lessee's Document."  *Id.* § 1.1.  But the Framework Agreement is a Lessee's Document only in connection with the six aircraft that were to be leased *under that agreement*.  *See* Framework Agreement §§ 1.1, 1.3 (Framework Agreement is a "'Lessee's Document' . . . for all purposes of[] each Lease Agreement," *id.* § 1.3, for "each of the six (6) new Airbus A320-251N aircraft scheduled to be delivered under the Purchase Agreement . . . specified in Schedule 1," *id.* § 1.1).  Only one such airplane was leased before the Framework Agreement was terminated.  The Framework Agreement is thus part of the Lease Agreements for only that one airplane (*i.e.*, the Framework

16

Agreement Airplane).  It is not part of the Lease Agreements for the 12 Pre–Framework Agreement Airplanes that use Lease Form 1.

The same outcome obtains in Lease Form 2, which applies to the final Pre–Framework Agreement Airplane.  Lease Form 2 bars transfers that would "increase [Frontier's] obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, *in each case under any Operative Document or in respect of the Aircraft*" leased under the particular form. Lease Form 2 § 22.3(v) (emphasis added).  But the Framework Agreement does not appear in Lease Form 2's definition of "Operative Documents":

> "Operative Documents" means this Agreement, the Aircraft Purchase Agreement, the Participation Agreement, the Assignments and any consents provided in connection therewith, the Netting Letter, the Bill of Sale, the FAA Bill of Sale, the Acceptance Certificate, the Lease Supplement, the Trust Agreement, the Guarantee, the Participation Agreement, together with any schedules, documents, notices or certificates from time to time executed or issued pursuant thereto and any side letters, supplements, amendments or modifications to any of the foregoing from time to time; . . . .

*Id.*, Schedule 1 § 1.[8]  As such, the Framework Agreement is irrelevant for the one Pre– Framework Agreement Airplane leased under the Lease Form 2.  In sum, the Framework Agreement is not incorporated into 13 of the 14 leases at issue—the 13 that were concluded before AMCK and Frontier entered into the Framework Agreement.

Second, even for the one Framework Agreement Airplane, Frontier has not offered anything beyond conclusory assertions that the proposed transfers would have threatened its ability to recover in Litigation 1.  Its counterclaim merely asserts that the transfers would have "undermin[ed] Frontier's claims in Lawsuits 1 and 2," Counterclaim ¶ 42, and "diminish[ed] and restrict[ed] Frontier's rights and interests in the Aircraft," *id.* ¶ 64.  But it does not offer any

---

[8] The Participation Agreement uses identical language.  Participation Agreement § 3.1(a)(5).

explanation *why* its ability to collect in Litigation 1 is based on *Carlyle's* ownership of the Aircraft.  Carlyle is not even a party in Litigation 1.  Thus, Frontier's argument, offered in Litigation 2, that *AMCK's* transfer of the Aircraft to Carlyle would render *AMCK* judgment proof gains no traction.  In Rule 12(b)(6) terms, the counterclaim's pleadings are threadbare "legal conclusion[s] couched as . . . factual allegation[s]."  *Twombly*, 550 U.S. at 555 (cleaned up). Even Frontier's grievance that Carlyle withheld "relevant information about the transaction parties," Counterclaim ¶ 46, is conclusory.  It is devoid of elaboration as to what details were withheld and why those details would have been relevant to Frontier's ability to exercise its contractual rights.  Frontier's counterclaim thus fails to allege "sufficient factual matter" to enable a court to "draw the reasonable inference" that Carlyle violated the Lease Agreements in issuing the Default Notices.  *Iqbal*, 556 U.S. at 678.

Attempting to avoid this conclusion, Frontier argues the Court has "already rejected [Carlyle's] 'no obligation' argument" twice in the course of Litigation 2—in denying defendants' motion to dismiss and in issuing a preliminary injunction—and "should reject it a third time here."  Def. Br. at 12.  That is wrong.  Neither decision controls this counterclaim.  The central question in Litigation 2—at least when the Court resolved defendants' motion to dismiss—was whether Frontier was entitled to notice before AMCK sold its leasing business to Carlyle in December 2021.  *See Frontier Airlines*, 2023 WL 3868585, at *8–9.  Here, however, Frontier admits that Carlyle provided *some* notice to Frontier before attempting to sell or refinance the Aircraft.  *See, e.g.*, Counterclaim ¶¶ 38–40.  The question here instead is whether Frontier *was entitled to refuse*—a question upon which the Court did not opine in Litigation 2.  The Court's decision on the motion to dismiss in Litigation 2 has little bearing, if any, on the issues presented by Frontier's counterclaim here.

The Court's preliminary injunction decision in Litigation 2 is also inapposite.  To be sure, it at least related to Carlyle's proposed transactions, rather than AMCK's.  But as that decision reflects, the Court's focus was on other elements of the test for injunctive relief—in particular, the likelihood of irreparable harm if Frontier's airplanes were grounded and the balance of the equities as between Frontier and Carlyle.  Dkt. 104 ("July 18, 2023 Tr."), 22 Civ. 2943, at 10–20.  As the Court made clear in granting preliminary relief, the dispositive question was not whether Frontier was likely to succeed on the merits, but whether, given that "the other injunctive factors support[ed] such relief," Frontier "ha[d] identified a sufficiently serious claim" to justify preliminary relief.  July 18, 2023 Tr. at 17 (citing *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010)).  The Court never held, even preliminarily, that the merits favored Frontier.  And even if the Court had done so, today's decision would control.  "A decision on a preliminary injunction is, in effect, only a prediction about the merits of the case." *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 107 (2d Cir. 2012) (quoting *Morris v. Hoffa*, 361 F.3d 177, 189 (3d Cir. 2004)).  "It would . . . be anomalous . . . to regard the [Court's] initial ruling as foreclosing the subsequent, more thorough consideration of the merits that the preliminary injunction expressly envisions." *Goodheart Clothing Co. v. Laura Goodman Enters., Inc.*, 962 F.2d 268, 274 (2d Cir. 1992).

The Court thus finds that Frontier's counterclaim does not plausibly plead that the Lessors violated the Lease Agreements by insisting it cooperate with the proposed transactions.

### b.        *Reimbursement of Frontier's legal fees*

Frontier's second theory of breach is that the Lessors have failed to timely reimburse it for its legal fees "associated with the transactions" proposed by Carlyle.  Counterclaim ¶ 93.  Although approximately $160,000 of Frontier's fees have been reimbursed, Frontier alleges that

more than $130,000 in non-litigation legal fees remain unpaid, despite the fact that Frontier invoiced the Lessors for such fees beginning in March 2023. *Id.* ¶¶ 74–78.

The Lessors concede that the above agreements require them to reimburse Frontier for certain transfer-related expenses, including legal fees. Pl. Br. at 15–16. But, they note, the Lease Agreements do not state "a date certain" by which such expenses must be reimbursed. *Id.* In addition, they assert, they have not "refused to reimburse" such legal fees, but instead have sought further clarification from Frontier bearing on the fees' reasonableness; a request Frontier has ignored. *Id.* On this point, the Lessors, in moving to dismiss, attach an August 2023 email from their counsel to Frontier's requesting a "meeting" to discuss "the remaining" fees. *See* Schwartz Decl., Ex. 5 at 1.

On this theory of contract breach, Frontier has pled sufficient facts to survive a motion to dismiss. The Lessors attempt to put before the Court facts that they contend support their claim, such as the August 2023 email. *See, e.g.*, Pl. Br. at 5–6 (quoting the email and characterizing Frontier's claim that the Lessors "have refused to reimburse" fees and expenses as "a blatant falsehood"). It is possible that such and other evidence will carry the day for the Lessors on summary judgment or at trial. But the Lessors' bid on a motion to dismiss to rely on evidence outside the pleadings before the Court is manifestly improper. At this stage, the Court instead must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555.

With extra-record materials put aside, the counterclaim pleads facts making this claim of contract breach plausible. The operative leases require the Lessors promptly to pay Frontier's "reasonable" legal fees. *See* Lease Form 1 § 20.2(a)(v) (the Lessors must "reimburse[] to Lessee []or . . . agree[] in writing to promptly reimburse to Lessee . . . [its] reasonable and invoiced out-

of-pocket costs and expenses incurred" in connection with any transfer"); Lease Form § 22.3(ii) (the Lessors "shall be responsible for Lessee's reasonable legal fees and other reasonable costs and expenses incurred in respect of such [Owner Participant] Transfer and shall pay such costs and expenses promptly upon demand therefor"); Participation Agreement § 3.1(a)(2) (same). Frontier's counterclaim alleges that it "sent Carlyle a March 9, 2023 fee invoice for $204,353 in 'nonlitigation' fees incurred to date," Counterclaim ¶ 76, and that "Carlyle did not object to this invoice for more than five months but simply failed to pay it," *id.* ¶ 77.  It adds that, although Carlyle later "paid $160,472.60 of the amount owed, . . . approximately $130,000 of the invoice [remains] unpaid."  *Id.* ¶ 78.

That the agreements do not set a "date certain" by which such expenses must be repaid does not make Frontier's claim of breach implausible.  Taken to its logical extreme, the Lessors' theory would allow them to defer payment indefinitely while escaping contract breach liability. The counterclaim plausibly alleges that the six-month delay in repayment violated the contracts' requirement of "prompt" reimbursement of "reasonable" fees.  *Cf., e.g.*, *N.Y. Marine & Gen. Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 485 F. Supp. 3d 398, 407 (S.D.N.Y. 2020) (holding, in connection with insurance policy requiring "prompt notice" of claims, a seven-month delay untimely as a matter of law).  Given the absence of a contractual definition of "prompt," the meaning of this term presents a question that may turn on the development of the factual record, and that may require resolution at summary judgment or by a jury.  *See Abner, Herrman & Brock, Inc. v. Great N. Ins. Co.*, 308 F. Supp. 2d 331, 337 (S.D.N.Y. 2004).  At this stage, Frontier's second theory of breach is plausibly pled.[9]

---

[9] Frontier relatedly claims that Carlyle must pay an additional $500,000 incurred in "litigation fees and costs."  Counterclaim ¶ 79.  Carlyle counters that *litigation* fees are not contemplated by the Lease Agreements.  Pl. Br. at 17–18.  Because the parties' briefing focused on non-litigation

c.      *Frontier's right to quiet enjoyment of the Aircraft*

Frontier's final theory is that Carlyle breached its "right to quiet enjoyment of the Aircraft" under the Lease Agreements and common law.  Counterclaim ¶ 94.  It contends that the "improperly" issued default notices, which threatened to "ground, impound, and/or deregister the Aircraft," "interfered with and disturbed Frontier's rights."  Def. Br. at 14.

The Lessors counter that Frontier's theory fails as a matter of law.  "In actions for damages for breach of the covenant of quiet enjoyment," they argue, "a tenant . . . must show an ouster, or if the eviction is constructive, an abandonment of the premises."  Pl. Br. at 14 (quoting *TDS Leasing, LLC v. Tradito*, 51 N.Y.S.3d 96, 97 (2d Dep't 2017)).  On the pleadings here, however, the Lessors note, "Frontier has not been ousted from its possession of the Aircraft, nor has it abandoned the Aircraft."  *Id.*

In response, Frontier argues that New York law does not require "actual or constructive eviction" and that "issuing wrongful default notice[s] can be a basis for breach of quiet enjoyment."  Def. Br. at 14–15 (citing *Butler Assocs. LLC v. 255 Butler LLC*, 102 N.Y.S.3d 699 (2d Dep't 2019) ["*Butler II*"]).  And even if actual or constructive eviction is required, Frontier argues, its counterclaim has pled actions by the Lessors that "resulted in a 'diminution in [its] enjoyment' of the leased property."  *Id.* at 15 (quoting *A&L Auto Repair, Inc. v. Hudson Petroleum Realty, LLC*, No. 17 Civ. 3529, 2018 WL 10517080, at *8 (E.D.N.Y. Mar. 6, 2018)).

The Lessors have the better of this argument.  It is blackletter law in New York that "[a] covenant for quiet enjoyment 'can be broken only by an eviction, actual or constructive.'"  *In re O'Donnell*, 240 N.Y. 99, 104 (1925) (quoting *Scriver v. Smith*, 100 N.Y. 471, 477 (1885)); *see*

---

fees, the Court does not have occasion to resolve at this juncture whether litigation fees must also be reimbursed.

*also, e.g.*, *Grammer v. Turits*, 706 N.Y.S.2d 453, 455 (2d Dep't 2000) (same).[10]  And when "the eviction is constructive," the lessee may maintain an action for damages only if it can prove that it "abandon[ed] the premises."  *TDS Leasing*, 51 N.Y.S.3d at 97; *see also, e.g.*, *Kofinas v. Fifty-Five Corp.*, No. 20 Civ. 7500 (JSR), 2021 WL 3169155, at *9.  Frontier's counterclaim does not allege anything of the sort.  It does not allege that it ever abandoned the Aircraft.  Its claim to have faced an "imminent threat of having its planes seized or grounded," Def. Br. at 15, does not satisfy this standard.  On the contrary, Frontier acknowledges that its planes remained in the sky at all times.  Counterclaim ¶¶ 66–67.  Because Frontier "admittedly never abandoned" the Aircraft, "no constructive eviction occurred."  *Reade v. Reva Holding Corp.*, 818 N.Y.S.2d 9, 17 (1st Dep't 2006).

   *Butler II*, on which Frontier relies, is not to the contrary.  Despite Frontier's claim, it did not hold that a wrongful default notice alone can serve as a basis for breach of quiet enjoyment. As the Second Department explained in a companion appeal, the defendant had not only "served the plaintiff with written notice[] alleging several defaults," but had also "served the plaintiff with a notice of termination of tenancy."  *255 Butler Assocs., LLC v. 255 Butler, LLC*, 102 N.Y.S.3d 259, 260 (2d Dep't 2019) ["*Butler I*"].  There was thus an open question whether "the

---

[10] Frontier suggests that the Lease Agreements, which required that the Lessors not "*interfere or disturb* Frontier's use, possession, or enjoyment of the Aircraft," Def. Br. at 14 (emphasis in original), might create different obligations than those imposed by New York law's implied covenant of quiet enjoyment.  That argument fails.  Frontier offers no basis to sensibly interpret the agreements' references to Frontier's right to the "continuous quiet use, possession and enjoyment of the Aircraft," *e.g.*, Lease Form 1 § 4.3(a), as referencing anything other than Frontier's common-law right, as a lessee, to the implied covenant of quiet enjoyment.  *See, e.g.*, *Kofinas v. Fifty-Five Corp.*, No. 20 Civ. 7500 (JSR), 2021 WL 3169155, at *9 (S.D.N.Y. July 27, 2021) (interpreting contractual provision guaranteeing the lessee's right to "quietly have, hold and enjoy" the leased property as codifying the covenant of quiet enjoyment under New York law); *Cafe Lughnasa Inc. v. A & R Kalimian LLC*, 111 N.Y.S.3d 268, 270 (1st Dep't 2019) (same); *In re Atl. Computer Sys. Inc.*, 135 B.R. 463, 469 (Bankr. S.D.N.Y. 1992) (same for provision guaranteeing lessee's right to "quiet use and possession" of the leased property).

plaintiff remained in possession of the subject property" at the relevant time. *Butler II*, 102 N.Y.S.3d at 701. The Second Department held that, had he vacated, even temporarily, such a claim might lie. *Id.* (citing *Prakhin v. Fulton Towers Realty Corp.*, 996 N.Y.S.2d 85, 89 (2d Dep't 2014)). Indeed, defeating Frontier's theory, the case on which *Butler II* relies on this point itself holds that, "[t]o demonstrate constructive eviction, . . . a tenant must vacate the premises." *Prakhin*, 996 N.Y.S.2d at 89. Frontier's continued undisturbed possession of the Aircraft thus forecloses its claim for breach by constructive eviction.

In any event, Frontier's counterclaim on this theory fails independent of its failure to plead abandonment. Under New York law, "[a] constructive eviction occurs where the landlord's wrongful acts substantially and materially deprive the tenant of the beneficial use and enjoyment of the leased premises." *Grammer*, 706 N.Y.S.2d at 455–56. The counterclaim, however, does not allege any tangible effects the default notices had on Frontier's "use and enjoyment" of the Aircraft. At most, the counterclaim hazily asserts that the default notices "caus[ed] actual and potential disruption to Frontier's operations," and "requir[ed] substantial amount of time by Frontier managers and employees to deal with the fallout." Counterclaim ¶ 95. Such assertions are hopelessly vague and conclusory. The counterclaim is devoid of factual averments that would allow the Court to determine whether Frontier was, in fact, "unable to use the [Aircraft] for the purpose intended." *Dinicu v. Groff Studios Corp.*, 690 N.Y.S.2d 220, 224 (2d Dep't 1999); *see also Frontier Airlines*, 2023 WL 4364450, at *14 (rejecting, in Litigation 1, Frontier's claim for "constructive eviction" on the basis that AMCK's default notices, even if wrongly issued, in no way "prevented [Frontier] from using or enjoying the [Aircraft]").

The Court accordingly rejects this theory of breach as implausibly pled, leaving alive only the counterclaim's theory of a breach based on a failure to reimburse legal expenses.[11]

### B.  Frontier's Cross-Motion to Consolidate This Case with Litigation 2

#### 1.  Legal Standard

Rule 42(a) provides that, "[i]f actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a).  "The Rule should be prudently employed as a valuable and important tool of judicial administration, invoked to expedite trial and eliminate unnecessary repetition and confusion." *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999) (cleaned up).  Before ordering consolidation, the Court must consider:

> [W]hether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives. When considering consolidation, a court should also note that the risks of prejudice and confusion may be reduced by the use of cautionary instructions to the jury and verdict sheets outlining the claims of each plaintiff.

*Johnson v. Celotex Corp.*, 899 F.2d 1281, 1285 (2d Cir. 1990) (second alteration in original) (quoting *Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1495 (11th Cir. 1985)).

---

[11] The Lessors argue that some of them should be dismissed as non-signatories to the relevant agreements.  Pl. Br. at 15–16.  As Frontier notes, however, all Lessors assert *claims* under the agreements, Compl. ¶¶ 69–83, making implausible their argument that they are immunized from the agreements' attendant *liabilities*, *see* Def. Br. at 15.  Given the sparse briefing on this point, the Court declines to resolve the issue at this juncture.

### 2.     Discussion

In opposing the Lessors' motion to dismiss, Frontier cross-moved to consolidate this case with Litigation 2.  It argues that "[b]oth actions concern the interpretation and meaning of not only the same agreements" but also "the same events that transpired from 2021 through 2023." Def. Br. at 15–16.  The Lessors oppose the motion, arguing that "Frontier's request is simply a continuation of its attempts to confuse the issues between this action and Litigation 2."  Pl. Reply Br. at 11.

The Court holds, decisively, with the Lessors.  As they rightly note, the two cases do not even "concern the same events or transactions." *Id.*  Litigation 2 relates to the sale in December 2021 of AMCK's leasing business to Carlyle.  *See Frontier Airlines,* 2023 WL 3868585, at *8–9. Litigation 3, in contrast, relates to Carlyle's attempted sale and refinancing of the Aircraft from November 2022 onward.  Compl. ¶¶ 48–54; Counterclaim ¶¶ 38–79.  There is no value to consolidating these matters.  And doing so could confuse the issues in the two cases and compound each case's forward progress.  *Cf., e.g., KGK Jewelry LLC v. ESDNetwork*, No. 11 Civ. 9236 (LTS) (RLE), 2014 WL 7333291, at *3 (S.D.N.Y. Dec. 24, 2014) (denying motion to consolidate given "the large[] range of legal and factual issues relevant only" to one case and the risk that consolidation would "muddle the issues before the [C]ourt or trier of fact"); *Smith v. Everson*, No. 06 Civ. 791 (SJF) (AKT), 2007 WL 2294320, at *3 (E.D.N.Y. Aug. 6, 2007) (denying motion to consolidate "in light of the distinct transactions involved in the two cases" and attendant "risk of confusion" that "would occur as a result of consolidation"); *Johnson v. Kerney*, No. 91 Civ. 4028 (CPS), 1993 WL 547466, at *6 (E.D.N.Y. Dec. 22, 1993) (denying motion to consolidate given that the two cases "concern[] different aspects" of an event and present different legal questions relating to that event).

The two cases also present distinct legal issues.  Litigation 3 focuses on whether Frontier was obliged to cooperate under the Lease Agreements with Carlyle's proposed transactions. Compl. ¶¶ 55–83.  As limited after motions practice, Litigation 2 focuses on whether Frontier was entitled to notice before AMCK sold its leasing business to Carlyle.  *See Frontier Airlines,* 2023 WL 3868585, at *16.  Although both cases relate to the Lease Agreements, the legal questions that are implicated are quite distinct.  Putting aside the cases' "superficial similarities," the different liability theories at issue makes it highly unlike that consolidation would advance "convenience or judicial economy."  *Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation*, No. 06 Civ. 1260 (KAM), 2009 WL 3644159, at *3 (E.D.N.Y. Oct. 27, 2009).

Finally, consolidation will not have any practical benefit.  The two cases are assigned to this Court and have been put on the same discovery track, to achieve economies such as in connection with the document review and production and deposition testimony.  *Compare* Dkt. 103, 22 Civ. 2943 (case management plan in Litigation 2), *with* Dkt. 21, 23 Civ. 4774 (case management plan in Litigation 3).  Frontier has not identified any concrete efficiencies that require consolidation.  The risks of consolidation (including confusion and delay of individual cases caused by their needless yoking) far outweigh the benefits, which are elusive, of consolidation.  *Johnson*, 899 F.2d at 1285.  The Court therefore denies Fronter's cross-motion for the same.

## CONCLUSION

For the foregoing reasons, the Court denies the Lessors' motion to dismiss Frontier's counterclaim, while substantially narrowing the scope of that counterclaim, and denies Frontier's

cross-motion to consolidate this case with Litigation 2.  The Clerk of Court is respectfully

directed to terminate all pending motions.

      SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: January 16, 2024
      New York, New York